Slip Op. 18 - 105

# UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |
|---|---|
| PORSCHE MOTORSPORT NORTH AMERICA, INC., : : : | |
| Plaintiff, : : | |
| v. : : | Before: R. Kenton Musgrave, Senior Judge<br>Court No. 16-00182 |
| UNITED STATES, : : | |
| Defendant. : : | |

**OPINION**

[On classification and liquidation of various automotive replacement and repair tools, parts and accessories, plaintiff's motion for summary judgment denied, defendant's cross-motion for summary judgment granted in part and denied in part.]

Dated: August 22, 2018

*Carl D. Cammarata*, Law Offices of George R. Tuttle, A.P.C., of Larkspur, CA, for the plaintiff.

*Stephen A. Josey*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for the defendant. On the brief were *Chad A. Readler*, Acting Assistant Attorney General, and *Amy M. Rubin*, Assistant Director.

**Musgrave, Senior Judge:** Before the court are cross-motions for summary judgment on three separate entries of "automotive replacement and repair tools, parts and accessories" from Canada in 2014. The articles number approximately 10,000 for each entry, upon which the plaintiff, Porsche Motorsport North America, Inc. ("PMNA"), claimed the articles entitled to duty free treatment under subheading 9801.00.85.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which provides for "[p]rofessional books, implements, instruments, and tools of trade,

Court No. 16-00182                                                                                                   Page 2

occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items". The defendant's U.S. Customs and Border Protection ("CBP") ultimately classified the articles under various dutiable tariff provisions of the HTSUS. Briefing of the respective motions does not dispose of the case.

## I. *Background*

In order to enhance the Porsche brand, PMNA states that it desired to provide "emergency" support for race teams during three of the Canadian 2014 Porsche GT3 Cup Challenge races in case of accidents or unexpected breakdowns of Porsche automobiles. *See*, *e.g.*, Pl's Resp. at 7-8; Pl's Br. at Ex. 6 (Declaration of Robert Resetar), ¶¶11-13. That support involved trucking a trailer loaded with various automobile parts and certain tools, nuts and bolts across the northern U.S. border prior to, and back across after, each of three of the GT3 Cup races. Those parts were made available not for sale to the general public but only to racing teams if needed for emergency repairs during races, according to PMNA. Sold parts were not subsequently returned to PMNA.

For each run into Canada, PMNA filed "Certificates of Registration" (CBP Form 4455) with CBP, and on each form it indicated a rough idea of its intent to provide support for each particular GT3 race (*see infra*; *see*, *e.g.*, Pl's Br. at 32), together with manifests listing quantities, descriptions, values, *et cetera* of each of the various automotive and non-automotive parts (*e.g.*, desks, chairs, monitors, radios and radio station, fire suits, *etc.*) in the form of spreadsheets. Each Form 4455 also listed the total respective values and quantities exported.

Upon re-entry into the United States, the same manifests attached on the Form 4455s were also, apparently, attached as declarations of the automotive parts being re-entered into the

Court No. 16-00182                                                                                                           Page 3

United States. *See* KB5-5376882-5 dated 05/22/2014 ("Entry One"), KB5-5378599-3 dated 06/23/2014 ("Entry Two"), and KB5-5381385-2 dated 09/01/2014 ("Entry Three"). It came to light that PMNA had, in fact, sold some of the parts it had exported during each of the three races, and during the course of litigation PMNA provided a letter dated June 2017 to clarify discrepancies between the export-registered and the import-declared entered merchandise.[1] As mentioned, CBP had earlier classified the merchandise under various HTSUS provisions and assessed duties, fees and interest, so PMNA filed two protests to cover the three entries involved, which were ultimately denied, and PMNA paid CBP the assessed and the claimed liquidated duties, fees, and interest in the total amount of $122,605.12, as follows:

- Entry One: $36,930.40, plus interest and fees of $2,592.65, for a total payment of $39,523.05;

- Entry Two: $40,488.92, plus interest and fees of $2,629.78, for a total payment of $43,118.70; and

- Entry Three: $38,675.28, plus interest and fees of $1,288.09, for a total payment of $39,963.37.

