UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: Honorable Stephen Alexander Vaden, Judge

|  |  |  |
|---|---|---|
| PORSCHE MOTORSPORTS<br>    NORTH AMERICA, INC.<br><br>                    Plaintiff,<br>    v.<br>UNITED STATES,<br>                    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Court No. 16-00182 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## RULE 56 MOTION FOR SUMMARY JUDGMENT

George R. Tuttle, III.
Law Offices of George R. Tuttle
A Professional Corporation
3950 Civic Center Drive Ste 310
San Rafael, CA 94903
(415) 986-8780
Attorneys for Plaintiff,
    Porsche Motorsports North America, Inc

Dated:  April 26, 2021

## TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................i

TABLE OF AUTHORITIES .................................................................................. ii

STATEMENT OF UNCONTESTED MATERIAL FACTS ..................................5

JURISDICATION AND STANDARD OF REVIEW ........................................10

STATUTORY PROVISIONS..............................................................................12

SUMMARY OF ARGUMENT............................................................................13

ARGUMENT........................................................................................................14

      I.      The Entries at Issue Satisfy All Requirements for Classification Under
             Subheading 9801.00.85 ......................................................................14

             A.   Automobile Racing and Repair is a Trade, Occupation and or
                Employment Within the Meaning of Subheading 9801.00.85 ..................15

             B.   The Imported Articles Constitute "Implements, Instruments, or
                Tools" Within the Meaning of Subheading 9801.00.85 .............................17

             C.   The Automotive Repair Parts and Tools Were Exported with the
                Intention of Being Temporarily Made Available to the Race Teams
                and Returned........................................................................................19

      II.     Clarification of Quantities Exported and Returned for Entry No. KB5-
             5376882-5 ..........................................................................................27

CONCLUSION .....................................................................................................28

## TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ...................................................13

*Bausch & Lomb v. United States*, 148 F.3d 1363 (Fed. Cir. 1998) ...............................12

*BenQ America Corp. v. United States*, 646 F.3d 1371  (Fed. Cir. 2011) ......................12

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999) ..........................12, 17

*Cummins Inc. v. United States*, 454 F.3d 1361 (Fed. Cir. 2006) ....................................13

*Fauss Group, Inc. v. United States*, 581 F.3d 1369 (Fed. Cir. 2009) ............................12

*IKO Indus. Ltd v. United States*, 105 F .3d 624 (Fed. Cir. 1997) ...................................14

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984).................................14

*Len—Ron Mfg. Co. v. United States*, 334 F.3d 1304  (Fed. Cir. 2003) ..........................17

*Link Snacks, Inc. v. United States*, 742 F.3d 962 (Fed Cir. 2014) .................................13

*North Am. Processing Co. v. United States*, 236 F.3d 695 (Fed. Cir. 2001) .................17

*Plexus Corp. v. United States*, 489 F. Supp. 3d 1379  (Ct. Int'l Trade 2020) ..................12, 17, 18

*Porsche Motorsport N. Am., Inc. v. United States*, Ct.  Int'l Trade IT Slip Op 18-105
   (August 22, 2018) ................................................................................................ passim

*Rollerblade, Inc. v. United States*, 112 F.3d 481 (Fed. Cir. 1997) ..........................12, 14

*Sports Graphics, Inc. v. United States*, 24 F.3d 1390 (Fed. Cir. 1994) .........................12

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .......................................................13

*Universal Elecs. Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997).........................14

*Warner-Lambert Co. v. United States*, 407 F.3d 1207 (Fed. Cir. 2005) .......................14

**Statutes**

28 U.S.C. § 1581(a) .......................................................................................................10

28 U.S.C. § 2639(a)(1) ..................................................................................................11

28 U.S.C. § 2640(a)(1) ..................................................................................................10

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

Harmonized Tariff Schedules of the United States

U.S. Note of Chapter 98 ................................................................................... 12, 13, 14

Subheading 9801.00.85 ..................................................................................... passim

**Rules**

USCIT R. 56 ............................................................................................................. 13

**Other Authorities**

CBP Headquarters Ruling HQ 562318 (August 27, 2007) ............................... 22, 24, 25

CBP Headquarters Ruling HQ H013537 (July 2, 2007) .................................... 18, 19, 26

CBP New York Ruling N013372 (July 3, 2007) ................................................... 24, 25

CBP New York Ruling N013373 (June 29, 2007) ..................................... 22, 23, 24, 25

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: Honorable Stephen Alexander Vaden, Judge

|  |  |  |
|---|---|---|
| PORSCHE MOTORSPORTS<br>  NORTH AMERICA, INC.<br><br>           Plaintiff,<br><br>  v.<br>UNITED STATES,<br><br>           Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Court No. 16-00182 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## RULE 56 MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 56(a) and 81 of the Rules of the U.S. Court of International Trade

("USCIT R."), Plaintiff, Porsche Motorsports North America, Inc. (hereinafter "PMNA"), by its

undersigned attorneys, respectfully moves this Court for Summary Judgment on Count 1 of its

Amended Complaint (the classification issue).

## INTRODUCTION

This case challenges the tariff classification by U.S. Customs and Border Protection

("Customs" or "CBP") of three entries[1] of automobile repair tools and parts[2] that were re-

imported by plaintiff (Porsche Motorsport North America ("PMNA")), following their temporary

exportation from the United States to Canada. At the time of export, the items were exported in a

specially equipped trailer and reported on an export manifest attached to CBP Form 4455,

---

[1] KB5-5376882-5 dated 05/22/2014 ("Exhibit One"); KB5-5378599-3 dated 06/23/2014 ("Exhibit Two");
and KB5-5381385-2 dated 09/01/2014 ("Exhibit Three").

[2] For each Porsche GTE Cup Challenge race event, PMNA provides a support tractor/trailer (hereinafter
"trailer") stocked with tools for the repair of the race cars (such as Hydraulic Press and vise, wrench
socket lug nuts, center lock wrench sockets and wrench socket central bolts) and parts for the repair of
race cars during the event, as needed.  B. Blocker Supplemental Declaration Exhibit 5 ¶ 21; Deposition of
Robert Resetar, page 44-46 and Defendant's Exhibit 15 thereto, Exhibit 7.

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

Certificate of Registration, which was submitted to CBP. While in Canada, the trailer's

inventory of automotive repair parts and tools were made available only to Porsche racing teams

competing at the track. Compared to the quantity of automotive repair parts exported, a very

small quantity of automotive repair parts was withdrawn from inventory by the competitive

racing teams during the race. The automotive repair parts acquired from PMNA's trailer were

not returned but were ultimately purchased and then paid for by the racing teams at a time later

after the race. At the conclusion of each race, the trailer would return to the United States with

the bulk of the originally exported inventory of automotive repair parts intact. Upon return of the

trailer with the automotive repair parts to the United States, PMNA claimed at entry that the

returning automotive repair parts were classified under subheading 9801.00.85, HTSUS, as

"implements, instruments, and tools of trade, occupation, or employment, returning to the United

States, after having been exported for use temporarily abroad." CBP later rejected the

classification of the items under 9801.00.85, HTSUS, and liquidated the items under their

respective tariff classifications, and assessed duties.

PMNA filed two timely protests (Protest Numbers 0901-15-100113 and 0712-16-

100073) and an Application for Further Review against the actions of CBP at liquidation of the

three entries. Following a decision by CBP HQ in Application for Further Review (HQ

H271066, dated May 6, 2021), both protests were denied by CBP and this action commenced.

## HISTORY OF THE ACTION

Following the timely filing of a summons and complaint, the parties engaged in

discovery, including the deposition and declarations of Mr. Robert Resetar, import manager for

PMNA and the deposition of Mr. Christopher G. Kinner, Senior Import Specialist for Customs

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

and Border Protection. In addition, there were declarations provided by Jens Walther, President

and Chief Executive Officer of PMNA, and Brian Blocker, Manager, Finance and Business

Development for PMNA. The parties engaged in an exchange of admissions and interrogatories.

Following discovery, the parties filed CIT Rule 56 Cross-motions for Summary Judgment,

asserting that there was no genuine dispute as to any material fact and each party asserted that

they were entitled to judgment as a matter of law.

Plaintiff's Amended Complaint raises two issues:

A. Whether automobile automotive repair parts and accessories, and certain
   hand tools covered by the entries at issue are classifiable under subheading
   9801.00.85, HTSUS.

B. Whether Entries KB5-5376882-5 and KB5-5378599-3 should have been
   liquidated by operation of law in accordance with 19 U.S.C. §1504, or
   whether CBP's notices of extension of liquidation validly extended the
   period of liquidation for those two entries.

Following submission of Rule 56 Cross-motions for Summary Judgment, plaintiff

requested Oral Argument.  In CIT Slip Op 18-105, dated August 22, 2018, this request was

denied.  Further, in Slip Op 18-105, PMNA's motion for summary judgment was denied and the

Government's cross-motion for summary judgment granted in part and denied in part.  Therein,

Judge Musgrave explained that "[t]here are several obvious problems with the parties' [*6]

motions for summary judgment that oral argument would not overcome." *Porsche Motorsport N.*

*Am., Inc. v. United States*, __ CIT __, Slip Op. 18-105 (August 22, 2018), 5-6. With regard to

PMNA's classification claim, Judge Musgrave noted that there existed disputed material facts:

> PMNA's contention also requires findings of fact that remain in
> dispute. That is, for the sake of arguing whether the "nature" of the
> imported articles does or does not meet the conditions of
> subheading 9801.00.85.00, the parties make assumptions as to that
> ultimate fact, in order to accord with their respective constructions

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

> of the terms giving rise to those conditions. But the "nature" of the
> imported article(s) actually remains in dispute, as whether the
> articles at bar are or are not "tools of the trade" returned to the
> United States after having been exported for "temporary use"
> abroad cannot be "found" on summary judgment.

*PMNA v. U.S., Supra,* at 18.

PMNA's second claim asserts that the notices of extension of liquidation for Entry Nos.

KB5-5376882-5 and KB5-5378599-3, were untimely and that the entries liquidated by operation

of law, as entered. PMNA advanced two arguments on deeming two of its entries liquidated. It

first averred that CBP failed to timely issue notices of extension of liquidation within the

required one-year period. With regard to this issue Judge Musgrave explained:

> [a]s the date of "12-12-15" on the notice of extension for Entry
> One shown among the papers speaks for itself: if it is not clerical
> error then it is belated notice. In conjunction with PMNA's other
> arguments and papers on the subject, this presents more than a
> mere "bald assertion" or "uncorroborated affidavit" of the issue, it
> amounts to a disputed material fact necessitating trial. Cf. Frontier
> Ins. Co. v. United States, 25 CIT 717, 725-27, 155 F. Supp. 2d
> 779, 787-88, SLIP OP. 2001-79 (2001); A.N. Deringer, Inc. v.
> United States, 20 CIT 978, SLIP OP. 96-131 (1996) (trial of issue
> of whether notices of [*9] extensions of liquidation were sent and
> received). While the defendant in order to support its position also
> characterizes in detail aspects of PMNA's witnesses' deposition
> testimony on the issue of nonreceipt, ultimately these matters
> involve findings of fact, which are not made on summary
> judgment.

*Id.* at 8-9.

Following the decision in Slip Op 18-105, the parties engaged in preparing a joint

statement of uncontested material facts pertaining to the classification issue in this action, which

was filed with the Court on November 4, 2020 (ECF 73) and appended hereto. The parties have

subsequently prepared an Amended Joint Statement of Uncontested Materials Facts, which has

been filed (ECF 81).

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

In addition, in accordance with USCIT R. 56.3 PMNA annexes its own separate short and concise **Statement of Additional Uncontested Material Facts** ("SAUMF") pertaining to the Classification Issue. ECF 80.

## QUESTION PRESENTED

A.      Whether the automotive repair parts in the trailers that were not used by the Porsche racing teams in Canada but imported back into the United States by PMNA are eligible for entry under subheading 9801.00.85 Harmonized Tariff Schedules of the United States upon re-importation into the United States?

## STATEMENT OF UNCONTESTED MATERIAL FACTS

PMNA is a subsidiary of Porsche AG (Germany), and a sister company to Porsche Cars North America (PCNA), which sells street legal vehicles and parts for their repair and maintenance. **Amended Joint Statement of Uncontested Material Facts** ("AJSUMF"), ¶¶ 5, 6. and 7 (ECF 81).