---

[1] For Entry One, PMNA stated 146 items had actually been sold during the Porsche GT3 Cup Challenge to race teams and 10,312 inventory items were returned to the United States. *See* List of Sold Items, Def's Ex. 7; June Letter ¶ II.B.2, Def's Ex. 8. PMNA also listed 537 items for Entry One that it claimed had been exported from either the United States or Germany to Canada and then had been either sold in Canada or returned to the U.S. in the truck/trailer. June Letter ¶ II.B.2. For Entry Two, PMNA stated 106 items had been sold to the race teams and 10,374 inventory items were returned to the United States. *See* Def's USCIT Rule 56.3 Statement of Fact ¶ 30; List of Sold Items; June Letter ¶ II.B.2. For Entry Three, PMNA stated 212 items had been sold to the race teams and 10,469 inventory items were returned to the United States. *See* Def's USCIT Rule 56.3 Statement of Fact ¶ 40; List of Sold Items; June Letter ¶ II.B.1&3. PMNA also listed 244 items that it claimed had been exported either from the United States or Germany to Canada and and then had been either sold in Canada or returned to the U.S. in the truck/trailer." *Id.*

Uncontested is PMNA's fulfillment of the prerequisites for initiating this action, *cf.* 28 U.S.C. §2637(a) *with* Comp. & Ans. ¶¶ 3-6, and therefore jurisdiction here is proper pursuant to 28 U.S.C. §1581(a). Seeking refund of the above amount(s), PMNA's complaint disputes (1) the customs duty classification of its automobile parts, accessories, and tools (collectively referred to as "inventory items") which its broker entered into the United States after PMNA had made the items available for sale at certain Porsche GT3 races in Canada[2] as well as (2) the liquidation process, the contention on this second point being that in the absence of proper notice to extend their dates of liquidation, two of the entries should be held deemed liquidated as claimed at entry by operation of law. *See* 19 U.S.C. §1504(a)(1); 19 C.F.R. §159.11. *But see* 19 C.F.R. §159.12.

## II. *Legal Standards*

At this stage, a denial of a protest under section 515 of the Tariff Act of 1930 is considered *de novo*. *See* 28 U.S.C. §2640(a)(1). The duty of the court is "to find the *correct* result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (emphasis in original). Generally speaking, the court employs a two-step process to determine the proper classification of imported merchandise. The first step is to determine the meaning of relevant tariff provisions, a question of law. The second step is to determine whether the "nature" of the merchandise falls within the properly-construed tariff provision, a question of fact. *See, e.g.*, *Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998).

---

[2] *See* Deposition of Plaintiff's USCIT Rule 30(b)(6) Representative, Robert Resetar (Resetar Dep.), Def. Ex. 1, 28:22-29:07.

Court No. 16-00182                                                                                                          Page 5

In that process, the decision of CBP in the classification of merchandise under the HTSUS is presumed correct by statute. 28 U.S.C. § 2639(a)(1). The statutory presumption does not apply to pure questions of law. *Universal Electronics, Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997). Pertinent to such analysis, CBP classification rulings are to be accorded a measure of deference in proportion to their "power to persuade". *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). And if, when all is said and done, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law", summary judgment is appropriate. USCIT R. 56(c).

### III. *Discussion*

The plaintiff requests oral argument. There are several obvious problems with the parties' motions for summary judgment that oral argument would not overcome. That request can therefore be, and it hereby is, denied.

### A. Notices for Extension of Liquidation

PMNA contends two of its entries should be deemed liquidated by operation of law in accordance with 19 U.S.C. §1504, which provides in pertinent part:

> (a) Liquidation
> (1) Entries for Consumption. Unless an entry of merchandise for consumption is extended under subsection (b) of this section or suspended as required by statute or court order, except as provided in section 1675(a)(3) of this title, an entry of merchandise for consumption not liquidated within 1 year from--
> (A) the date of entry of such merchandise, . . . shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by the importer of record. Notwithstanding section 1500(e) of this title, notice of liquidation need not be given of an entry deemed liquidated.

PMNA advances two arguments on deeming two of its entries liquidated. It first avers that CBP failed to timely issue notices of extension of liquidation within the required one year

Court No. 16-00182                                                                                                    Page 6

period. The relevant CBP regulation, 19 C.F.R. §159.11, provides in part:

> (a) Time limit generally. Except as provided in §159.12, an entry not liquidated within 1 year from the date of entry of the merchandise, . . . will be deemed liquidated by operation of law at the rate of duty, value, quantity, and amount of duties asserted by the importer at the time of filing an entry summary for consumption in proper form, with estimated duties attached, or a withdrawal for consumption in proper form, with estimated duties attached. . . .
> (b) Applicability. The provisions of this section and §159.12 will apply to entries of merchandise for consumption or withdrawals of merchandise for consumption made on or after April 1, 1979.