The principal business of PMNA is to sell Porsche racing cars and parts for their repair and maintenance, for the purpose of automobile racing, and promote the Porsche brand. AJSUMF, ¶ 7. PMNA provides sponsorship to racing events that feature Porsche race cars. AJSUMF, ¶¶ 8, 13.  In addition to sponsoring racing events that feature Porsche race cars, PMNA provides track side support using specially equipped trailers with repair tools that can be used to repair cars during the race.  AJSUMF, ¶ 17. The trailers also contain an inventory of automotive repair parts that may be acquired by Porsche race teams during the race to repair vehicles during a race that are damaged or defective when the team does not have the necessary replacement part available. AJSUMF, ¶¶ 17, 18. If PMNA did not provide this support service,

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

the race teams would be unable to compete, and would make the purchase of Porsche race

vehicles significantly less attractive. AJSUMF, ¶¶ 11, 20. At no time before, during or after the

event, does PMNA offer the automotive repair parts that are in the trailers for sale to the general

public, or to Porsche race teams as a means of restocking their inventory. AJSUMF, ¶¶ 15, 23.

Automobile racing is a sport and a business. SAUMF, ¶ 8. The team or crew of people

that prepare, maintain and repair the vehicle have many years of experience and training to

acquire the skills and knowledge necessary to maintain a race car in its proper condition, ready to

race, and maintain that vehicle in racing condition during the race. SAUMF, ¶ 12. The people

that work to prepare, maintain, and repair the race vehicle apply their experience, training, skill,

and knowledge to keep the vehicles on the track competing.  They are often employed by the

team owner of the vehicle(s) to do so, SAUMF, ¶ 13, and consider the work and service they

provide to the team and the car to be their full or part time vocation, occupation, or career.

SAUMF, ¶ 14.

The articles that are the subject of this litigation were exported in specially equipped

trailers that were stationed trackside to service the independent Porsche car racing teams at three

Porsche GTE Cup Challenge racing events in Canada. The races in question were the:

1.   2014 Porsche GT3 Cup Challenge Race at Canadian Tire Motorsport Park in
     Bowmanville/Ontario (Entry KB5-5376882-5 dated 05/30/2014 (Exhibit One))

2.   2014 Porsche GT3 Cup at CALABOGIE MOTORSPORTS PARK in CALABOGIE/
     Ontario (Entry KB5-5378599-3 dated 06/23/2014 (Exhibit Two)).

3.   2014 Porsche GT3 Cup Challenge Canada, in Bowmanville, Ontario (Entry KB5-
     5381385-2 dated 09/01/2014 (Exhibit Three)).

Prior to the export from the United States, PMNA registered the export of the trailers

containing the tools and the automotive repair parts stocked in the trailer by filing CBP Form

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

4455 with CBP, Certificate of Registration, which included an export manifest.  The export

manifest included a list the vehicle repair parts that were inventoried in the trailers. AJSUMF, ¶¶

19, 35, 36, 49, 50, 62, 63.

　　　　To acquire a tool or part, a representative from a Porsche race team would visit PMNA's

trailer and request the part from PMNA's parts manager, or similarly designated PMNA

employee.  If the part was available on the truck, the parts manager would provide the part to the

Porsche race team representative. AJSUMF, ¶ 26. PMNA's employees account for the parts used

by the Porsche race teams by maintaining an order sheet for each team.  AJSUMF, ¶ 27. The

order sheet identifies the Porsche race team that acquired the part(s) from the inventory in the

trailer, as well as, the part number (SKU) and quantity.  AJSUMF, ¶ 27. When the support trailer

returns to the U.S. after the race, a record of the transactions is made in the accounting system of

PMNA from each order sheet, and PMNA office in Carson CA invoices the Porsche race team

for the race car parts provided to them at the race. AJSUMF, ¶ 29.

　　　　At the conclusion of each race, the support trailer is returned to the United States with its

tools and the inventory of repair parts that were not acquired during the race by the independent

Porsche racing teams, along with some additional parts received while in Canada.

　　　　At entry, PMNA's broker classified the returning tools and automotive repair parts under

subheading 9801.00.85, HTSUS, duty-free, as implements, instruments, and tools of trade,

occupation, or employment, when returned to the United States after having been exported for

use temporarily abroad, but did not make any adjustments to the quantities returning.  (Entry

Papers in Court File., Exhibits 1, 2, and 3.)

　　　　For the first race (Entry KB5-5376882-5, Exhibit 1), the inventory report at the time of

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

export for trailer 4HH42354 identified 1,562 unique SKU items in inventory, a quantity parts

count of 9,921, and a total value of $1,442,775. AJSUMF, ¶ 37. For the second race (Entry KB5-

5378599-3, Exhibit 2), the inventory report at the time of export for trailer 4HH42354 identified

1,576 unique SKU items in inventory, a quantity parts count of 10,322, and a total value of

$1,483,795.32. AJSUMF, ¶ 51.  For the third race (Entry KB5-5381385-2, Exhibit 3), the

inventory report at the time of export for trailer 4HH42354 identified 1,605 unique SKU items in

inventory and a quantity parts count of 10,426 with a total value of $1,518,553.74.  AJSUMF,

¶ 64.  There were also an additional 71 items (with a reported value of $13,140) for Entry KB5-

5376882-5, Exhibit 1, identified on the "Non-inventory items PMNA support truck" list that was

submitted with the Form 4455 and the export manifest of parts. AJSUMF, ¶ 38, Exhibit 19.  For

the second and third entry, although the trailer included the same items identified on the list of

"Non-inventory items PMNA support truck," these items were not listed or included on the

manifest and were not separately declared at the time of re-entry.  AJSUMF, ¶¶ 60, 70.

  As noted, during the course of the three races, a small quantity of automotive repair parts

from the trailers was acquired by the independent race teams for use during the race.  For the

first race (Entry KB5-5376882-5, Exhibit 1), Porsche race car teams withdrew 146 parts

consisting of 69 individual SKU items from the inventory of trailer 4HH42354. AJSUMF, ¶ 40.

For the second race (Entry KB5-5378599-3, Exhibit 2), the Porsche race car teams withdrew 106

parts consisting of 52 individual SKU items from the inventory of trailer 4HH42354, with a sales

price of $31,850.37. AJSUMF, ¶ 52.  For the third race (Entry KB5-5381385-2, Exhibit 3),

Porsche race car teams withdrew 206 parts consisting of 69 individual SKU items with a sales

price of $69,069.93 from the inventory of trailer 4HH42354. AJSUMF, ¶ 65. The racing teams

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

are independent of PMNA. AJSUMF ¶¶ 14, 15.

During the course of the first two races, PMNA imported small quantities of additional

inventory parts into Canada, which were added to the inventory of the trailer.

During the first race (Entry KB5-5376882-5, Exhibit 1), PMNA replenished the

inventory of race trailer 4HH42354 in Canada with 537 parts, consisting of 145 individual SKU

items, with a value of $11,507.09. AJSUMF, ¶ 41.  Of these additional items, 91 unique SKUs,

consisting of 330 individual items were exported to Canada from Germany, and 50 unique

SKUs, consisting of 207 individual items were exported from the United States. AJSUMF, ¶ 42.

The additional automotive repair parts received from Germany while the trailer was in Canada

were properly declared and entered into the United States under a separate customs entry.

AJSUMF, ¶ 45. The additional automotive repair parts received from the United States while the

trailer was in Canada were separately reported to CBP via a Prior Disclosure filed by PMNA.

AJSUMF, ¶ 46.

For the second race (Entry KB5-5378599-3, Exhibit 2), PMNA replenished the inventory

of trailer 4HH42354 in Canada with 148 parts, consisting of 48 individual SKU items, with a

value of $14,853.18.  AJSUMF, ¶ 53.  Of these additional items, 17 unique SKU items

consisting of a total of 65 individual items were exported to Canada from Germany and 14

unique SKU items, consisting of a total of 83 individual items, were exported from the

United States. AJSUMF, ¶ 54. The additional automotive repair parts received from Germany

while the support trailer was in Canada were declared and entered under a separate customs

entry. AJSUMF, ¶ 58. The additional automotive repair parts received from the United States

while the support trailer was in Canada were separately reported to CBP via a Prior Disclosure

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

filed by PMNA. AJSUMF, ¶ 59.  There was no replenishment of the trailer's stock while the

trailer was in Canada for the third race (Entry KB5-5381385-2, Exhibit 3).  AJSUMF, ¶ 66.

At the time of re-entry of the trailers, however, the documents accompanying the entry

did not properly identify or account for the automotive repair parts and quantities in the trailers

that were returning.  Rather, the broker reported the same exported items and quantities that were

originally reported on the export manifests that accompanied the Customs Forms 4455.  The

import documents did not take into account the items that were removed from inventory and

used by Porsche car racing teams for the repair of their cars during the races, nor did the

worksheets accompanying the entry documents include automotive repair parts that had been

added to the inventory of the trailers while in Canada as a result of separate imports into Canada

by PMNA from Germany and the U.S. to augment the stock in the trailer.

U.S. Customs and Border Protection (CBP) rejected PMNA's classification of the articles

in question under subheading 9801.00.85, and, instead, classified the various automotive repair

parts, accessories, and tools according to their respective HTSUS provisions, and assessed duties

thereon.

## JURISDICATION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a), as plaintiff is contesting the

denial of its protests by CBP against the tariff classification of its returning automotive repair

parts and tools in question.

Pursuant to 28 U.S.C. § 2640(a)(1) and as determined by the Court in *Fauss Group, Inc.*

*v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009); *Carl Zeiss, Inc. v. United States*, 195

F.3d 1375, 1379 (Fed. Cir. 1999); and *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483-484

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

(Fed. Cir. 1997), this Court determines the proper tariff classification of goods, *de novo*.

The ultimate question in a classification case is whether the merchandise is properly classified under one or another classification heading, "which is "a question of law. *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1394 (Ct. Int'l Trade 2020), citing *Bausch & Lomb v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Tariff classification is a two-step process that guides the court in determining the proper classification of merchandise. *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994). First, the court must "ascertain[] the proper meaning of specific terms within the tariff provision." *BenQ America Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011). This is a question of law. Second, the court must determine "whether the merchandise at issue comes within the description of such terms as properly construed." *Id.* This is a question of fact. *Id.*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact…." USCIT R. 56. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A party opposing a motion for summary judgment may not rest upon mere allegations or denials but must point to specific and sufficient evidence of the claimed differences to require that the facts be established at trial. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986).

Where there is no material factual dispute, as here, the two-step classification test "collapses entirely into a question of law," *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965–966 (Fed Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006), and CBP's entitlement to the statutory presumption of correctness set out in 28 U.S.C.

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

§ 2639(a)(1) does not apply. See e.g., *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001);

*Universal Elecs. Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997). Since there are no

disputed material issues of fact to be resolved by trial, disposition by summary judgment is

appropriate. The only task for the court is to construe the legal provisions at issue. See, e.g., *IKO*

*Indus. Ltd v. United States*, 105 F .3d 624, 626-27 (Fed. Cir. 1997); *Rollerblade, Inc. v. United*

*States*, 112 F.3d 481, 483 (Fed. Cir. 1997).

The court has an independent legal responsibility to decide the proper scope and meaning

of HTSUS terms. *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

The Court is not limited to considering the classifications advanced by the parties but has an

obligation to determine "whether the government's classification is correct, both independently

and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d

873, 878 (Fed. Cir. 1984).

## STATUTORY PROVISIONS

PMNA asserts that the imported repair tools, parts, and equipment <u>returning</u> in the

specially equipped trailers are properly classified under subheading 9801.00.85, HTSUS, duty

free, which provides for:

> Professional books, implements, instruments, and tools of trade,
> occupation, or employment, when returned to the United States
> after having been exported for use temporarily abroad, if imported
> by or for the account of the person who exported such items.

U.S. Note 1 of HTSUS Chapter 98 states that:

> [t]he provisions of this chapter are not subject to the rule of relative
> specificity in general rule of interpretation 3(a). Any article
> described in any provision in this chapter is classifiable in said
> provision if the conditions and requirements thereof and any

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

regulations are met."

## SUMMARY OF ARGUMENT

It is PMNA's assertion that the items returning in the specially equipped trailers are properly classified under subheading 9801.00.85, HTSUS, as implements, instruments, and tools of trade which having been exported for use temporarily abroad, and returned by or for the account of the person who exported such items, because:

1.     Automobile racing, and the repair and maintenance of racing automobiles is a trade or occupation, and individuals engaged in such activities are employed to do so.

2.     Under common meaning, as well as CBP own rulings, the exported repair parts and tools are necessary for the repair of the race vehicles and restore them to an operating or racing condition, and as such, the returning articles are understood to be "implements, instruments, and tools of the trade."

3.     PMNA's actions of equipping the trailers with the repair parts; exporting the trailers; and, making the trailers and repair parts temporarily available to the racing teams during the race is a "use" with the common meaning of that term.

4.     The items in question were exported by PMNA to Canada temporarily and were imported by PMNA back into the U.S. after the races in Canada, thus, falling squarely within the scope of subheading 9801.00.85, HTSUS.