PMNA contends that the question of whether CBP issued timely notices involves a disputed question of fact, which it purports to reserve pending disposition of the instant motion. Specifically, for Entry One, PMNA states that while it did receive a notice of extension, it is dated December 12, 2015, which is not within one year of the May 22, 2014 date of entry for Entry One. For Entry Two, PMNA claims it did not receive a notice of extension at all. The defendant disputes those assertions, claiming CBP did timely and properly issue notices of extension on January 15, 2015, and it cross-moves for summary judgment on this issue, arguing that this issue can be resolved now, because "there is no evidence that supports PMNA's claim on this point." Def's Br. at 19.

PMNA responds that it also provided evidence to support its claim in the form of PMNA's customs manager's deposition testimony to the effect that Porsche and its related companies searched their records and could find no CBP notices of extensions for any of the three subject entries other than the notice for Entry Two. Pl's Resp. at 23 (citation omitted). The defendant replies that it is still entitled to the presumption of regularity on this issue and that PMNA's evidence is insufficient to overcome dismissal of its claim of untimeliness. Def's Br. at 20-23 (reviewing record of deposition testimony on "Extension Suspension History"). The court disagrees, as the date of "12-12-15" on the notice of extension for Entry One shown among the

Court No. 16-00182                                                                                                            Page 7

papers speaks for itself: if it is not clerical error then it is belated notice. In conjunction with PMNA's other arguments and papers on the subject, this presents more than a mere "bald assertion"[3] or "uncorroborated affidavit"[4] of the issue, it amounts to a disputed material fact necessitating trial. *Cf. Frontier Ins. Co. v. United States*, 25 CIT 717, ___, 155 F. Supp. 2d 779, 787-88 (2001); *A.N. Deringer, Inc. v. United States*, 20 CIT 978 (1996) (trial of issue of whether notices of extensions of liquidation were sent and received). While the defendant in order to support its position also characterizes in detail aspects of PMNA's witnesses's deposition testimony on the issue of non-receipt, ultimately these matters involve findings of fact, which are not made on summary judgment.

      PMNA also contends in its motion for summary judgment that CBP failed to advise it, as importer, of the "reason" for the extension of liquidation on the notice of such extension, in accordance with 19 U.S.C. §1504, such that the importer will be advised if the problem involves a question of classification, value, country of origin, admissibility, *et cetera*, as implied by 19 C.F.R.§159.12 ("Extension of time for liquidation"), which provides in part:

> (a) Reasons-- (1) Extension. The port director may extend the 1-year statutory period for liquidation for an additional period not to exceed 1 year if: . . .
> (i) Information needed by CBP. Information needed by CBP for the proper appraisement or classification of the merchandise is not available, or . . .
> (b) Notice of extension. If the port director extends the time for liquidation, as provided in paragraph (a)(1) of this section, he promptly will notify the importer or the consignee and his agent and surety on CBP Form 4333-A, appropriately modified, that the time has been extended and the reasons for doing so.
> (c) Notice of suspension . . ..

---

[3] *T&M Distributors, Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999).

[4] *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1241 (Fed. Cir. 2002) (uncorroborated affidavit accusing government officer of bad-faith threats, drafted six years after alleged coercion, held not clear and convincing to rebut the presumption of regularity).

Court No. 16-00182 Page 8

> (d) Additional extensions-- (1) Information needed by CBP. If an extension has been granted because CBP needs more information and the port director thereafter determines that more time is needed, he may extend the time for liquidation for an additional period not to exceed 1 year provided he issues the notice required by paragraph (b) of this section before termination of the prior extension period.

The defendant also cross-moves for summary judgment on this issue of the "reason" for the notice of extension of liquidation. Def's Br. at 27-30. The notice of extension for Entry One that PMNA received provided, in addition to indicating the entry number: "The period to liquidate this entry has been extended for a period not to exceed one year, pursuant to 19 USC § 1504(b) and 19 CFR § 159.12(a)(1)." *See, e.g.*, Pl's Br. at Ex. 8. PMNA argues the defendant admits, through its deposed witness, "that no reason was given on the notices of extensions other than to cite the law and regulations." Pl's Br. at 22. The current state of the law, however, is that the failure to include a reason for an extension on such notice constitutes harmless error and does not invalidate the extension notice. *Intercargo Insurance Co. v. United States*, 83 F.3d 391, 394-96 (Fed. Cir. 1996). The court assumes it has not been CBP's practice to perpetuate "harmless" errors after the decision in *Intercargo*, because wilful perpetuation of error cannot be regarded as harmless, but on the papers at bar, it is implicit from the statute and regulation referenced on the extension notice to PMNA for Entry One that the reason for the extension was that CBP did not have complete information to make a determination on PMNA's classification claims, which as mentioned in similar circumstances the appellate court deemed merely harmless error. On this issue, the defendant is entitled to summary judgment.