Additionally, PMNA should not have been assessed duty on those repair parts that were not a part of the inventory of the returning trailers. See AJSUMF Exhibits, 9, 10 and 11.

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

## THE ARGUMENT

**I.  The Entries at Issue Satisfy All Requirements for Classification Under Subheading 9801.00.85**

It is well settled in Customs law that, absent contrary legislative intent, HTSUS terms are construed according to their common and commercial meanings. When interpreting a tariff term, the court may rely on its <u>own understanding of the terms</u> and on secondary sources such as scientific authorities and dictionaries. *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1391 (Ct. Int'l Trade 2020) (citing *Len—Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003). *North Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001) (citing *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

Chapter 98, HTSUS, covers "special classification provisions." U.S. Note 1 to HTSUS Chapter 98 provides:

> [t]he provisions of this chapter are not subject to the rule of relative specificity in general rule of interpretation 3(a). Any article described in any provision in this chapter is classifiable in said provision if the conditions and requirements thereof and any regulations are met."

U.S. Note 1 of HTSUS Chapter 98, HTSUS.

The Court need not resort to any GRIs beyond GRI 1 in this matter. If the imported articles meet the requirements articulated in subheading 9801.00.85, HTSUS, they are classifiable under that provision regardless of whether the articles are also prima facie classifiable under other provisions. U.S. Note 1 of HTSUS Chapter 98.

For items to be classifiable under subheading 9801.00.85, HTSUS, they must meet each of the four criteria:

(1)  consist of professional books, implements, instrument, or tools

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

(2)      of a trade, occupation, or employment

(3)      returned to the United States after having been exported for use temporarily

abroad; and

(4)      imported by or for the account of the person who exported such items.

There is no issue with regard to the fourth criteria. The articles in question were re-

imported by or for the account of PMNA, the person/party that exported them.

The primary questions before the Court with respect to the classification issue are:

1.      Is automobile racing, and/or the repair of race cars a trade, occupation, or

employment?

2.      Are the articles in question "implements, instruments, or tools" of such trade,

occupation, or employment?

3.      Were the articles in question exported for "temporarily use abroad?"

To understand and properly apply the language of subheading 9801.00.85, the court must

begin by construing the terms in question. *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379,

1394 (Ct. Int'l Trade 2020) ("To understand and apply properly the language of Headings 8517

and 8525, the court begins by defining the terms in each heading.").

### A.      Automobile Racing and Repair is a Trade, Occupation and or Employment Within the Meaning of Subheading 9801.00.85

Auto racing and the repair of racing automobiles is a trade, occupation and or

employment. The term "trade" refers to: a "skilled job, typically one requiring manual skills and

special training." Found in https://slideplayer.com/slide/5896136/. [Accessed 23 April 2021]

PMSJ Exhibit 1. Market Business News defines the term "trade" as meaning a job or skill,

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

especially one that involves working with one's hands. Examples include carpentry, plumbing,

and mechanics." Available at https://marketbusinessnews.com/financial-glossary/trade-

definition-meaning/. [Accessed 23 April 2021] PMSJ Exhibit 2

A "trade" involves "6. any occupation pursued as a business or livelihood.  7. some line

of skilled manual or mechanical work; craft: 8. people engaged in a particular line of business:"

Available at https://www.dictionary.com/browse/trade. [Accessed 23 April 2021] PMSJ Exhibit

3.

The term "Occupation" is defined by Dictionary.com as:

> "a person's usual or principal work or business, especially as a
> means of earning a living…any activity in which a person is
> engaged…."

Available at https://www.dictionary.com/browse/occupation . [Accessed 23 April 2021] PMSJ

Exhibit 4.

The term "Employment" is defined by Dictionary.com as:

> an act or instance of employing someone or something.  The state
> of being employed.  An occupation by which a person earns a
> living; work; business.

Available at: https://www.dictionary.com/browse/employment. [Accessed 23 April 2021].  PMSJ

Exhibit 5.

Automobile racing is a sport in which drivers compete against each other on a course

designed for racing or on closed public roads. Available at:

https://www.dictionary.com/browse/auto-racing [Accessed 23 April 2021]. PMSJ Exhibit 6.

Automobile racing is a sport and a business, SAUMF, ¶ 8, and that the team or crew of

people that prepare, maintain and repair the vehicle have many years of experience and training

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

to acquire the skills and knowledge necessary to maintain a race car in its proper condition, ready

to race, and maintain that vehicle in racing condition during the race. SAUMF ¶ 12. The people

that work to prepare, maintain, and repair the race vehicle apply their experience, training, skill,

and knowledge to keep the vehicles on the track competing. They are often employed by the

team owner of the vehicle(s) to do so, SAUMF ¶ 13, and consider the work and service they

provide to the team and the car to be their full or part time vocation, occupation, or career.

SAUMF ¶ 14.

Construing these terms ("trade, occupation, employment") according to their common

and commercial meanings, automobile racing and the repair of racing automobiles is a trade,

occupation, or employment.

> ### B. The Imported Articles Constitute "Implements, Instruments, or Tools" Within the Meaning of Subheading 9801.00.85

The imported articles in issue consist predominantly of automotive repair parts (and some

tools for their installation) required for the repair of race cars to return them to an operating

condition.  AJSUMF, ¶ 20.   PMNA contends that these automotive repair parts are "implements,

instruments, or tools," when used by persons engaged in the trade, occupation or otherwise

employed to repair race cars.

The term "implements" is defined as:

> "Such things as are used or employed for a trade, ... particularly
> applied to tools, utensils, vessels, instruments of labor; as, the
> implements of trade or of husbandry."

*Black's Law Dictionary*, 4th ed. (1968). PMSJ Exhibit 7.  The term "implements" is defined by

the Oxford Dictionaries as:

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

> a tool, utensil, or other piece of equipment that is used for a
> particular purpose, performance of an obligation.

Available at https://en.oxforddictionaries.com/definition/implement. [Accessed 23 April 2021]

PMSJ Exhibit 8.

The term "instruments" is defined in Merriam-Webster Dictionary as:

> "A tool or device used for a particular purpose; especially: a tool or
> device designed to do careful and exact work. …: a device that
> measures something (such as temperature or distance) …"

Available at https://www.merriam-webster.com/dictionary/instrument. [Accessed 23 April 2021]

PMSJ Exhibit 9.  The term "instrument" is defined by Collins English Dictionary as: "a tool or

device that is used to do a particular task." Available at

https://www.collinsdictionary.com/us/dictionary/english/instrument [Accessed 23 April 2021]

PMSJ Exhibit 10.

The Free Dictionary at defines "Tools of the Trade" as: "the things that are needed in

order to do a job." Available at http://idioms.thefreedictionary.com/tools+of+the+trade

[Accessed 23 April 2021] PMSJ Exhibit 11.

Based on the above definitions, the terms "implements," "instruments," and "tools of

trade" may be said to be synonymous with one another.  The definitions of the terms

"implements, instruments, or tools," all emphasize that such articles consist of items that are

used to accomplish or complete some task, which in this case, is to repair race cars and bring

them back to an operating condition. AJSUMF, ¶ 20.  In fact, CBP has concluded aircraft

components are "tools of trade" if the goods are necessary for the work of mechanics. In CBP

Headquarters Ruling HQ H013537 (July 2, 2007), CBP expressed its position that:

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

> Tools of trade generally include those items necessary for the
> exercise of the trade or profession of the subject individuals, in this
> case, mechanics of TAESL. Based upon the information submitted,
> we find that goods such as mechanics' tooling, specialized tooling,
> shop supplies, attaching hardware, reference manuals, and shop
> equipment, which are necessary for the work of the TAESL
> mechanics, qualify for entry under subheading 9801.00.85,
> HTSUS.
>
> Your request also mentions aircraft components. If these goods are
> necessary for the work performed by the TAESL mechanics, they
> qualify for entry under subheading 9801.00.85, HTSUS.
> [Emphasis added.]

CBP Ruling HQ H013537 (July 2, 2007), PMSJ Exhibit 12. Like the aircraft components in CBP

Ruling HQ H013537, the PMNA automotive components for the race vehicles are necessary for

the work performed by the mechanics employed by the independent Porsche racing teams.

Without access to these automotive repair parts, the vehicles could not be brought back to

operation for continued participation in the race. AJSUMF, ¶ 20.

##### C.    The Automotive Repair Parts and Tools Were Exported with the Intention of Being Temporarily Made Available to the Race Teams and Returned

PMNA's inventory of repair parts and tools were exported to be made available to the

independent race car operators for the track side repair of race cars and not for general resale.

AJSUMF, ¶¶ 15, 20, 23.

The business of PMNA is to sell Porsche racing cars, parts for their repair and

maintenance, and promote the Porsche brand.  AJSUMF, ¶ 7. To further this business goal

PMNA provides sponsorship to racing events that feature Porsche race cars, including the

Porsche GT3 Cup Challenge Race series that takes place in the United States and Canada.

AJSUMF, ¶ 8. The Porsche GT3 Cup Challenge Race series is a single-make vehicle race series

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

for semi-professional and aspiring professional drivers that showcase the world's most produced

and iconic race car, the Porsche 911 GT3.  AJSUMF, ¶ 9.  The average selling price at retail for a

Porsche 911 GT3 is $ 225,000, and a single race may have between 14 and 25 Porsche 911 GT3

vehicles participating, and there are 6 race events annually in a series.  AJSUMF, ¶ 10.  In

addition to sponsoring racing events such as the Porsche GT3 Cup Challenge Race series,

PMNA provides track side support in the form of specially equipped trailers with repair tools and

parts that can be used to repair cars during the race.  AJSUMF, ¶ 8. PMNA enters into these race

sponsorship agreements with race promoters, such as the International Motor Sports Association,

LLC. ("IMSA"). AJSUMF, ¶ 13.  In these series sponsorships, PMNA agrees to provide various

support activities in furtherance of the race series that include Porsche branded race cars,

including technical support, advertising, promotion, and track-site services. AJSUMF, ¶ 14.  The

automotive repair parts are made available to and may be acquired by Porsche race teams during

the race to repair vehicles that become damaged, or have a defective part, if the race team does

not otherwise have the necessary part available. AJSUMF, ¶ 7. If PMNA did not provide these

track site support services, the Porsche vehicles would be less likely to compete, and it would

make the purchase of Porsche race vehicles significantly less attractive. AJSUMF, ¶ 9. At no

time before, during or after the event, does PMNA offer the automotive repair parts that are in

the trailers for sale to the general public, or to Porsche race teams as a means of restocking their

inventory. AJSUMF, ¶¶ 15, 20, 23, 24.

    The records associated with withdrawal/acquisition and sale of the automotive repair

parts for the three entries in question reveal that PMNA sold a total of 458 total parts with a

combined value of $134,928.60, as follows (see AJSUMF Exhibits 9, 10 and 11):

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

| Race | Qty Withdrawn | $ Value | Source |
|---|---|---|---|
| Entry KB5-5376882-5, Exhibit 1 | 146 | $34,009.61 | AJSUMF, ¶ 40 |
| Entry KB5-5378599-3, Exhibit 2 | 106 | $31,850.37 | AJSUMF, ¶ 52 |
| Entry KB5-5381385-2, Exhibit 3 | 206 | $69,069.93 | AJSUMF, ¶ 65 |
| Total | 458 | $134,929.91 | |

This must be contrasted to the total value of the inventory of the automotive repair parts,

and related items that are contained within the trailers, which exceeded $1.45 million. (Trailer 1,

$1.44 million; Trailer 2, $1.48 Million; and Trailer 3, $1.5 million.)

PMNA spends approximately $1.7 million annually to provide trackside support at racing

events in the United States and Canada, including the provision of the support "trailer" stocked

with tools and automotive repair parts. AJSUMF, ¶ 12. Contrary to defendant's assertion, it is

not the intention of PMNA to send the support trailers equipped with the tools and automotive

repair parts to Canada to "make money" or to "sell parts" like a mobile Kiosk or food truck.

Rather, it demonstrates the intention of PMNA to provide support to the racing teams with tools

and repair parts, should they be needed, and to return the balance of inventory of repair parts to

the United States at the conclusion of the race.  If PMNA did not provide this type of support at

the races, people and teams interested in competing in automotive races would not be willing to

spend hundreds of thousands of dollars on the purchase of Porsche racing cars and participate in

the various races.