Court No. 16-00182                                                                                                   Page 9

### B. Subheading 9801.00.85.00 and
### the "Nature" of the Imported Merchandise

With respect to the plaintiff's substantive motion for summary judgment, the identification of the merchandise remains imprecise, as the defendant points out.[5] *See, e.g.*, Def's Br. 5-10, citing, *inter alia*, *Group Italglass U.S.A., Inc. v. United States*, 16 CIT 763, 765, 798 F. Supp. 727, 728 (1992). *Cf.* June Letter *with* Entry Summaries. PMNA responded to the defendant's cross-motion by submitting unauthenticated exhibits that it contends identify the merchandise at issue. Pl's Resp. 20-21. There is presently no indication that these exhibits would be admissible at trial,[6] and the defendant further points out they contain information that conflicts with other evidence

---

[5] The defendant also points out that the "hand tools" PMNA exported and reimported into the United States were not individually declared on the entry documents, as PMNA considered them to be part of its truck/trailer, and therefore CBP did not classify the items or assess duties on them. Def's Br. at 4-5 (citations omitted). As a further side note, appropriate here, the defendant complains PMNA failed to provide a separate statement of material facts as to which there are no genuine issues to be tried as required by USCIT Rule 56.3, but instead provided a "concise statement of facts" consisting of both numbered and unnumbered paragraphs within the body of its opening brief, which clearly does not comport with the court's rules. Also, in its response brief PMNA submitted an attachment entitled "Plaintiff's Reply to Defendant's Response to Plaintiff's Statement of Facts" that the defendant points out is not permitted by USCIT Rule 56.3, which requires a party to respond to an opposing party's statement of facts but does not provide for a party to reply to the opposing party's responses or present argument in the required submissions. USCIT Rule 56.3(a),(b). Any "reply" arguments should be included in a reply brief. As such, because PMNA's "reply" to the defendant's response to its "concise statement of facts" is beyond what the court's rules permit, the defendant asks that the document should be stricken, or at least disregarded by the court. The objection is here duly noted and PMNA's reply has been disregarded.

[6] As the defendant argues, the exhibits are not admissible as there are no attached declarations or affidavits from anyone with personal knowledge attesting to the veracity of the information contained therein. Def's Reply at 6, referencing Fed. R. Evid. 802, 901 (hearsay rule and rule discussing the requirements to authenticate evidence). Nor does PMNA explain how the exhibits were prepared beyond the general statement that it is a "schedule . . . that deducts all of the items listed on Defendant's Exhibit 7 from the items listed on the corresponding Customs Entry and/or Certificate of Origin", *id.* at 6-7, referencing Pl's Resp. 22-23, and there is no oath from PMNA confirming that this is a complete and accurate list of the entered merchandise, *id* at 7.

Court No. 16-00182                                                                                              Page 10

submitted for consideration.[7]  The court cannot make an informed determination regarding the propriety of a particular tariff provision without knowing exactly what it is being asked to classify. *See, e.g.*, Def's Reply at 5-7.  The plaintiff's substantive motion for summary judgment is thus premature.

Furthermore, both parties' motions reveal fundamental disagreement over not only the proper delineation of the ambit of subheading 9801.00.85.00, but also over the "nature" of the article(s) claimed for classification in that tariff provision, *i.e.*, the ultimate question of fact.  *See, e.g., Orlando Food Corp., supra*.  Both motions must therefore be denied.  The parties agree that for articles to be classifiable under subheading 9801.00.85.00 they must be (1) professional implements, instruments, or tools of a (2) trade, occupation, or employment (3) returned to the United States after having been exported for use temporarily abroad and (4) imported by or for the account of the person who exported such items.  The defendant's position, in the context of that general latitude, is that the entries consist of a bunch of loose automobile parts being shipped across the border for sale, like a kiosk.  It argues that "the vast majority of inventory items were not 'books, implements, instruments, or tools;' were not used in PMNA's trade, occupation, or employment; and had not been