PMNA's intention to re-import the items in the trailer at the conclusion of the race is

evidenced by the fact that it completed and submitted a Certificate of Registration, Form 4455

with CBP prior to the export of each trailer. AJSUMF, ¶ 33, evidencing its intention to CBP to

export them temporarily abroad and then import them back into the United States at the

conclusion of the race.  This is the form CBP specifies that importers should use to register its

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

merchandise when exporting it for temporary use abroad before importing it back into the United

States (Deposition of Senior Import Specialist Christopher Kinner, at pp. 11-12 (August 18,

2007) PMSJ Exhibit 13). PMNA contends that proper filing of this form prior to export is prima

facie evidence of Porsche's intent to temporarily export the items abroad and make them

available to the race teams before importing them back into the United States.

In addition, there are U.S. Customs Rulings that support the position of PMNA that the

actual use of the article is not required in order to qualify for classification under subheading

9801.00.85.

In CBP Headquarters Ruling HQ 562318 (PMSJ Exhibit 14) a U.S. company (ATT

Metrology) exported a laser tracker systems and associated equipment to a Canadian company,

Bombardier Aerospace, for temporary use.  After completion of the temporary use in Canada,

Bombardier exported the merchandise back to the U.S. and imported it for the account of the

original exporter ATT Metrology. In its ruling that the returning goods qualified under

9801.00.85, CBP Headquarters explained that "There is no requirement that the merchandise be

used abroad by the person who exported it.  CBP Headquarters Ruling HQ 562318 (August 27,

2002), PMSJ Exhibit 14. Emphasis added.

In CBP New York Ruling N013373 (June 29, 2007), PMSJ Exhibit 15, a U.S. company,

American Airlines, assembled kits in the U.S. for export to a foreign country to expedite the

repair of an aircraft or aircraft engine before re-importing the balance of the items back to the

U.S.  The kits consist of tools; equipment, such as an aircraft engine hoist or sling; spare repair

parts for an aircraft; spare repair parts for aircraft engines; and items such as lubricants and

gloves to support the repair; and consumable aircraft repair parts, such as nuts and bolts. PMSJ

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

Exhibit 15. In CBP NY Ruling N013373, CBP explained that when a repair was required at an

international location, the kit to support the repair was exported; the repair work was performed;

the aircraft repair parts needed for the repair are utilized; and the remaining aircraft repair parts

in the kit that are not needed for the repairs were imported back into the U.S. The contents of the

kit varied based on the required type of repair. CBP ruled that the kit containing the unused

items was properly classifiable under subheading 9801.00.85, HTSUS, when imported back into

the United States. CBP NY Ruling N013373, PMSJ Exhibit 15.

Similarly, PNMA's trailer contain various repair parts and tools, that, based on years of

experience, were determined necessary for the repair of the race cars. AJSUMF, ¶ 21. This

situation is similar to that presented in CBP New York Ruling N013373 (PMSJ Exhibit 15), and

the American Airlines' repair kit. American Airlines exported the full repair kits and then

imported the kits back into the U.S., except for the parts utilized abroad. Everything that it

exported, except for the items needed abroad, was imported back into the U.S. As in CBP New

York Ruling N013373, PNMA exported the trailer with full parts and tools for the track-side

repair of the racing vehicles; and then expects, and intends, to import them all back into the U.S.,

except for those items actually withdrawn by the Porsche racing teams that were necessary for

the repair of their vehicles. Those items remain in Canada with the teams.

The American Airlines Ruling N013373 and the Porsche case are nearly identical, except

that American Airlines uses the needed parts abroad itself, whereas PMNA uses the parts as

temporary inventory abroad, and the Porsche teams use the needed parts to repair their vehicles.

As CBP Headquarters confirmed in CBP Headquarters Ruling HQ 562318 (August 27, 2002)

(PMSJ Exhibit 14), "there is no requirement that the merchandise be used abroad by the person

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

who exported it." PMNA contends that these Customs Rulings are directly on point and confirm that the automotive repair parts are properly classifiable under subheading 9801.00.85, HTSUS.

Next, in CBP New York Ruling N013372 (July 3, 2007), American Airlines sought confirmation a second time that when its maintenance toolkit (consisting of tools, equipment, spare parts for an aircraft, spare parts for an aircraft engine, and spare parts for support equipment and/or consumable spare parts) is exported, after the repair work is performed abroad and the kit is imported back into the U.S. without those parts used abroad, the returning kit is classifiable under subheading 9801.00.85, HTSUS. PMSJ Exhibit 16. Again, in New York Ruling N013372 (July 3, 2007), CBPs' National Commodity Specialist Division affirmed its earlier ruling N013373 (June 29, 2007), and concluded that even though some of the spare parts and consumable parts were removed from the kit and used to repair the airplane or its engine, the remaining items were classifiable under subheading 9801.00.85, HTSUS, when were imported back into the U.S.

CBP New York Ruling N013372 (July 3, 2007), along with CBP New York Ruling N013373 (June 29, 2007) and CBP Headquarters Ruling HQ 562318 (August 27, 2007) are directly applicable to PMNA's case. PMNA asserts that the rulings should have been followed by CBP. These three rulings (CBP Headquarters Ruling HQ 562318 (August 27, 2007), CBP New York Ruling N013373 (June 29, 2007)and CBP New York Ruling N013372 (July 3, 2007) should be considered dispositive of the issue of the eligibility of PMNA's returning trailer and repair parts and tools under subheading 9801.00.85, HTSUS. Just as in the two American Airlines Rulings, PMNA intended to export the Porsche repair parts for use temporarily abroad before importing them back into the United States. (Declaration of Robert Resetar, at p. 2

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

(February 21, 2017), PMSJ Exhibit 17; Declaration of Jens Walter, at p. 4 (February 10, 2017),

PMSJ Exhibit 18.)

With regard to the "temporary use" question, we note that in *Porsche Motorsport N. Am.,*

*Inc. v. United States*, __ CIT __, Slip Op. 18-105 (August 22, 2018), the court expressed its view

to defendant's opposition to PMNA's assertion that the automobile repair parts were exported for

"temporary use" abroad, acknowledging that the rulings (CBP Headquarters Ruling HQ 562318

(August 27, 2007), CBP New York Ruling N013373 (June 29, 2007) and CBP New York Ruling

N013372 (July 3, 2007) are **not** "unreasonable interpretations" of subheading 9801.00.85,

HTSUS:

> "Temporary use" might or might not encompass "that use which is
> pertinent to the race event itself", regardless of whether any sold
> part stays with the race team after the race. Indeed, in N013372
> and N013373, the "remainder" of the kit(s) reimported into the
> U.S. were apparently allowed duty-free entry despite the apparent
> fact that the parts that were actually replaced were not reimported
> along with the rest of the kit.[9] These rulings do not appear to be
> unreasonable interpretations of subheading 9801.00.85.00,
> HTSUS. The question of moment, thus, appears to be whether
> "temporary use" encompasses "temporary availability," of
> automobile parts in furtherance of the Porsche brand, to
> professional race teams in case of "emergency," whatever that is
> supposed to mean in this context. [Emphasis added.]

*Supra*, Slip Op. 18-105, at 15. The court then engaged in an extensive examination of the

definition of the word "use" in a nominative context, noting:

> These latter definitions are noteworthy. In accordance with the
> foregoing, in arguing that its trailer is a "kit" of replacement parts
> that it makes "available" for the GT3 races in cases of
> "emergency" in order to support its global brand, PMNA raises a
> claim of "use" that would at least appear theoretically to be
> encompassed by certain of the above definitions, and therefore,
> prima facie, encompassed by subheading 9801.00.85.00, HTSUS.

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

*Id.,* Slip Op. 18-105*,* at 18.

PMNA is "using" the trailers and the auto repair parts therein by the very act of exporting them and making the trailers and the repair parts inside available, albeit on a temporarily basis, to the race teams. The very fact that the repair parts are in the trailer connotes a "use" of those parts by PMNA because it is making them available to the racing teams. Looking to the definitions of "use" cited by the court in Slip Op. 18-105 at 16, the repair parts are being "used" because they are being "employed" by PMNA through the action of making them available to the racing teams.

We note that acceptable synonyms for the term "temporary" include: "provisionally," "momentarily" and "briefly."  And, as previous addressed above, the automobile repair parts are "tools of the trade," as acknowledge by defendant in CBP Headquarters Ruling HQ H013537 (July 2, 2007), because they are "necessary for the work performed by the {Porsche racing team} mechanics." Thus, the court's question at the top of page 16 ("The question of moment, thus, appears to be whether "temporary use" encompasses "temporary availability," of automobile parts in furtherance of the Porsche brand, to professional race teams in case of "emergency") is affirmatively answered.

Subheading 9801.00.85, HTSUS, does not preclude the eligibility of the returning items of that tariff classification when there is a sale of some items originally exported, as it only pertains to those items temporarily used abroad and imported back into the U.S.  As Judge Musgrave pointed out: "there is nothing plain or inherent in the argued tariff provision that circumscribes, let alone addresses, any "consideration" (i.e., sale) for any 'use', howsoever 'temporary', of the 'tools of the trade'." *Supra*, at 15.

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

In view of the above, the subject Porsche repair parts are properly classifiable under subheading 9801.00.85, HTSUS.

## II.   Clarification of Quantities Exported and Returned for Entry No. KB5-5376882-5

In a Telephonic Status Conference held on February 23, 2021, the Court requested the parties to address certain discrepancies in the quantities exported and returned for Entry No. KB5-5376882-5 (AJMUMF Exhibit One).

1.      The Certificate of Registration dated May 9, 2014 shows 9,992 items with a value of $1,455,915.89 exported.  SAUMF, ¶ 1.

2.      The returning inventory worksheet prepared by Brian Blocker (AJSUMF, ¶ 37) shows 9,921 items with a value of $1,442,775.89 (see proforma invoice and AJSUMF Exhibit 12; SAUMF, ¶ 2.

3.      The difference between the Certificate of Registration and the returning Inventory worksheet is 71 parts with a value of $13,140.

4.      The 71 parts and $13,140 match the non-inventory items included in the support trailer inventory list.  AJSUMF, ¶ 38.  These items are not included in the Blocker inventory sheets because they are not inventory, but the count and value of which are included on the Certificate of Registration at the time of export.

5.      AJSUMF Exhibit 25 contains the ACE eManifest, list of non-inventory items and the brokerage statement from B. Zee Brokerage detailed the inventory exported to Canada.

6.      AJSUMF Exhibit 9 consists of the individual PMNA order sheets and subsequent billing invoices sent to the Porsche racing teams following the first race at the Canadian Tire

Porsche Motorsports Inc. v. United States
Plaintiff's Memorandum in Support of Motion for Summary Judgement
Court No. 16-00182

Motorsport Park in Bowmanville, Ontario (the KB5-5376882-5). These documents identify the part #, description, quantity and value of the items purchased by the racing teams. The total number of parts sold was 146 with a value of $34,009.61.

7.      The entry lines form 7501 for Entry KB5-5376882-5 all state "Prof Books, etc. returned to the US" HTS 9801.00.85. Exhibit 2. Block 35 shows a total entered value $1,455,916 which would indicate the value of the non-inventory items were included in the total entered value of the goods that were returning.

## CONCLUSION

For the reasons set forth above, plaintiff respectfully requests that this Court grant plaintiff's motion for summary judgment and order defendant to refund the duties deposited, with interest, and for such further relief as this Court deems just.

Respectfully submitted,

By: George R. Tuttle III
George R. Tuttle, III.
Law Offices of George R. Tuttle
A Professional Corporation
3950 Civic Center Drive Ste 310
San Rafael, CA 94903
(415) 986-8780
Attorneys for Plaintiff,
    Porsche Motorsports North America, Inc

Dated:  April 26, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiff's Memorandum of Law in Support of Plaintiff's Rule 56 Motion for Summary Judgment, as computed by Law Office of George R. Tuttle word processing system Microsoft Word 365 ProPlus is 7,981 words, less than the 14,000 word limit.