---

[7] According to the defendant, with respect to Entry No. KB5-5378599-3 PMNA disclosed in its June Letter that 10,374 items were "exported from the United States to Canada . . . but were not sold in Canada and were returned to the United States," even though only 10,322 items were listed on the Certificate of Registration, and of those, PMNA states that 106 of those items were sold while PMNA's inventory trailer was in Canada.  June Letter, Def. Ex. 8; Lists of Sold Inventory Items, Def. Ex. 7. The defendant states that a comparison of these documents reveals that there are at least 10 items listed on Exhibit 2B that were not listed on the June 19, 2014 Certificate of Registration.  Exhibit 2B states that 105 items were sold in Canada, even though PMNA previously provided a list of 106 such items. Lists of Sold Inventory Items, Def. Ex. 7.  Finally, according to Exhibit 2B, PMNA's ending inventory quantity for this entry was 10,227 item, but PMNA has not explained or reconciled this figure with the statement in its June Letter that there were "10,374 items that the customs broker should have used when making entry." June Letter ¶ II.B.

Court No. 16-00182 Page 11

'exported for use temporarily abroad." Def's Br. at 12-13; Def's Reply at 8. Further, it contends that the inventory items were not exported with any expectation that they would actually be "used" to effect a repair and then re-imported. But the validity of that position depends upon what "use" means in the context of the tariff provision and also what PMNA's "trade" or "occupation" encompasses.

PMNA implies the "for use" requirement of subheading 9801.00.85, HTSUS, covers its "temporary inventory" of parts that might be needed during a race. Its intent, PMNA contends, was to bring "all" the repair parts back into the United States except for "those relatively few" parts needed by race teams that would actually need to be sold to them in an emergency. *See* Pl's Br. at 18-19 (citations omitted); *see also* Pl's Resp. 5-6. *Cf.* Pl's Br. at 30 ("whereas although [PMNA] uses the parts as temporary inventory abroad, the Porsche teams use the needed parts abroad"). PMNA thus regards the "tools of the trade" clause as describing "those things that one needs to do one's job", and it offers, broadly speaking, that its "job" does include providing support for its global brand through exactly this kind of "temporary inventory" provision for the Porsche GT3 races. *See* Pl's Br. at 26-27 (providing various common online lexicographic definitions of "implements", "instruments", "tools of the trade", "occupation" and "employment"). *Cf.* Resetar Dep. at 28:22-29:07 (alluding to necessity of supporting the Porsche brand). PMNA argues that the fact that it went through the laborious process of providing Forms 4455 in the first instance, prior to exportation, is *prima facie* evidence of intent to "use" the items abroad (in accordance with PMNA's interpretation of that term) before importing them back into the United States. Pl's Br. at 32.

PMNA supports this tools of the trade "kit" argument with three CBP rulings. The first ruling stands for the proposition that the "plain language" of subheading 9801.00.85 only

requires that the merchandise be (1) exported for temporary use abroad and (2) imported (after being exported) by or for the account of the person who originally exported the merchandise, and that while temporary use is a requirement of that provision, "[t]here is no requirement that the merchandise be used abroad by the person who exported it.". Pl's Br. at 27-28, quoting HQ 562318 (Aug. 27, 2002).

The other two customs duty rulings, N013373 (June 29, 2007) and N013372 (July 3, 2007), both considered the classification of "kits" for expedited repairs of an aircraft or engine. For the first ruling, the airline company that sought the ruling stated that its kits are assembled "on a non-routine basis" but for the second ruling described its kits as "used in the normal course of business." *Cf.* N013373 *with* N013372. "These kits may consist of tools, equipment such as an aircraft engine hoist or sling, spare parts for an aircraft, spare parts for aircraft engines, items such as lubricants and gloves to support the repair and consumable parts such as nuts and bolts." N013373. "When a specific repair is required at an international location, the kit to support the repair is exported, the repair work is performed and the kit is imported back into the United States. The contents of the kits will vary based on the required type of repair." *Id*.