*/s/ George R. Tuttle, III.*
George R. Tuttle, III
*Counsel for Plaintiff*

Porsche Motorsports North America v. United States
Court No. 16-00182
Table of Exhibits Accompanying
Memorandum of Law in Support of Plaintiff's Rule 56 Motion for Summary Judgment

| | |
|---|---|
| Exhibit 01 | Term "trade" as identified in https://slideplayer.com/slide/5896136/ |
| Exhibit 02 | Term "trade" as defined in https://marketbusinessnews.com/financial-glossary/trade-definition-meaning/ |
| Exhibit 03 | Definition of "trade" as defined in http://www.dictionary.com/trade |
| Exhibit 04 | Definition of "occupation" as defined in http://www.dictionary.com/occupation |
| Exhibit 05 | Definition of "employment" as defined in http://www.dictionary.com/employment |
| Exhibit 06 | Definition of "auto racing" as defined in https://www.dictionary.com/browse/auto-racing |
| Exhibit 07 | Definition of term "implements" as defined in Black's Law Dictionary |
| Exhibit 08 | Definition of term "implements" as defined in https://en.oxforddictionaries.com/definition/implement |
| Exhibit 09 | Definition of term "instruments" as defined in https://www.merriam-webster.com/dictionary/instrument |
| Exhibit 10 | Definition of term "instrument" as defined in https://www.collinsdictionary.com/us/dictionary/english/instrument. |
| Exhibit 11 | Definition "tools of the trade" as defined in http://idioms.thefreedictionary.com/tools+of+the+trade |
| Exhibit 12 | HQ H013537 (July 2, 2007) |
| Exhibit 13 | Deposition of Senior Import Specialist Christopher Kinner (August 18, 2007) |
| Exhibit 14 | HQ 562318 (August 27, 2002) |
| Exhibit 15 | HQ N013373 (June 29, 2007) |
| Exhibit 16 | HQ N013372 (July 3, 2007) |
| Exhibit 17 | Declaration of Robert Resetar (March 1, 2017) |
| Exhibit 18 | Declaration of Jens Walter (April 10, 2017) |

PMSJ Exhibit 1

Definition of the term "trade"

# A Trade is:

- A skilled job, typically one requiring manual skills and special training.

https://slideplayer.com/slide/5896136/

PMSJ Exhibit 2

Definition of the term "trade"

What is trade? Definition and meaning

**Trade** as a noun can refer to the action of buying-selling or exchanging goods and services between people, companies, countries, and other entities. The term is often synonymous with *'commerce.'* It may also refer to a particular industry as in the building, tourist or fur trades.

People, companies, and countries that buy and sell goods and services are traders.

**Job or skill**

The term can mean a job or skill, especially one that involves working with one's hands. Examples include carpentry, plumbing, and mechanics.

https://marketbusinessnews.com/financial-glossary/trade-definition-meaning/

PMSJ Exhibit 3

Definition of the term "trade"

# **trade** [ treyd ] SHOW IPA 🔊 ☆

**See synonyms for:** trade / traded / trading **on Thesaurus.com**

*noun*

1  the act or process of buying, selling, or exchanging commodities, at either wholesale or retail, within a country or between countries:
   *domestic trade; foreign trade.*

2  the act of buying, selling, or exchanging stocks, bonds, or currency:
   *Stock brokerages typically charge a commission per trade.*

3  a purchase or sale; business deal or transaction.

4  an exchange of items, usually without payment of money.

5  *Sports.* the transfer of a player or players among professional teams:
   *a midseason trade.*

6  any occupation pursued as a business or livelihood.

7  some line of skilled manual or mechanical work; craft:
   *the trade of a carpenter; printer's trade.*

8  people engaged in a particular line of business:
   *a lecture of interest only to the trade.*

https://www.dictionary.com/browse/trade

Exhibit 3

PMSJ Exhibit 4

Definition of the term "occupation"

# occupation [ ok-*yuh*-**pey**-sh*uh*n ] SHOW IPA 🔊 ☆

**See synonyms for:** occupation / occupations **on Thesaurus.com**

*noun*

1  a person's usual or principal work or business, especially as a means of earning a living; vocation:

   *Her occupation was dentistry.*

2  any activity in which a person is engaged.

https://www.dictionary.com/browse/occupation

**Exhibit 4**

PMSJ Exhibit 5

Definition of the term "employment"

# employment [ em-**ploi**-m*uh*nt ] SHOW IPA 🔊 ☆

See synonyms for *employment* on Thesaurus.com

*noun*

1. an act or instance of employing someone or something.

2. the state of being employed; employ; service:
   *to begin or terminate employment.*

3. an occupation by which a person earns a living; work; business.

https://www.dictionary.com/browse/employment

Exhibit 5

PMSJ Exhibit 6

Definition of the term "auto racing"

# auto racing ☆

See synonyms for *auto racing* on Thesaurus.com

*noun*

1   the sport of racing automobiles in which drivers compete against each other on a course designed for racing or on closed public roads.

https://www.dictionary.com/browse/auto-racing

PMSJ Exhibit 7

Definition of the term "implements"

*Black's Law Dictionary*, 4th ed. (1968)

# BLACK'S
# LAW DICTIONARY

Definitions of the Terms and Phrases of
American and English Jurisprudence,
Ancient and Modern

By

## HENRY CAMPBELL BLACK, M. A.

Author of Treatises on Judgments, Tax Titles, Intoxicating Liquors,
Bankruptcy, Mortgages, Constitutional Law, Interpretation
of Laws, Rescission and Cancellation of Contracts, Etc.

## REVISED FOURTH EDITION

BY

## THE PUBLISHER'S EDITORIAL STAFF

ST. PAUL, MINN.
WEST PUBLISHING CO.
1968

Exhibit 7

COPYRIGHT © 1891, 1910, 1933, 1951, 1957 WEST PUBLISHING COMPANY

——————

COPYRIGHT 0 1968
By
WEST PUBLISHING CO.

Black's Law Dictionary 4th Ed. Rev.
6-1971

Exhibit 7

# IMPERTINENT

At Law. A term applied to matter not necessary to constitute the cause of action or ground of defense. Cowp. 683; 5 East, 275; Tucker v. Randall, 2 Mass. 283. It constitutes surplusage, (which see.)

**IMPESCARE.** In old records. To impeach or accuse. Impescatus, impeached. Blount.

**IMPETITIO VASTI.** Impeachment of waste, *(q. v.)*

**IMPETRARE.** In old English practice. To obtain by request, as a writ or privilege. Bract. fols. 57, 172b. This application of the word seems to be derived from the civil law. Calvin.

**IMPETRATION.** In old English law. The obtaining anything by petition or entreaty. Particularly, the obtaining of a benefice from Rome by solicitation, which benefice belonged to the disposal of the king or other lay patron. Webster; Cowell.

**IMPIER.** Umpire *(q. v.).*

**IMPEERMENT.** Impairing or prejudicing. Jacob.

**IMPIGNORATA.** Pledged; given in pledge, *(pignori data;)* mortgaged. A term applied in Bracton to land. Bract. fol. 20.

**IMPIGNORATION.** The act of pawning or putting to pledge.

**IMPIUS ET CRUDELIS JUDICANDUS EST QUI LIBERTATI NON FAVET.** He is to be judged impious and cruel who does not favor liberty. Co. Litt. 124.

**IMPLACITARE.** Lat. To implead; to sue.

**EVIPLEAD.** In practice. To sue or prosecute by due course of law. People v. Clarke, 9 N.Y. 368.

**IMPLEADED.** Sued or prosecuted; used particularly in the titles of causes where there are several defendants; as "A. B., impleaded with C. D."

**IMPLEMENTS.** Such things as are used or employed for a trade, or furniture of a house. Whatever may supply wants; particularly applied to tools, utensils, vessels, instruments of labor; as, the implements of trade or of husbandry. Goddard v. Chaffee, 2 Allen (Mass.) 395, 79 Am.Dec. 796. Mississippi Road Supply Ca. v. Hester, 185 Miss. 839, 188 So. 281, 287, 124 A.L.R. 574.

**IMPLICATA.** A term used in mercantile law, derived from the Italian. In order to avoid the risk of making fruitless voyages, merchants have been in the habit of receiving small adventures, on freight, at so much per cent, to which they are entitled at all events, even if the adventure be lost; and this is called *"implicata."* Wharton.

**IMPLICATION.** Intendment or inference, as distinguished from the actual expression of a thing in words. In a will, an estate may pass by mere *implication,* without any express words to direct its course. 2 Bl. Comm. 381.

An inference of something not directly declared, but arising from what is admitted or expressed.

In construing a will conjecture must not be taken for implication; but necessary implication means, not natural necessity, but so strong a probability of intention that an intention contrary to that which is imputed to the testator cannot be supposed. 1 Ves. & B. 466.

"Implication" is also used in the sense of "inference;" *e.,* where the existence of an intention is inferred from acts not done for the sole purpose of communicating it, but for some other purpose. Sweet.

### Necessary implication

In construing a will, necessary implication means not natural necessity, but so strong a probability of intention that an intention contrary to that which is imputed to the testator cannot be supposed. Wilkinson v. Adam, 1 Ves. & B. 466; Gilbert v. Craddock, 67 Kan. 346, 72 P. 869.

**IMPLIED.** This word is used in law as contrasted with "express;" e., where the intention in regard to the subject-matter is not manifested by explicit and direct words, but is gathered by implication or necessary deduction from the circumstances, the general language, or the conduct of the parties.

As to implied "Abrogation," "Agreement," "Assumpsit," "Condition," "Confession," "Consent," "Consideration," "Contract," "Covenant," "Dedication," "Easement," "Invitation," "Malice," "Notice," "Obligation," "Powers," "Trust," "Use," "Waiver," and "Warranty," see those titles.

**IMPORTATION.** The act of bringing goods and merchandise into a country from a foreign country. Cunard Steamship Co. v. Mellon, 43 S.Ct. 504,, 262 U.S. 100, 67 L.Ed. 894, 27 A.L.R. 1306.

**IMPORTED.** This word, in general, has the same meaning in the tariff laws that its etymology shows, *in porto,* to carry in. To "import" is to bear or carry into. An "imported" article is one brought or carried into a country from abroad. The Conqueror, 49 Fed. 99. See Imports.

**IMPORTS.** Importations; goods or other property imported or brought into the country from a foreign country.

**IMPORTUNITY.** Pressing solicitation; urgent request; application for a claim or favor which is urged with troublesome frequency or pertinacity. Webster.

**IMPOSE.** To levy or exact as by authority; to lay as a burden, tax, duty or charge. State v. Nickerson, 97 Neb. 837, 151 N.W. 981, 982.

**IMPOSITION.** An impost; tax; contribution. Paterson v. Society, 24 N.J.L. 400; Singer Mfg. Co. v. Heppenheimer, 58 N.J.L. 633, 34 A. 1061, 32 L. R.A. 643; Town of Brandon v. Harvey, 105 Vt. 435, 168 A. 708, 710.

**IMPOSSIBILITY.** That which, in the constitution and course of nature or the law, no man can do or perform. Klauber v. San Diego Street-Car Co., 95 Cal. 353, 30 P. 555.

*Impossibility of performance of contract,* absolving party from liability for nonperformance, means not only strict impossibility, but impracticability because of extreme arid unreasonable difficulty, expense, injury or loss involved.

PMSJ Exhibit 8

Definition of the term "implement"

# implement



Pronunciation ⓘ /ˈɪmplɪm(ə)nt/ 🔊 /ˈɪmplɪmɛnt/ 🔊

See synonyms for implement

Translate implement into Spanish

## NOUN

1   A tool, utensil, or other piece of equipment that is used for a particular purpose.

    *'garden implements'*

https://en.oxforddictionaries.com/definition/implement

PMSJ Exhibit 9

Definition of the term "instruments"

Exhibit 9

# instrument noun

 Save Word

in·stru·ment  |  \ ˈin(t)-strə-mənt 🔊 \

**Definition of *instrument* (Entry 1 of 2)**

1    : a device used to produce music
     *also* : a singing voice

2    : IMPLEMENT
     *especially* : one designed for precision work

3    **a**   : a measuring device for determining the present value of a quantity under
             observation

     **b**   : an electrical or mechanical device used in navigating an airplane
             *especially* : such a device used as the sole means of navigating

4    **a**   : a means whereby something is achieved, performed, or furthered

     **b**   : one used by another as a means or aid : DUPE, TOOL

5    : a formal legal document (such as a deed, bond, or agreement)

https://www.merriam-webster.com/dictionary/instrument

PMSJ Exhibit 10

Definition of the term "instrument"

**Definition of 'instrument'**

# instrument

Collins COBUILD

Word Frequency

(ɪnstrəmənt 🔊)

**Word forms: instruments**

**1. COUNTABLE NOUN**

An instrument is a tool or device that is used to do a particular task, especially a scientific task.

...instruments for cleaning and polishing teeth.🔊

https://www.collinsdictionary.com/us/dictionary/english/instrument

PSMSJ Exhibit 11

Definition of the term "tools of the trade"

**the tools of the/your ˈtrade** the things you need to do your job: *We are proud to make David's boots, because they are the tools of his trade as a professional footballer.* ◊ *Ambulancemen now believe that helicopters are vital tools of the trade.*
See also: of, tool, trade

**the tools of the/(one's) trade**
The specific tools used in a particular profession.
*If you want to become a painter, you have to familiarize yourself with the tools of the trade—which include more than just paintbrushes.*
*As a reporter, the tools of my trade used to be a pencil and a pad of paper—but now technology has changed the game.*
See also: of, tool, trade

http://idioms.thefreedictionary.com/tools+of+the+trade

PSMJ Exhibit 12

HQ H013537 (July 2, 2007)

**HQ H013537**

July 2, 2007

OT:RR:CTF:VS      H013537  GOB

**CATEGORY:**  Classification

Texas Aero Engine Services Limited
Attn.: Vincent A. Enea
Trade Compliance Manager
2100 Eagle Parkway
Fort Worth, Texas 76177

**RE:**    Tools of Trade; Subheading 9801.00.85, HTSUS

Dear Mr. Enea:

This is in reply to your request of June 13, 2007, which was forwarded to this office by the National Commodity Specialist Division.  Our ruling follows.