For these "non-routine maintenance toolkit[s]", CBP advised that 9801.00.85, HTSUS, is the applicable classification. Likewise, for "airline maintenance toolkit[s]" consisting of "tools, equipment, spare parts for an aircraft, spare parts for an aircraft engine and spare parts for support equipment and/or consumable spare parts", to wit, "KIT9476 a fan blade change kit and KIT9289 a wheel change equipment kit" that are "used in the normal course of business", CBP advised that 9801.00.85, HTSUS, is the applicable classification. N013372. Given the foregoing,

therefore, PMNA argues that the only difference between the items at issue in these New York rulings and the items at issue here are that its articles are car "repair items":

> The facts stated in [N013373] are that when a specific repair is required at an international location, the kit to support the repair is exported; the repair work is performed; the parts needed for the repair are utilized; and the remaining parts in the kit that were not needed for the repairs are imported back into the U.S. The contents of the kit vary based on the required type of repair. CBP ruled that the kit containing the unneeded items was properly classifiable under subheading 9801.00.85.00, HTSUS, when imported back into the United States.

Pl's Br. at 29.

Regarding CBP Ruling N013372, PMNA emphasizes "CBP ruled that even though some of the spare parts and consumable parts were removed from the kit and used to repair the airplane or its engine, the remaining items were determined to be classifiable under subheading 9801.00.8500, HTSUS, when they were imported back into the U.S." *Id*. at 31. PMNA thus contends that its entire trailer "kit" vis-a-vis the Porsche GT3 races is similar to the American Airlines kits that CBP ruled classifiable under subheading 9801.00.85, and that while those airplanes are designed to fly properly, as with any mechanical device sometimes repairs are necessary:

> [T]he race cars Porsche produces are designed to race properly but sometimes repairs are necessary. Porsche makes its Porsche repair parts available to its racing teams for only emergency repairs needed during a race, such as to replace a part damaged during a collision. To make them available, Porsche exported the subject Porsche repair parts in its Porsche truck/trailer for use temporarily in Canada, as inventory for availability for those emergency repairs. Porsche intended to return all the Porsche repair parts back to the United States except for those few that might be urgently needed by the teams.

Pl's Br. at 33.

The defendant dismisses the two New York rulings as "sparse on detail". It agrees they cover toolkits that were exported to perform a "specific repair" while abroad but did not consist

Court No. 16-00182                                                                                        Page 14

of items to be offered for sale while abroad.  It stresses the fact that several items were, in fact, sold from PMNA's trailer, and also the fact that PMNA's customers may have used purchased inventory items to perform specific tasks is immaterial, as those items were not reimported and are not at issue:

> PMNA's trailer was akin to a mobile store, not a repair kit. The kits at issue in the cited rulings were not available for sale. Rather, they were used to complete a specific task (repairing the airplane), and then returned to the United States. *PMNA's merchandise was not exported for the purpose of completing a task*; it was exported to be offered for sale.

Def's Br. at 17 (italics added).  And therein lies the rub, which is a material fact in dispute.

The tariff provision at issue appears to provide no indication of "specificity" apart from the implicit "use" of the "tools" of a "professional."  Even if the tariff provision were limited to a "specific" repair, as the parties theorize, the arguments thus far do not foreclose consideration of whether automobile parts that are made available only to the racing teams of a professional automobile race to address the advent of specific part need(s) that arise during such race constitutes a "specific" repair need.

PMNA also adds that the tariff provision does not "preclude" sales of some of the exported items, Pl's Br. at 33, but for that matter subheading 9801.00.85.00 would not necessarily so preclude.  The ambit of that subheading depends upon what the "temporary use" of "tools of the trade" encompasses for purposes of tariff classification.

On that point, the defendant also contends (or agrees) that PMNA's lexicographic definitions of instruments, implements, *etc.,* refer to items used to complete or effect some task, Def's Br. 11-12,[8] and the defendant insists that

---

[8] *See also Ayers v. United States*, 48 Cust. Ct. 336 (1962), quoting *Webster's* (*see infra*)
(continued...)

Court No. 16-00182                                                                                                    Page 15

> PMNA's statements that it was in the business of "supporting" race teams, by making an "emergency repair kit or inventory" "available" tiptoes around the reality of the situation. PMNA "supported" the race teams by making "emergency" inventory items *available for purchase*.

*Id*. at 11 (italics in original). *See also*, *e.g.*, *id*. at 10 ("PMNA disputes our characterization of its occupation or employment as that of a sales company that makes spare parts available for purchase to race teams during race events") (citation omitted). But, as PMNA argues, there is nothing plain or inherent in the argued tariff provision that circumscribes, let alone addresses, any "consideration" (*i.e.*, sale) for any "use", howsoever "temporary", of the "tools of the trade".