**FACTS:**

You describe the pertinent facts as follows.  Texas Aero Engine Services Limited ("TAESL") is a joint venture between Rolls Royce and American Airlines whose primary business is the overhaul of aircraft turbine engines and the return of the engines to a serviceable condition.

When TAESL mechanics travel internationally they bring goods needed to accomplish their work, including aircraft components, mechanics' tooling, specialized tooling, shop supplies, attaching hardware, reference manuals, and shop equipment.  Certain of these materials are brought back into the United States upon completion of the work.  In addition to the goods enumerated above, the items brought back to the United States may include material which has been removed from the serviced aircraft.

You state that TAESL would like to classify the above-described goods as tools of trade within the meaning of subheading 9801.00.85, Harmonized Tariff Schedule of the United States ("HTSUS").

Exhibit 12

2

**ISSUE:**

Whether the above-described goods may be classified in subheading 9801.00.85, HTSUS, as tools of trade.

**LAW AND ANALYSIS:**

Subheading 9801.00.85, HTSUS provides for duty-free treatment for "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items."

Tools of trade generally include those items necessary for the exercise of the trade or profession of the subject individuals, in this case, mechanics of TAESL. Based upon the information submitted, we find that goods such as mechanics' tooling, specialized tooling, shop supplies, attaching hardware, reference manuals, and shop equipment, which are necessary for the work of the TAESL mechanics, qualify for entry under subheading 9801.00.85, HTSUS.

Your request also mentions aircraft components. If these goods are necessary for the work performed by the TAESL mechanics, they qualify for entry under subheading 9801.00.85, HTSUS.

Materials removed from the serviced aircraft (*i.e.*, materials which were not taken abroad by the TAESL mechanics) do not fall within the scope of subheading 9801.00.85, HTSUS, and are therefore not eligible for entry under this provision.

We note that, in order for subheading 9801.00.85, HTSUS to be applicable, the goods at issue must be imported by or for the account of the person who exported the same goods.

While the Customs and Border Protection ("CBP") Regulations do not provide for specific documentation required to substantiate a claim under subheading 9801.00.85, HTSUS, carnets, commercial invoices, packing lists, landing certifications, customs documents used to import the merchandise into the foreign country, or any other documentation which shows that the merchandise being imported under subheading 9801.00.85, HTSUS, is the same as what was exported, may be utilized for this purpose.

**HOLDINGS:**

Exhibit 12

Exhibit page 57

3

Goods such as mechanics' tooling, specialized tooling, shop supplies, attaching hardware, reference manuals, and shop equipment, which are necessary for the work of the TAESL mechanics, qualify for entry under subheading 9801.00.85, HTSUS, provided that they are imported by or for the account of the person who exported those goods.

If the aircraft components are necessary for the work performed by the TAESL mechanics, they qualify for entry under subheading 9801.00.85, HTSUS, provided that they are imported by or for the account of the person who exported those goods.

Materials removed from the serviced aircraft (*i.e.*, materials which were not taken abroad by the TAESL mechanics) are not eligible for entry under subheading 9801.00.85, HTSUS.

A copy of this ruling letter should be attached to the entry documents filed at the time the goods are entered.  If the documents have been filed without a copy, this ruling should be brought to the attention of the CBP officer handling the transaction.

Sincerely,


Monika R. Brenner
Chief
Valuation and Special Programs Branch

Exhibit 12

Exhibit page 58

PMSJ Exhibit 13


Deposition of Import Specialist Christopher Kinner (August 18, 2017)

Page 1

```
 1    UNITED STATES COURT OF INTERNATIONAL TRADE
 2    BEFORE THE HONORABLE R. KENTON MUSGRAVE,
 3    SENIOR JUDGE

      ------------------------------------------
 4    PORSCHE MOTORSPORTS NORTH AMERICA, INC.,
 5                         Plaintiff,
 6        -against-                    Court No.:
                                       16-00182
 7    UNITED STATES,
 8                         Defendant.

      ------------------------------------------
 9
10                     Deposition Of:
11                 CHRISTOPHER KINNER
12              Friday, August 18, 2017
13               12:50 p.m. - 2:58 p.m.
14
15    HELD:      U.S. Customes and Border Protection
16               237 West Service Road
17               Champlain, New York
18    BEFORE:    Brenda J. O'Connor-Marello, CSR,
                 Certified Shorthand Reporter and
19               Notary Public in and for the
                 State of New York.
20
21
22
                   Veritext Legal Solutions
23                  Mid-Atlantic Region
               1250 Eye Street NW - Suite 350
24               Washington, D.C.  20005
25
```

Page 2

```
 1    A P P E A R A N C E S :
 2    APPEARING FOR THE PLAINTIFF(S):
 3    (via teleconference)
 4         LAW OFFICES OF GEORGE R. TUTTLE,
           A Professional Corporation
 5         1100 Larkspur Landing Circle, Suite 385
           Larkspur, California 94939
 6         415-986-8780
           BY:   CARL D. CAMMARATA, ESQ.
 7               chuck.cammarata@tuttlelaw.com
 8
 9
10    APPEARING FOR THE DEFENDANT(S):
11         U.S. DEPARTMENT OF JUSTICE
           26 Federal Plaza
12         New York, New York 10278
           212-264-0481
13         BY:   STEPHEN A. JOSEY, ESQ.
                 stephen.a.josey2@usadoj.gov
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                      *   *   *
 2              (Exhibit 1, Amended Notice,
 3          herein was marked for identification.)
 4                      *   *   *
 5                  CHRISTOPHER KINNER,
 6     called as the witness, hereinbefore named, being
 7     first duly cautioned and sworn or affirmed by
 8     BRENDA J. O'CONNOR-MARELLO, a Certified
 9     Shorthand Reporter and Notary Public in and for
10     the State of New York, Qualified in Saratoga
11     County, herein to tell the truth, the whole
12     truth, and nothing but the truth, was examined
13     and testified as follows:
14                      EXAMINATION
15     BY MR. CAMMARATA:
16     Q.   Thank you, Mr. Kinner.
17     A.   Yes.
18     Q.   Mr. Stephen Josey is here representing the
19          Government in this action.  And I'm Carl
20          Cammarata representing the plaintiff,
21          Porsche Motorsports North America, Inc.
22          And we have issued a pending notice of
23          taking deposition, and you've been
24          selected to represent the Government in
25          this action as if the Government were
```

Page 11

```
 1        sold in Canada, so Porsche did not import
 2        them back into the United States; isn't
 3        that correct?
 4   A.   Yes.
 5   Q.   Okay.  So the parts that they did import
 6        back into the United States were not sold;
 7        isn't that correct?
 8   A.   Yes.
 9   Q.   Okay.  Do you know or recall that Porsche
10        filed certificates of registration for
11        those auto tools, parts and accessories
12        before exporting them from the United
13        States?
14   A.   Yes.  I'm aware of that.
15   Q.   Is that document -- I believe it's a
16        CF4455, certificate of registration.
17        Isn't that the document that Customs wants
18        importers who are going to export items,
19        and then reimport them back into the
20        United States to use to notify Customs of
21        their intent?
22   A.   Yes.
23   Q.   So Customs accepts the -- or let me
24        rephrase that.
25             Customs requests that importers who
```

Page 12

```
 1        intend to export items out of the United
 2        States, and then reimport them back into
 3        the United States, one of the correct
 4        forms to use is the CF4455; isn't that
 5        correct?
 6   A.   Yes.
 7   Q.   So when Porsche filed these forms for each
 8        of the three entries, why didn't Customs
 9        accept those forms as evidence of their
10        intent to reimport them back into the
11        United States?
12                 MR. JOSEY:  Objection.  There's
13             no foundation that they didn't use
14             those forms as evidence.  But, you
15             know, I can instruct him to answer the
16             question.  Or you may clarify.
17   BY MR. CAMMARATA:
18   Q.   Well, that they didn't accept those forms
19        I think is the point that I'm curious
20        about.  Why wouldn't Customs accept those
21        as evidence?
22                 MR. JOSEY:  Objection again.
23             You haven't established that they
24             didn't accept that as evidence or
25             something that they didn't look at.
```

PMSJ Exhibit 14

Ruling HQ 56318 (August 27, 2002)

HQ 562318

August 27, 2002

MAR-2-05 RR:IA 562318 RFC

CATEGORY: Classification

Tariff No. 9801.00.8500

Area Port Director of Customs
U.S. Customs Service
9901 Pacific Highway
Blaine, WA 98230

RE: Protest and Application for Further Review No. 3004-01-50004

Dear Sir or Madam:

This is in reference to a Protest and Application for Further Review (number 3004-01-50004) filed by Bombardier Inc./Canadair, contesting the denial of a claim under subheading 9801.00.8500 of the Harmonized Tariff Schedule of the United States (HTSUS) for duty free treatment.

**FACTS:**

The importer of record is Bombardier Inc-Canadair, Montreal, Canada.  The consignee is ATT Metrology Services, Inc., Richmond, Washington.  The exporter of the merchandise to the United States is Bombardier Aerospace, Montreal, Quebec, Canada.

The merchandise consists of laser tracker systems.  ATT Metrology had a contract with Bombardier Aerospace to supply laser tracker systems and associated equipment to Bombardier Aerospace on a temporary basis for use in the fabrication, assembly and inspection of the tooling made for its commercial and business airplane programs. Upon completion of the agreement, the laser tracker systems were returned to ATT Metrology in the United States.  ATT Metrology may not necessarily be the original importer of some of the equipment and has acquired some of the equipment domestically.

The merchandise was imported and entered on October 4, 2001. The merchandise was liquidated on August 17, 2001, under various HTSUS subheadings.

Exhibit 14

2

On October 4, 2000, a protest was filed against the rate of duty. The protest contends that all the merchandise should have been liquidated under subheading 9801.00.8500.   In the instant case, the port disagrees with classification in subheading 9801.00.8500 because it believes that in order to receive the benefits of that subheading "the equipment should be utilized by the owner of a tool of the trade and not leased to a Canadian company for use by them."

The protest was filed in a timely manner within ninety days from the date of liquidation.

**ISSUES:**

Whether the merchandise that is the subject of this protest is entitled to duty free treatment under HTSUS subheading 9801.00.8500.

**LAW AND ANALYSIS:**

HTSUS subheading 9801.00.8500 provides as follows:

> Professional books, implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items.

HTSUS Subheading 9801.00.8500

In order to receive the preferential tariff treatment provided for under subheading 9801.00.8500, the plain language of that provision only requires that the merchandise (1) be exported for temporary use abroad and (2) be imported (after being exported) by or for the account of the person who originally exported the merchandise.   There is no requirement that the merchandise be used abroad by the person who exported it.

In the instant case, ATT Metrology exported the merchandise under consideration to Bombardier Aerospace in Canada for temporary use. After completion of this temporary use in Canada, Bombardier Aerospace exported the merchandise back to the United States and imported it by or for the account of ATT Metrology—the company that originally exported it. Accordingly, the merchandise in this transaction has satisfied the requirements of HTSUS subheading 9801.00.8500.

**HOLDING:**

Exhibit 14

3

The merchandise in the above-mentioned transaction has satisfied the requirements of HTSUS subheading 9801.00.9500.  Accordingly, the protest should be granted.

In accordance with section 3 A (11) (b) of Customs Directive 099 3550-065, dated August 4, 1993, Subject Revised Protest Directive, you are to mail this decision, together with Customs Form 19, to the protestant no later than sixty (60) days from the date of this letter.  Any reliquidation of the entry or entries in accordance with the decision must be accomplished prior to mailing the decision.

Sixty (60) days from the date of this decision, the Office of Regulations and Rulings will make the decision available to U.S. Customs Service personnel, and to the public on the U.S. Custom Service web site (ww.customs.gov), by means of the Freedom of Information Act, and other methods of public distribution.

Sincerely,


Myles B. Harmon, Acting Director
Commercial Rulings Division

Exhibit 14

PMSJ Exhibit 15

Ruling N013373 (June 29, 2007)

N013373

June 29, 2007

CLA-2-98:RR:E:NC:SP:233

CATEGORY:  Classification

TARIFF NO.: 9801.00.8500

Doug Auten
Senior Customs Compliance Manager
American Airlines. Inc.
3900 North Mingo Road
Mail Drop 580
Tulsa, OK 74116

RE:    The tariff classification of a non-routine airline maintenance toolkit.