"Temporary use" might or might not encompass "that use which is pertinent to the race event itself", regardless of whether any sold part stays with the race team after the race. Indeed, in N013372 and N013373, the "remainder" of the kit(s) reimported into the U.S. were apparently allowed duty-free entry despite the apparent fact that the parts that were actually replaced were not reimported along with the rest of the kit.[9] These rulings do not appear to be unreasonable

---

[8] (...continued)
definitions of the term "implement," to wit:
> 1. That which fulfills or supplies a want or use; esp., an instrument, tool, or utensil used by man to accomplish a given work; as the implements of trade, of husbandry, or of war.
> 2. A constituent part; an element Obs. & R.
> 3. Scots Law. Fulfillment, performance.
> Syn. implement, tool, utensil, instrument agree in suggesting relatively simple construction and personal manipulation. Implement and tool are often interchangeable. But implement is the broader term, frequently implying that by which any operation is carried on: tool commonly suggests the implements of a craftsman or laborer[.]

48 Cust. Ct. at 338 (bracketing added).

[9] For that matter, if the *damaged* part that was replaced by a particular kit was then reimported along with the rest of the kit (*e.g.*, for refurbishment), the rulings give no indication of
(continued...)

Court No. 16-00182                                                                                                Page 16

interpretations of subheading 9801.00.85.00, HTSUS. The question of moment, thus, appears to be whether "temporary *use*" encompasses "temporary *availability*," of automobile parts in furtherance of the Porsche brand, to professional race teams in case of "emergency," whatever that is supposed to mean in this context.

        Deployed as nominative in subheading 9801.00.85.00, HTSUS, *Webster's* defines "use" broadly as follows (italics in original):

> 1. Act of employing anything, or state of being employed; application; employment; as, the *use* of pen; his machines are in *use*.
>     Books can never teach the *use* of books . . . *Bacon*
>
> 2. The fact of being used or employed habitually; useage; as, the wear and tear resulting from ordinary *use*.
>
> 3. a. Continued or repeated exercise or employment; as, a habit is strengthened by *use*. b. A practice, habit, or custom; esp., a custom prevailing from a certain group, district, country, etc.; as, it was not the *use* of farmers to make friends quickly
>     How weary, stale, flat, and unprofitable,
>     Seem to me the *uses* of this world! . . . *Shak*.
>
> 4. Occasion or need to employ; necessity; -- often with for; as, no further *use* for a book. "I have *use* for it" Shak.
>
> 5. Method or way of using; as, he knew the *use* of various herbs in the neighborhood for concocting remedies.
>
> 6. Quality of being suitable for employment; capability of being used or of service to promoting an end; usefulness; utility; advantage; as, there is no small *use* in anger; also, the end served; the purpose or object; as, he put his knowledge to good *use*.
>     'T is use alone that sanctifies expense . . . *Pope*.
>
> 7. Function; particular service; As, everything in nature seems to have its *use*.
>
> 8. Common occurrence; ordinary experience. *Rare*.

---

[9] (...continued)
any apparent test of the country of origin of the damaged part.

Court No. 16-00182                                                                                   Page 17

> O Caesar! these things are beyond all *use*.
>
> * * *
>
> Syn. -- Use, Usefulness, Utility.  Use, as here compared (see Habit), is very general in sense, and occurs chiefly in certain familiar phrases; as, to be of *use*; there's no *use* in that; what's the *use*? Usefulness is employed chiefly of things in the concrete; Utility is more general and abstract; as the *usefulness* of a tool, the *utility* of an invention.  But the two words are often interchangeable.

*Webster's New International Dictionary* 2806 (Unabridged, 2d ed. 1956).

The *Oxford English Dictionary* definitions of the nominative of "use" are similar.

Among those are the following (italics in original; examples omitted).