Dear Mr. Auten:

        In your letter dated June 25, 2007, you requested a tariff classification ruling.

        You state that on a non-routine basis, operating as an international carrier,
American Airlines' bases in the United States assemble kits for an expedited repair
of an aircraft or aircraft engine.  These kits may consist of tools, equipment such as
an aircraft engine hoist or sling, spare parts for an aircraft, spare parts for aircraft
engines, items such as lubricants and gloves to support the repair and consumable
parts such as nuts and bolts.  When a specific repair is required at an international
location, the kit to support the repair is exported, the repair work is performed and
the kit is imported back into the United States.  The contents of the kits will vary
based on the required type of repair.

        When a specific repair is required at an international location, the kit to
support the repair is assembled in the United States, and then exported. The repair
work is performed and the kit is imported back into the United States.  The kit is
imported solely for the account of American Airlines, who is also the exporter.  The
repair at the international location may be performed by a related or unrelated.  The
parts, tooling and other materials required to perform the repair may be of U.S. or
foreign origin.

        The applicable subheading for the non-routine maintenance toolkit will be
9801.00.8500, Harmonized Tariff Schedule of the United States (HTSUS), which
provides for Professional books, implements, instruments, and *tools of trade*,

Exhibit 15

occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items." The rate of duty will be free.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Lawrence Mushinske at 646-733-3036.

Sincerely,

Robert B. Swierupski
Director,
National Commodity
Specialist Division

Exhibit 15

Exhibit page 71

PMSJ Exhibit 16


Ruling N013372 (July 3, 2007)

Exhibit 16

N013372

July 3, 2007

CLA-2-98:RR:E:NC:SP:233

CATEGORY:  Classification

TARIFF NO.: 9801.00.8500

Doug Auten
Senior Customs Compliance Manager
American Airlines. Inc.
3900 North Mingo Road
Mail Drop 580
Tulsa, OK 74116

RE:   The tariff classification of airline maintenance toolkit.

Dear Mr. Auten:

In your letter dated June 25, 2007, you requested a tariff classification ruling.

You describe the airline maintenance toolkit as consisting of tools, equipment, spare parts for an aircraft, spare parts for an aircraft engine and spare parts for support equipment and/or consumable spare parts.  When a specific repair is required at an international location, the kit to support the repair is exported, the repair work is performed and the kit is imported back into the United States.  The kit is exported by, and is imported solely for the account of American Airlines.  The parts and tooling may be of U.S. or foreign origin.  You have provided details on several of the kits: KIT9476 a fan blade change kit and KIT9289 a wheel change equipment kit. You further advise that the toolkits are used in the normal course of business.

The applicable subheading for the maintenance toolkit will be 9801.00.8500, Harmonized Tariff Schedule of the United States (HTSUS), which provides for Professional books, implements, instruments, and *tools of trade*, occupation, or employment, when returned to the United States after having been exported for use
temporarily abroad, if imported by or for the account of the person who exported such items."  The rate of duty will be free.

Exhibit 16

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Lawrence Mushinske at 646-733-3036.


Sincerely,


Robert B. Swierupski
Director,
National Commodity
Specialist Division

Exhibit 16

PMSJ Exhibit 17

Declaration of Robert Resetar (March 1, 2013271327) ¶¶12-15 at p. 2

**Declaration**
**Of**
**Robert Resetar**

I, Robert Resetar, declare as follows:

**A.    Background**

1. I am familiar with the case of *Porsche Motorsport North America, Inc. v. United States,* Court Number 16-00182, pending in the United States Court of International Trade, and I submit this Declaration in support of Plaintiff's position asserted in that litigation;

2. I am a Licensed Customs Broker having received Customs License No. 15265, issued on September 20, 1996 in New York;

3. I am employed by Porsche Cars North America, Inc. (hereinafter "Porsche") and am its Customs & Trade Compliance Manager;

4. I commenced my employment with Porsche in 1997 and during the following approximately 20 years, have been responsible for its importation compliance, including but not limited to the classification of its imported products;

5. My duties at Porsche not only include classification of Porsche's imported products, but also, consumer product safety compliance matters for certain children's products that Porsche imports and I am the person responsible for C-TPAT, of which Porsche is a member under account 97651595;

6. Additionally, I am a customs consultant for other Porsche affiliates that have import activity, such as Porsche Motorsport North America, Inc. (hereinafter "PMNA"), Porsche Design of America, Porsche Latin America and Porsche Cars Canada;

7. Prior to my employment with Porsche, I worked for Mercedes-Benz North America for almost 9 years where one of my main duties, in addition to overseeing parts importations, was customs classification;

8. Prior to my employment at Mercedes, I was employed by Pasha International, a freight forwarder, and my responsibilities included managing the logistics for a small parcel business Pasha had for expatriates working in Saudi Arabia for U.S. based aerospace companies;

9. In addition to my training and experience as a Licensed Customs Broker, I Have been active in the Alliance of Automobile Manufacturers trade

{0133220.DOCX,1}

**Exhibit 17**

organization since the beginning of my employment and I regularly attend annual customs related seminars given by service providers, as well as major trade organizations, such as AAEI (America Association of Exporters and Importers). Further, I have attended every CBP Trade Symposium and C-TPAT conference;

10.     I am the author of over 250 binding rulings issued by U.S. Customs and Border Protection (hereinafter "CBP") on parts and accessories for the Porsche affiliates;

**B.     Intent to Temporarily Export**

11.     As a licensed customs broker employed by Porsche and experienced in classification of its products imported into the United States, I was approached by the Porsche affiliate, PMNA, and advised of that company's intent to support racing teams that race Porsche cars in Canadian races;

12.     I was advised that in order to encourage race teams to race Porsche cars, PMNA offered to support the teams racing Porsche cars by temporarily making available to the race teams in Canada during the races certain repair tools, parts, and accessories for the teams use in the unlikely event that the repair items were needed because of a breakdown or accident;

13.     PMNA determined that the race teams' success while racing Porsche cars would enhance the Porsche brand;

14.     Although PMNA believed that the Porsche race cars would not breakdown, as they were designed, engineered and produced to withstand the rigors of auto racing, they know that as with any mechanical device put under stress, the misuse, unexpected circumstances, or accidents may cause the vehicle to not operate properly;

15.     Therefore, as a precaution and as an inducement to the teams to race Porsche race cars, PMNA put together a kit consisting of certain repair tools, parts, and accessories that it estimated may be needed to repair the cars during a race in Canada so that the teams could continue to race;

16.     Out of over 37,000 active Porsche SKU's (repair tools, parts, and accessories) that PMNA maintains, only about 1,500 repair items are maintained in the PMNA truck/trailer for race car repairs;

17.     The selection of these approximately 1,500 repair items is based upon PMNA's experience of the most likely items that will need to be repaired or replaced in a race due to accident or failure;

18.     Those Porsche repair tools, parts, and accessories that the race

teams need during the race are purchased from PMNA and the remainder are returned to the United States;

19.    These repair tools, parts, and accessories are not available, offered, or sold to the general public or any other racing teams;

20.    They are only temporarily made available for the teams racing Porsche cars while in Canada.

21.    These repair items, in essence, formed a repair kit and were loaded into a PMNA truck/trailer for their temporary export to Canada for the races before importing them back into the United States.  A picture of the PMNA truck/trailer is attached marked as **Exhibit 1**;

22.    PMNA advised me that those repair items were only being exported to Canada temporarily as PMNA intended to return all of them back to the United States after the races;

23.    If any of those repair tools, parts, and accessories that make up the said repair kit were needed by the race teams, those repair items would remain with the race teams and not be imported back into the United States by PMNA;

**C.    Classification Analysis**

24.    As I routinely do when analyzing a new classification issue, I researched CBP's CROSS data base for classification guidance and found a CBP Ruling issued to American Airlines that appeared to be right on point and controlling, as the pertinent facts were almost identical to PMNA's importations;

25.    The American Airlines Ruling determined that the proper tariff classification for imported repair tools, parts, and accessories that were temporarily exported abroad were to be classified under subheading 9801.00.8500, HTSUS, when imported back into the United States;

26.    The American Airlines ruling that I reviewed was either Ruling N013373, dated June 29, 2007, or Ruling N013372, dated July 3, 2007;

27.    The pertinent facts in the American Airlines rulings were that American Airlines exported certain repair tools, parts, and accessories that it determined may be necessary to repair its airplanes abroad and after the repairs were completed, imported those unneeded items back into the United States;

28.    Similarly, PMNA intended to export to Canada certain of its repair tools, parts, and accessories that might be needed to repair Porsche race

cars and then after the races, the unneeded repair items would be imported back into the United States;

29.     Therefore, I concluded that pursuant to the said Ruling in the American Airlines case, the proper classification for the Porsche repair items temporarily exported to Canada upon being imported back into the United States was under subheading 9801.00.8500, HTSUS;

### D.   Documents Supporting PMNA's Intent to Temporarily Export Items

30.     Since PMNA fully intended to return all of the repair tools, parts, and accessories back into the United States, CBP Certificates of Registration for all of the items exported were prepared and submitted as required by CBP as evidence of PMNA's intent to import them back into the United States after temporarily exporting them to Canada;

31.     A copy of the CBP Certificate of Registration that was submitted in connection with CBP Entry Number KB5-5381385, protested under Protest Number 0901-15-100113, is attached marked as **Exhibit 2**;

32.     Similarly, under Protest Number 071216 100073, a copy of the CBP Certificate or Registration that was submitted in connection with CBP Entry Number KB5-5376882-5 is attached marked as **Exhibit 3** and the CBP Certificate of Registration submitted in connection with CBP Entry Number KB5-5378599-3 is attached as **Exhibit 4**;

33.     As in the American Airlines Ruling, only the items unexpectedly needed in Canada were not be imported back into the United States by PMNA;

34.     Those items not needed by the race teams were returned to the United States and classified under subheading 9801.00.8500, HTSUS;

### E.   Repair Items Not Imported Back into the United States

35.     Attached, marked as **Exhibit 5** is a list of those repair tools parts and accessories that were needed by the racing teams that raced Porsche cars in Canada and were not imported back into the United States by PMNA under CBP Entry Number KB5-5376882-5.  As indicated, out of the approximate 1,500 repair items temporarily exported, only 80 repair items remained with the Porsche racing teams;

36.     Attached, marked as **Exhibit 6** is a list of those repair tools parts and accessories that were needed by the racing teams that raced Porsche cars in Canada and were not imported back into the United States by

PMNA under CBP Entry Number KB5-5378599-3. As indicated, out of the approximate 1,500 repair items temporarily exported, only 72 repair items remained with the Porsche racing teams;

37.    Attached, marked as **Exhibit 7** is a list of those repair tools parts and accessories that were needed by the racing teams that raced Porsche cars in Canada and were not imported back into the United States by PMNA under CBP Entry Number KB5-5381385-2. As indicated, out of the approximate 1,500 repair items temporarily exported, only 426 repair items remained with the Porsche racing teams;

**F.    Temporarily Exported Items Imported Back into the United States**

38.    After the races in Canada, other than those repair items needed by the teams racing Porsche cars during the races, the remailing repair tools, parts, and accessories that had been temporarily exported to Canada were promptly imported back into the United States under CBP Entry Numbers KB5-5376882-5, KB5-5378599-3, and KB5-5381385-2;

39.    Although the entered classification was under subheading 9801.00.8500, HTSUS, CBP liquidated them under other tariff provisions and PMNA protested them under Protest Numbers 0901-15-100113 and 071216 100073. CBP denied both of those Protests;

**G.    Porsche's Policy Regarding Communications Received from CBP**

40.    It is Porsche's policy that any written communications received from CBP by any of the Porsche family of companies in the United States, are to be immediately forwarded to me, as I am the licensed customs broker and am the corporate official designated with the responsibility to review and process those matters;

41.    I have duly searched Porsche's records and have requested that PMNA search its records to locate any CBP notices for extension or suspension of the one-year time period for liquidating the said three entries that are the subject of this Court action;

42.    Only one Notice of Extension was located. A copy of it is attached marked as **Exhibit 8**. It is for Entry Number KB5-5376882-5, entered on or about May 22, 2014. However, as stated on the Notice, CBP issued it to PMNA on December 12, 2015, which is over a year and one half after the date of entry. Consequently, pursuant to 19 C.F.R. §§ 159.11 and 159.12, as well as 19 U.S.C. § 1504, I believe that the entry had already been liquidated by operation of law as entered before the Notice of Extension was issued rendering the Notice null and void;

Exhibit 17

43.    Further, I believe that said Notice of Extension is defective as it does not include a cause to extend the liquidation as required by 19 C.F.R. § 159.12;

44.    With respect to the other two entries, no Notices of Extension were received and the entries were liquidated by CBP more than one year after entry so I believe that those entries were also liquidated by operation of law as entered by PMNA pursuant to the provisions of 19 C.F.R. §§ 159.11 and 159.12, as well as 19 U.S.C. § 1504; and

**H.    PMNA Has Paid CBP Full Amount Demanded for Duties, Fees and Interest**

45.    For the subject three entries, PMNA has paid CBP the assessed and liquidated duties, fees, and interest demanded in the amount of $39,963.37 for Entry Number KB5-5381385-2; $39,523.05 for Entry Number KB5-5376882-5; and $43,118.70 for Entry Number KB5-5378599-3 for a total amount of $122,605.12.