> I. Act of using, or fact of being used.
> 1. a. The act of employing a thing for any (esp. a profitable) purpose; the fact, state, or condition of being so employed; utilization or employment for or with some aim or purpose, application or conversion to some (esp. good or useful) end.
> 2. a. In various prepositional phrases (with *in*, *to, out of*, *for*, *of*).
>   b. *in the use of*, making use of.  *Obs*.
> 3. In special senses: a. The act of using or fact of being used as food, etc.; consumption. . . .
> 4. *Law*.  a. The act or fact of using, holding, possessing land or other property so as to derive revnue, profit, or other benefit from such.
> . . .
> II. Habit of using.
> 7. a. With *the*.  The habitual, usual, or common practice; continual, repeated, or accustomed employment or exercise; habit, custom. (Cf. 9.)
> 8. A custom, habit, or practice.'
> 9. a. Without article.  Accustomed practice or procedure; habit, usage, custom, wont. (Cf. 7.) Also (*b*) coupled with synonymous term, esp. *wont*.
>   . . .
>   d. Ordinary or usual experience.  *Obs*. . . .
> 10. Const. *of*.  a. Opportunity, occasion, habit, or practice of using. Chiefly *to have the use of*.
>   b. The power of using some faculty, etc.; ability to use or employ.
> . . .
> IV. Purpose served by the thing used.
> 16. a. A purpose, object, or end, esp. of a useful or advantageous nature.
>   . . .
>   c. The provision, supplying, or maintenance of something.  *Obs. rare.*
> 17. The fact or quality of serving the needs or ends of a person or persons.
>   . . .

> 20.  a.  The character, property, or quality which makes a thing useful or suitable for some purpose; capability for securing some end; usefulness, utility; advantage, benefit.
>     b.  In the phr. *to* or *of* (*no*, *little*, etc.) *use*.
>         . . .
>  21.  a.  Need or occasion for using or employing; necessity, demand, exigency.  Freq. *to have use for* (or *of*).

XIX *The Oxford English Dictionary* 350-52 (2d ed. 1989).

These latter definitions are noteworthy. In accordance with the foregoing, in arguing that its trailer is a "kit" of replacement parts that it makes "available" for the GT3 races in cases of "emergency" in order to support its global brand, PMNA raises a claim of "use" that would at least appear theoretically to be encompassed by certain of the above definitions, and therefore, *prima facie*, encompassed by subheading 9801.00.85.00, HTSUS. Nonetheless, PMNA's contention also requires findings of fact that remain in dispute. That is, for the sake of arguing whether the "nature" of the imported articles does or does not meet the conditions of subheading 9801.00.85.00, the parties make assumptions as to that ultimate fact, in order to accord with their respective constructions of the terms giving rise to those conditions. But the "nature" of the imported article(s) actually remains in dispute, as whether the articles at bar are or are not "tools of the trade" returned to the United States after having been exported for "temporary use" abroad cannot be "found" on summary judgment.

In passing, the court notes an anomaly that the papers do not address. Both parties argue for all-or-nothing: either duty-free under subheading 9801.00.85.00, or dutiability under other tariff provisions covering the subject automobile parts. PMNA's three trips into Canada occurred over a relatively short span of time, between May 22, 2014 and September 1, 2014. While it is clear that the composition of the parts contained on PMNA's trailer varied somewhat, the extent of that

variation is unclear, in particular what parts remained with the trailer throughout, *i.e.*, in-between those trips. And *cf*. 19 U.S.C. §1313(j)(2) & 19 C.F.R. §191.32 (substitution drawback). If PMNA, after the parties sort out the foregoing, is unable to persuade through trial or otherwise that it is ultimately entitled to judgment in its favor on its classification claim and that the defendant is not entitled to the duties, fees and interest paid on Entry One, that does not, *ipso facto*, necessarily mean that the defendant is also entitled to duties, fees and interest on Entry Two or Entry Three.

"[D]ouble taxation . . . is not a preferred result." *Atlas Copco, Inc. v. United States*, 10 CIT 790, 792-93, 651 F. Supp. 1446, 1448 (1986), citing, *inter alia*, citing, *Tennessee v. Whitworth*, 117 U.S. 129, 137 (1885); *see also Werner & Pfleiderer Corp. v. United States*, 17 CIT 916, 918 (1993). Double taxation may be said to exist when both taxes have been imposed in the same year, for the same purpose, upon property owned by the same person, and by the same taxing authority. *See Czarnikow-Rionda Co. v. United States*, 328 F. Supp. 487, 493 (Cust. Ct. 1971), *aff'd*, 468 F.2d 211 (C.C.P.A. 1972). The court has drawn no conclusions as to whether the entries at bar are or are not to be classified in subheading 9801.00.85.00, but the parties should bear the foregoing in mind as they consider the alternatives and return to negotiations to move the case forward.

*Conclusion*

In consideration of the foregoing, and in furtherance of its case, the plaintiff shall file a status report on behalf of the parties on or before September 28, 2018.

**So ordered**.

/s/ R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: August 22, 2018
New York, New York