In accordance with the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

Declarant

Dated: 3/1/2017

Robert Resetar

PSMJ Exhibit 18

Declaration of Jens Walter (April 10, 2017) ¶¶ 25-27 at p. 4

**Declaration**
**Of**
**Jens C. Walther**

I, Jens C. Walther, declare as follows:

1. I am the President and Chief Executive Officer of Porsche Motorsports North America, Inc. (hereinafter "PMNA") and have held that position since September 2010.  PMNA is located at 19800 South Main Street, Carson, CA 90745.  Telephone: (770) 290-7071;

2. PMNA is incorporated in the State of Delaware and is in good standing;

3. PMNA is a wholly owned indirect subsidiary of Porsche, AG;

4. My occupational career is set forth as follows:

09/2010 to Present    President & CEO of PMNA and my duties include and are not limited to:

- Management of PMNA
- Management of Porsche racing activities in North America
- Re-organization of the business and move to new location (PEC LA)
- Diversification and growth of business

08/2007 – 09/2010    Dr. Ing. h.c. F. Porsche Aktiengesellschaft, Weissach, Germany
- Motorsport – Manager One-Make Championships
- Management of the international Porsche One-Make Cup Program
- Development to 19 national and international championships
- Management of the Porsche Mobil 1 Supercup

01/2005 - 07/2007    Dr. Ing. h.c. F. Porsche Aktiengesellschaft, Weissach
Motorsport – Manager Porsche Mobil 1 Supercup
- Management of Porsche's premium championship
- Management of the team at the racetrack (ca. 25 people)
- Coordination of all Formula One related issues for Porsche AG and its international subsidiaries (strategies, marketing activation, TV)

11/2001 - 12/2004    Porsche Engineering Group GmbH, Weissach, Germany
Manager Marketing, Communications & Business

30139037 DOCX 1;

Exhibit 18

Development
 - Strategic and operative Marketing
 - Development of a marketing strategy for Porsche's engineering branch
 - Support of the international subsidiaries (Prague, Troy)
 - Close cooperation with Porsche AG's central departments for communication, Marketing and R&D

5. My education includes:

08/1999 - 07/2001    International University in Germany / Arthur D. Little School of Management (partly Boston, MA, USA)
 - Master of Business Administration (M.B.A.)
 - Focus: International Management & Management Strategy

01/1990 - 12/1991    Schiller International University, Heidelberg (partly Clearwater, FL, USA)
 - Bachelor of Business Administration
 - Majors: Marketing & Management

6. I am familiar with the judicial action pending in the United States Court of International Trade entitled, *"Porsche Motorsports North America, Inc. v. United States,"* bearing Court Number 16-00182, and I make this Declaration in support of Plaintiff's claim in that action, as well as in support of PMNA's position in the administrative action initiated by U.S. Customs and Border Protection (hereinafter "CBP") in Case Number 2017071230001001;

7. In addition to managing PMNA, my duties include management of Porsche racing activities in North America including working with the professional automobile racing associations, as well as teams that enter Porsche Race Cars into competitive race series;

8. It is PMNA's policy to provide support to teams that enter Porsche Race cars into competitive race series as competitive racing enhances the Porsche Brand;

9. PMNA is a series title sponsor for races promoted by the International Motor Sport Association (hereinafter "IMSA") and Pirelli World Challenge (hereinafter "PWC");

10.  IMSA and PWC promote automobile racing in both Canada and the United States;

11.  PMNA has agreements with IMSA to promote the races in the series and I am knowledgeable about the terms of those agreements;

2

12.    PMNA has agreed to promote such race series and integral to its promotion is to provide support for the teams that race Porsche cars in such race series, including the races in both Canada and the United States;

13.    As part of each race series, IMSA held racing events in both Canada and the United States in 2012 through 2016 in which the teams that raced Porsche cars participated;

14.    During those racing events, PMNA made available to the Porsche racing teams certain tools, parts, and accessories that were exported from the United States and imported back into the United States under the three entries that are the subject of this litigation, as well as the five other entries that CBP has cited in its said administrative case;

15.    The races were held in Canada and in the United States as set forth in the Schedule attached hereto marked as **Exhibit 1**;

16.    To make the tools, parts, and accessories available, if needed, for use by the teams during the races in both Canada and the United States, PMNA stocks them in its truck/trailer and drives them to the races for temporary use;

17.    The truck (tractor) is a Volvo and the trailer is a BT Transporter and are registered as a commercial vehicle in the United States and are included as part of the CBP Registration Form 4455;

18.    I have been informed that all necessary information, such as, truck and trailer license and VIN, driver name, driver license number and passport number are entered, prior to export, into the ACE manifest system;

19.    Attached marked as **Exhibit 2** is a collection of photographs of the PMNA truck/trailer and some of the tools, parts, and accessories that PMNA routinely stocks in the truck/trailer to support the race teams if any of those items should be needed for use during a race;

20.    Before the races are held, PMNA encourages the teams racing Porsche race cars to purchase all the spare parts and accessories from PMNA which the teams anticipate that they may need and offers them a discount from the retail price for those purchases;

21.    However, to support its commitment to IMSA to promote the series, as a backup procedure, PMNA makes approximately 1,500 of its tools, parts, and accessories temporarily available to the teams for use during the races;

22.    These backup tools, parts and accessories are selected by PMNA based

3

upon its racing experience and they are placed in the trailer in case the teams should need to use any of them while participating in a series event;

23.   The tools are only available for use by PMNA and/or the race teams but are never sold to them. All tools are returned to the United States by PMNA. Only the parts and accessories needed by the race teams are sold to the teams and they are not imported by PMNA back into the United States;

24.   The sale price of the parts and accessories used by the race teams during the races is the regular PMNA retail price and PMNA does not charge the teams for its costs and expenses for making the tools, parts, and accessories available for use by the race teams;

25.   When the races are held in Canada, the truck/trailer loaded with these Porsche tools, parts, and accessories is temporarily sent to Canada for use, if needed, and then it is returned to the United States;

26.   PMNA intends to only temporarily export the tools, parts, and accessories to Canada before returning all of them to the United States;

27.   PMNA does not expect any of these tools, parts, and accessories to be utilized by the racing teams in Canada for two reasons:

   •   First, Porsche has designed, engineered and produced the Porsche cars to withstand the rigors of auto racing without breaking down; and

   •   Second, the teams have brought their own backup tools, parts, and accessories for use in case of an accident, driver error, or some other breakdown;

28.   PMNA fully expects that all its tools, parts, and accessories that it has loaded in its truck/trailer for temporary use in Canada, if needed, will remain unneeded during the Canadian races and intends for them all to be returned to the United States after the races;

29.   However, as with any mechanical device, during races there are many unforeseen or unexpected circumstances that may occur, such as an accident, driver error, or undue stress on a component that may cause unanticipated damage or malfunction to the vehicle requiring immediate repair for which the team cannot make with its own tools or supplies;

30.   It is for that reason that PMNA makes its tools parts, and accessories available for use by the race teams, if needed;

31.   The PMNA truck/trailer situation is analogous to that of an ambulance. Just as an ambulance is frequently stationed at a race and is outfitted with medical instruments and supplies for use in the event of a medical emergency, so too does PMNA station its truck/trailer outfitted with its tools, parts, and accessories for use in the event of a racing car emergency;

32.   Just as an ambulance company does not know what medical instruments or medical supplies will be needed when stocking the ambulance or responding to a medical emergency, it stocks them in the ambulance based upon its experience of items that it may need. Similarly, PMNA does not know what tools, parts, or accessories will be needed, if any, for use during a racing emergency but, based upon its experience, it stocks its truck/trailer with items that may be needed during a racing emergency;

33.   Those parts and accessories needed by the race teams while in Canada are sold to the race teams and are not returned to the United States by PMNA. The balance of the unneeded parts and accessories are returned to the United States by PMNA;

34.   None of the tools are sold, as they are only available for the race teams temporary use during the races while in Canada but are all returned to the United States by PMNA in its truck/trailer;

35.   PMNA does not sell any of the parts and accessories that are transported in its said truck/trailer to anyone else other than to the teams racing Porsche cars and only if they are needed during an event, for immediate use. None of them are offered or sold to the public;

36.   The same truck/trailer with the same tools, parts, and accessories are made available on the same basis to the race teams that race Porsche cars in the United States as those in Canada;

37.   Upon commencing to support the teams racing Porsche cars in Canada, PMNA advised Mr. Robert Resetar, a licensed customs broker employed by Porsche Cars North America, Inc. (a sister company of PMNA), of all the pertinent facts and sought and followed his advice on the proper method to temporarily export the selected Porsche tools, parts, and accessories from the United States to Canada and then to import them back into the United States;

38.   The pertinent facts provided to the licensed customs broker included:

- PMNA's intent to only export to Canada the Porsche tools, parts and accessories for temporary use in Canada in the unlikely event that they would be needed for use by the Porsche race teams during the

5

race in case of an accident or breakdown; and

- After the races, all the said tools, parts, and accessories would be returned to the United States, except for just those few, if any, parts and accessories that were used by the race teams, which would be sold to them and not be imported back into the United States by PMNA. However, all the tools and the unused parts and accessories would be returned to the United States;

39.    The advice PMNA sought and followed from the licensed customs broker included seeking:

- The proper method to export the Porsche tools, parts, and accessories from the United States to Canada, including preparation and completing the CBP Certificates of Registration for the temporary export of the items, and
- The proper method to import them back into the United States from Canada including, but not limited to, the classification to use upon importation of those temporarily exported items;

40.    PMNA sought and received that professional advice from a licensed customs broker (Mr. Robert Resetar), relied upon it, followed it, and classified the items in accordance with the broker's advice;

41.    I have been informed by the licensed customs broker, Mr. Resetar, that he based his classification advice upon a Customs ruling issued to American Airlines which involved very similar facts, as it pertained to the temporary exportation from the United States of repair parts and subsequent importation of the unused parts back into the United States;

42.    Referring to the three Customs Entries that are the subject of the Court action (Entry Numbers KB5-5381385-2, KB5-5376882-5, and KB5-5378599-3), I have caused a search of PMNA records to locate any Notices received from CBP that state that CBP has extended or suspended the period of liquidation for those three entries;

43.    That search revealed only one such Notice and it pertained to Entry Number KB5-5376882-5, entered on or about May 22, 2014. The Notice had been issued to PMNA on or about December 12, 2015, which is over one year after the date of entry (see **Exhibit 3**);

44.    That Notice does not include a reason for the purported extension or suspension of the period for liquidation;

45.    The search revealed that no other Notices of Extension or Suspension

were received by PMNA for either of the other two entries (Entry Numbers KB5-5381385-2, and KB5-5378599-3) or for Entry Number KB5-5376882-5;

46.    It is PMNA's policy to promptly refer all written communications received from CBP to Mr. Resetar for assistance in processing;

47.    Mr. Resetar was requested to search his records to determine if he has received any other such Notices of Extension or Suspension of the Liquidation Period for the subject three entries from either CBP or PMNA and he responded that he had not. The only Notice he received was a copy of the Notice described above (**Exhibit 3**) which was issued more than one year after entry;

48.    CBP assessed the subject imported items under various other HTSUS subheadings depending on the type of the item and assessed duties on the items at various rates;

49.    CBP required PMNA to pay, and PMNA did pay to CBP the assessed and liquidated duties with interest in the amount of $39,963.37 for Entry Number KB5-5381385-2; $39,523.05 for Entry Number KB5-5376882-5; and $43,118.70 for Entry Number KB5-5378599-3 for a total amount of $122,605.12; and

50.    PMNA disputes that those said duties, fees and interest were payable; and

51.    By the said court action PMNA seeks a refund of that total amount, plus interest, as provided by law.

In accordance with the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

Dated: _April 10 2017_

Declarant _[signature]_

Jens C. Walther
President and Chief Executive Officer
Porsche Motorsports North America, Inc.

{0135037.DOCX.1}

7

Exhibit 18