UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN ALEXANDER VADEN, *JUDGE*

| | | |
|---|---|---|
| PORSCHE MOTORSPORTS NORTH AMERICA, INC., Plaintiff, | : | Court No. 16-00182 |
| v. | : | |
| UNITED STATES, Defendant. | : | |

**JUDGMENT ORDER**

Upon reading plaintiff's motion for summary judgment; defendant's cross-motion for summary judgment; plaintiff's response and reply; defendant's reply; and upon other papers and proceedings had herein, it is hereby

**ORDERED** that plaintiff's motion for summary judgment be, and hereby is, denied; and it is further

**ORDERED** that defendant's cross-motion for summary judgment be, and hereby is, granted; and it is further

**ORDERED** that this action is dismissed.

________________________________
STEPHEN ALEXANDER VADEN, *JUDGE*

Dated: ____________________
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN ALEXANDER VADEN, *JUDGE*

PORSCHE MOTORSPORTS NORTH AMERICA, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Court No. 16-00182

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

BEVERLY A. FARRELL
Senior Trial Attorney
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel.: (212) 264-9230
Attorneys for Defendant

*Of Counsel*:
Valerie A. Sorensen-Clark
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: May 26, 2021

## TABLE OF CONTENTS

BACKGROUND .......... 2

PRIOR PROCEEDINGS .......... 4

A. Notices for Extension of Liquidation .......... 4

B. Subheading 9801.00.85 and the Nature of the Imported Merchandise .......... 6

C. Law of the Case Doctrine .......... 6

QUESTIONS PRESENTED .......... 7

STATUTORY PROVISION .......... 7

SUMMARY OF ARGUMENT .......... 7

ARGUMENT .......... 9

I. THE GOODS COVERED BY ENTRY NUMBERS KB5-5376882-5, KB5-5378599-3, AND KB5-5381385-2 ARE NOT CLASSIFIABLE UNDER SUBHEADING 9801.00.85, HTSUS .......... 9

A. Standard of Review .......... 9

B. Legal Standard For Summary Judgment .......... 10

C. Legal Standard for Classification .......... 11

D. The Merchandise Declared On The Entry Forms Is Not Classifiable Under Subheading 9801.00.85, HTSUS .......... 12

1. Promulgation of Subheading 9801.00.85, HTSUS .......... 12

2. With the exception of wrench sockets, the inventory items do not qualify as “books, implements, instruments, or tools” .......... 13

3. While in Canada, the inventory items were not used in the course of a trade, occupation, or employment .......... 15

4. The inventory items were not “exported for use temporarily” in Canada .......... 17

E. PMNA’s Arguments Are Unavailing .......... 18

1. PMNA’s business is not racing automobiles or repairing them .......... 18

2. PMNA's imported inventory does not constitute implements, instruments or tools of subheading 9801.00.85 .......... 19

3. The automotive repair parts and tools were exported with the intention of being temporarily made available to race teams and returned .......... 20

II. CUSTOMS PROPERLY EXTENDED THE TIME TO LIQUIDATE ENTRY NUMBERS ENTRIES KB5-5376882-5 AND KB5-5378599-3 .......... 26

A. Notices of Extension were Timely Mailed and Delivered to PMNA .......... 27

B. The Extension Notices Provided PMNA With A Reason For Customs' Extension Of Liquidation .......... 33

CONCLUSION .......... 34

## TABLE OF AUTHORITIES

**Cases**

A.N. Deringer, Inc. v. United States, 20 CIT 978 (1996) .......... 32

ABB, Inc. v. United States, 28 CIT 1444, 346 F. Supp. 2d 1357 (2004) .......... 9

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) .......... 10

Alaska Airlines, Inc. v. Johnson, 8 F.3d 791 (Fed. Cir. 1993) .......... 27-28, 31-32

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......... 10

Atlas Copco, Inc. v. United States, 651 F. Supp. 1446 (Ct. Int'l Tr. 1986) .......... 25

Butler v. Principi, 244 F.3d 1337 (Fed. Cir. 2001) .......... 31, 32

CamelBak Products, LLC v. United States, 649 F.3d 1361 (Fed. Cir. 2011) .......... 11

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)....................10

Chrysler Corp. v. United States,
601 F. Supp. 2d 1347 (Ct. Int'l Trade 2009)....................9

Clarendon Marketing, Inc. v. United States,
144 F.3d 1464 (Fed. Cir. 1998)....................11

Cummins Inc v. United States,
454 F.3d 1361 (Fed. Cir. 2006)....................11

Deckers Outdoor Corp. v. United States,
714 F. 3d 1363 (Fed. Cir. 2013)....................11

Ford Motor Co. v. United States,
157 F.3d 849 (Fed. Cir. 1998)....................10

Ford Motor Co. v. United States,
926 F.3d 741 (Fed. Cir. 2019)....................21

Ford Motor Co. v. United States,
992 F. Supp. 2d 1346 (Ct. Int'l Trade 2014)....................6, 33

Frontier Insurance Co. v. United States,
155 F. Supp. 2d 779 (Ct. Int'l Tr. 2001)....................31, 32

Hudson v. Principi,
260 F.3d 1357 (Fed. Cir. 2001)....................6, 33

Intergraph Corp. v. Intel Corp.,
253 F.3d 695 (Fed. Cir. 2001)....................6, 33

Int'l Cargo & Surety Ins. Co. v. United States,
779 F. Supp. 174 (Ct. Int'l Trade 1991)....................32

La Crosse Tech, Ltd. v. United States,
723 F.3d 1353 (Fed. Cir. 2013)....................11

Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)....................10

Millennium Lumber Distr. Ltd. v. United States,
558 F.3d 1326 (Fed. Cir. 2009)....................24

Novosteel SA v. United States,
284 F.3d 1261 (Fed. Cir. 2002)....................27

Pillowtex Corp. v. United States,
171 F.3d 1370 (Fed. Cir. 1999)....................11

Plexus Corp. v. United States,
489 F. Supp. 3d 1379 (Ct. Int'l Trade 2020)....................9, 10

Porsche Motorsport North America, Inc.,
Slip Op. 18-105, 2018 WL 4029172 (Ct. Int'l Trade Aug. 22, 2018)....................*passim*

Riggs National Corp. & Subsidiaries v. C.I.R.,
295 F.3d 16 (Fed. Cir. 2002)....................28

Rosenthal v. Walker,
111 U.S. 185 (1884)....................32

Saab Cars USA, Inc. v. United States,
434 F.3d 1359 (Fed. Cir. 2006)....................9

S. C. Johnson & Son, Inc. v. United States,
415 F. Supp. 3d 1375 (Ct. Int'l Trade 2019)....................19

Skaraborg Invest USA, Inc. v. United States,
9 F. Supp. 2d 706 (Ct. Int'l Trade 1998)....................19

SmithKline Beecham Corp. v. Apotex Corp.,
439 F.3d 1312 (Fed. Cir. 2006)....................26

Texas Apparel Co. v. United States,
698 F. Supp. 932 (Ct. Int'l Trade 1988), *Aff'd,*
883 F.2d 66 (Fed. Cir. 1989), cert. denied, 493 U.S. 1024 (1990)....................10

Tradewind Farms, Inc. v. United States,
31 CIT 664 (2007)....................12

United States v. Great American Ins. Co.,
738 F.3d 1320 (Fed. Cir. 2013)....................26

United States v. Mead Corp.,
533 U.S. 218 (2001)....................9, 10

United States v. Millenium Lumber Distrib. Co. Ltd.,
887 F. Supp. 2d 1369 (Ct. Int'l Trade 2013)....................19

United States v. White,
846 F.2d 678 (11th Cir. 1988) .......... 6, 33

**Statutes**

19 U.S.C. § 1504 .......... 4, 5, 30

19 U.S.C. § 1504(a) .......... 27, 25

19 U.S.C. § 1504(b) .......... 5, 27, 31

19 U.S.C. § 1504(b)(1) .......... 27, 28, 31

28 U.S.C. § 2639(a)(1) .......... 9

**Rules**

USCIT Rule 56 .......... 10

USCIT Rule 56(c) .......... 10

**Regulations**

19 C.F.R. § 159.11 .......... 5

19 C.F.R. § 159.12(a)(1) .......... 5, 33

19 C.F.R. § 162.74 .......... 3

19 C.F.R. § 177.9 .......... 19

19 C.F.R. § 177.9(b) .......... 19

19 C.F.R. § 177.9(b)(2) .......... 21, 24

**Harmonized Tariff Schedule of the United States**

GRI 1 ........ 11, 21

GRI 3(a) ........ 12

Section XXII

Chapter 98 ........ 11, 12, 13

US Note 1 ........ 11-12

Heading 9801

Subheading 9801.00.85 ........ passim

Subheading 9804.00.10 ........ 12, 13

**Miscellaneous**

S. Rep. 104-393, Sec. 44 ........ 12, 26

HQ H013537 ........ 14, 19

HQ 562318 ........ 21, 22, 23

N013372 ........ 23

N013373 ........ 23

*Employment*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/employment (last visited May 26, 2021) ..... 15

*Implement*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/implement (last visited May 24, 2021) .. 13, 14

*Instrument*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/instrument (last visited May 24, 2021) ........ 14

*Occupation*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/occupation (last visited May 26, 2021) ....... 15

*Tool*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/tool (last visited May 24, 2021) ........ 14

*Trade*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/trade (last visited May 26, 2021) ........ 15

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN ALEXANDER VADEN, *JUDGE*

| | | |
|---|---|---|
| PORSCHE MOTORSPORTS NORTH AMERICA, INC., Plaintiff, | : | Court No. 16-00182 |
| v. | : | |
| UNITED STATES, Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, the United States (the Government), submits this memorandum in opposition to plaintiff's, Porsche Motorsports North America, Inc. (PMNA), motion for summary judgment and in support of our cross-motion for summary judgment. For the reasons set forth below, we respectfully request that the Court enter an order denying plaintiff's motion for summary judgment; granting our cross-motion for summary judgment; and dismissing this action in its entirety.

As we demonstrate below, the Court should affirm U.S. Customs and Border Protection's (Customs or CBP) determination that the merchandise covered by Entry Nos. KB5-5376882-5, KB5-5378599-3, and KB5-5381385-2 is not classifiable under subheading 9801.00.85, Harmonized Tariff Schedule of the United States (HTSUS), which provides for "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items."

**BACKGROUND**

This action concerns the exportation and return of a trailer containing certain automotive tools and parts stocked by PMNA in connection with its promotion of the Porsche brand at certain races in Canada. Amended Joint Statement of Material Facts (AJSMF), Docket No. 81 at ¶¶ 2, 7, 8, 17, 19; *2018 Decision*, 2018 WL 4029172, *1.

PMNA contends that inventory items not sold in Canada and returned to the United States under Entry Nos. KB5-5376882-5, KB5-5378599-3, and KB5-5381385-2 should be classified duty free under subheading 9801.00.85, HTSUS, as "implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad." PMNA argues that by making parts and accessories available for sale to those engaged in auto racing and auto repair it has satisfied the requirements of subheading 9801.00.85, HTSUS.

PMNA exported certain automobile parts and accessories, in addition to a select number of hand tools, from the United States to be made available for purchase by race teams at car races in Canada.[1] AJSMF at ¶ 17; Def. Ex. 1 (Transcript of USCIT Rule 30(b)(6) Deposition of PMNA) at 28:22-29:07. Prior to exportation, PMNA filed Certificates of Registration with an attached "invoice" covering inventory items that it was exporting to Canada. Docket No. 81-2, AJSMF Exs. 1, 2, 3 (Certificates of Registration).

The race teams were not permitted to borrow any of the inventory items. Def. Ex. 1 at 32:18-32:21. When a race team purchased an inventory item, that item permanently remained with the team and would not be reimported to the United States by PMNA. AJSMF ¶ 30, Def.

[1] For ease of reference, in our brief we refer to these items, collectively, as the "inventory items."

Ex. 1 at 36:13-36:17; 56:13-56:20. After a race, any inventory items that were unsold were reimported to the United States. Def. Ex. 2 (Pl. Resp. to Second Set of Interrogatories ¶ 2); Def. Ex. 1 at 61:03-61:07. The reimported inventory items were not used while in Canada. Def. Ex. 1 at 35:03-35:05, 36:18-36:21. Any inventory item that was originally exported in its individual packing from the United States to Canada, and was not sold to a race team, remained in its original packaging upon reimportation. Def. Ex. 1 at 37:04-37:09. PMNA was under no contractual obligation with the race teams or any other party to make the inventory items available for sale in Canada. Def. Ex. 3 (Pl. Resp. to Req. for Prod. of Docs) at ¶ 2.

During discovery in this action, PMNA filed a letter with CBP (hereinafter referred to as the June Letter), which was incorrectly identified by PMNA as a "prior disclosure."[2] AJSMF Ex. 15 (Docket No. 81-2).[3] This letter stated that PMNA had imported *more* items from Canada to the United States than it had previously declared on its Certificates of Registration and entry forms. AJSMF Ex. 15 at ¶ II.B; Def. Ex. 1 at 68:03-69:12. PMNA has identified these items in Exhibits 12, 13, and 14 to the AJSMF.

In addition to those items listed on the Certificates of Registration, PMNA also exported various hand tools from the United States to Canada. Def. Ex. 2 at ¶¶ 1.A, 1.B. These items, which we will refer to as the "permanent tools," were not made available for sale, but race teams were permitted to borrow them. Def. Ex. 1 at 29:08-29:12. Any race team that borrowed one of these permanent tools was required to return it to PMNA. Def. Ex. 4 (Pl. Resp. to First Set of Interrogatories) at ¶ 6. After a race, PMNA would reimport these permanent tools to the United

[2] *See* 19 C.F.R. § 162.74.

[3] Although this letter is marked "confidential," the parties agree that the letter does not contain proprietary information. Accordingly, PMNA filed this letter publicly as Exhibit 15 to the AJSMF.

States, but did not individually declare any of them on its entry forms. Def. Ex. 2 at ¶ 1.B; Def. Ex. 1 at 48:04-48:07. PMNA did not declare these items because it considered them to be part of its truck. Def. Ex. 2 at ¶ 1.B; Def. Ex. 1 at 48:08-48:10. Because PMNA did not individually report these permanent tools on its entry forms, CBP did not classify the items or assess duties on them. *See* Def. Ex. 1 at 47:18-50:19. PMNA did not keep a list of the permanent tools that were on the truck for any of the three entries at issue. Def. Ex. 1 at 74:03-74:17. However, PMNA has provided a "Workshop Tool Inventory" as part of Exhibit 7 to the AJSMF.

## PRIOR PROCEEDINGS

The Court has already had an opportunity to consider whether the imported merchandise qualifies for duty free treatment by operation of classification under subheading 9801.00.85, HTSUS. *See Porsche Motorsport North America, Inc.*, Slip Op. 18-105, 2018 WL 4029172 (Ct. Int'l Trade Aug. 22, 2018) (the *2018 Decision*). After considering the parties' cross-motions for summary judgment, the Court reached no conclusions as to whether the subject entries qualify for duty-free treatment under subheading 9801.00.85, HTSUS, but addressed CBP's notices for extension of liquidation and conducted an analysis interpreting the language of subheading 9801.00.85, HTSUS.

### A. Notices for Extension of Liquidation

PMNA argued that Entry Nos. KB5-5376882-5 and KB5-5378599-3 should be deemed liquidated by operation of law pursuant to 19 U.S.C. § 1504, which requires liquidation[4] of an entry within one year from the date of entry unless the deadline is extended. *2018 Decision*,

[4] When goods are imported into the United States, CBP is obligated to "fix the final amount of duty to be paid on such merchandise and determine any increased or additional duties, taxes, and fees due[.]" 19 U.S.C. § 1500(c). CBP calculates the "final computation or ascertainment of duties" through a process called "liquidation." 19 C.F.R. § 159.1.

2018 WL 4029172 at *3.  If an entry liquidates by operation of law, it does so at the rate of duty,

value, quantity, and amount of duties asserted by the importer at the time of filing an entry

summary, which would be duty free under the classification of subheading 9801.00.85, HTSUS,

asserted by PMNA at the time of entry.  *Id.*

   PMNA contended that CBP failed to timely issue notices of extension in accordance with

19 C.F.R. § 159.11 because it had received a notice of extension for Entry No. KB5-5376882-5

dated December 12, 2015, which was more than one year after the May 22, 2014 date of entry.

*Id.*  PMNA claimed that it had not received any notice for Entry No. KB5-5378599-3.  *Id.*  The

Government responded that it was entitled to a presumption of regularity regarding the notices,

but the Court disagreed because the December 12 notice would have either been late or

contained a clerical error.  *Id.*

   PMNA also contended that CBP failed to advise it of the reason for the extension of

liquidation in accordance with 19 U.S.C. § 1504.  *Id.* at *4.  The Court concluded that a reason

had been provided because CBP stated in its notice that "[t]he period to liquidate this entry has

been extended for a period not to exceed one year, pursuant to 19 U.S.C. § 1504(b) and 19

.CF.R. § 159.12(a)(1)."  *Id.* at *4.  Based on these citations, the Court found that the reason for

the extension was that CBP lacked complete information to make a determination on PMNA's

classification claim.  *Id.*  Moreover, even if a reason had not been included in the notices, such a

failure would constitute harmless error and not invalidate the notices.  *Id.*  Therefore, the Court

granted summary judgment to the Government on this issue.  *Id.*

**B. <u>Subheading 9801.00.85 and the Nature of the Imported Merchandise</u>**

With respect to whether the inventory items should qualify for duty-free treatment under subheading 9801.00.85, the Court concluded that PMNA's motion was premature because it did not provide sufficient admissible evidence to describe the specific merchandise to be classified. *Id.* The Court noted the parties' agreement that goods classifiable under subheading 9801.00.85 "must be (1) professional implements, instruments, or tools of a (2) trade, occupation, or employment (3) returned to the United States after having been exported for use temporarily abroad and (4) imported by or for the account of the person who exported such items." *Id.* at *5.

In reviewing these requirements, the Court recognized that "[t]he question of moment, thus, appears to be whether 'temporary use' encompasses 'temporary availability,' of automobile parts in furtherance of the Porsche brand, to professional race teams in case of 'emergency.'" *Id.* at *7. The Court then conducted a definitional analysis of the term "use" in the subheading. *Id.* at *7-*9. However, the Court reached no conclusions as to whether the subject entries qualify for classification in subheading 9801.00.85. *Id.* at *9.

**C. <u>Law of the Case Doctrine</u>**

Because the Court has issued an opinion in connection with this action, doctrine of "law of the case" is implicated. The law of the case doctrine encompasses issues expressly decided or "decided by necessary implication." *United States v. White*, 846 F.2d 678, 684 (11th Cir. 1988); *see also Ford Motor Co. v. United States*, 992 F. Supp. 2d 1346, 1355 (Ct. Int'l Trade 2014). "The doctrine of law of the case generally bars retrial of issues that were previously resolved." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697 (Fed. Cir. 2001). Whether to apply this doctrine is within the discretion of the Court. *Hudson v. Principi*, 260 F.3d 1357, 1363 (Fed. Cir. 2001).

## QUESTIONS PRESENTED

1. Whether automobile parts and accessories, and certain hand tools covered by the entries at issue, qualify for duty-free treatment through classification under subheading 9801.00.85, HTSUS.
2. Whether CBP properly extended the period of liquidation for Entry Nos. KB5-5376882-5 and KB5-5378599-3.[5]

## STATUTORY PROVISION

At issue in this action is subheading 9801.00.85, HTSUS, which provides:

> [p]rofessional books, implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items.

## SUMMARY OF ARGUMENT

To qualify for duty-free treatment under subheading 9801.00.85, PMNA must show that the imported goods are (i) professional implements, instruments, or tools; (ii) of a trade, occupation, or employment; (iii) returned to the United States after having been exported for use temporarily abroad; and (iv) imported by or for the account of the person who exported such goods.[6] PMNA fails to make this showing.

First, PMNA admits that it actually imported items into the United States from Canada that were not, and could not have been, listed among the articles in PMNA's Certificates of

---

[5] Although this question is presented in the amended complaint, as we demonstrate below, PMNA has now abandoned and waived this issue.

[6] For ease of reference, in our brief we refer to subheading 9801.00.85, HTSUS, as the "tools of trade" provision.

Registration as having been exported to Canada.  Any imported merchandise that was either not registered at exportation or was acquired in Canada is ineligible for "tools of trade" classification under subheading 9801.00.85, HTSUS, because they could not have been "returned to the United States after having been exported for use temporarily abroad," as they were never exported in the first place.

Second, the items that were actually included on PMNA's Certificates of Registration and entry documents are not classifiable under the "tools of trade" provision.  The declared merchandise consists primarily of spare parts and accessories that were exported only to be offered for sale, and then returned to the United States if they were not sold in Canada.  Such items do not meet the requirements articulated in subheading 9801.00.85, HTSUS, because they are not implements, instruments and tools of an occupation or trade, and were not exported for use temporarily abroad.

Finally, although Entry Nos. KB5-5376882-5 and KB5-5378599-3 were not liquidated within one year of entry, these entries did not liquidate by operation of law, as argued by PMNA in its Amended Complaint, because CBP properly extended the period of liquidation. Notwithstanding that PMNA appears to have abandoned this argument by failing to raise it in its motion for summary judgment, we provide evidence supporting that the notices extending the time for liquidation were timely issued and sent to PMNA.  Similarly, as the Court determined in the *2018 Decision*, the extension notices for these entries were not invalid for failure to state a reason why liquidation was being extended.  Rather, because the notices contained language explaining the statutory and regulatory reason for the extension, the Court held in the *2018 Decision* that CBP did provide PMNA with the reason for the extension: that CBP did not have complete information.

## ARGUMENT

### I. THE GOODS COVERED BY ENTRY NUMBERS KB5-5376882-5, KB5-5378599-3, AND KB5-5381385-2 ARE NOT CLASSIFIABLE UNDER SUBHEADING 9801.00.85, HTSUS

#### A. Standard of Review

This Court "reviews Customs' protest decisions *de novo*." *Chrysler Corp. v. United States*, 601 F. Supp. 2d 1347, 1350 (Ct. Int'l Trade 2009). However, Customs' decisions are statutorily entitled to a presumption of correctness. 28 U.S.C. § 2639(a)(1) ("the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision."). Where a plaintiff challenges Customs' decision, "a court presumes that Customs applied the provision correctly, which means that the plaintiff is left with the burden of showing by a preponderance of the evidence that Customs' decision was incorrect." *ABB, Inc. v. United States*, 28 CIT 1444, 346 F. Supp. 2d 1357, 1364 (2004); *see also Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (a plaintiff must "meet its burden of contradicting Customs' presumed correct factual finding . . . ."). The presumption of correctness "is not a true evidentiary presumption governed by Federal Rule of Evidence 301," instead it is "an 'assumption' that allocates to plaintiff the burden of proof on contested factual issues that arise from the protest decision." *Chrysler*, 601 F. Supp. 2d at 1354.

Although this Court conducts a *de novo* review of classification case, "Customs' ruling letters, as explanations of classification decisions, are entitled to a level of 'respect proportional to their power to persuade.'" *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1402 (Ct. Int'l Trade 2020) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)). The degree of a ruling letter's persuasive power may be found in "the agency's thoroughness, logic and

expertness, and consistency with prior interpretations." *Plexus*, 489 F. Supp. 3d at 1403 (citing *Mead*, 533 U.S. at 235).

**B. <u>Legal Standard For Summary Judgment</u>**

Under Rule 56 of the United States Court of International Trade (USCIT), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must determine "whether there are any factual disputes that are material to the resolution of the action." *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Trade 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In determining whether a genuine, material issue of fact exists, a court reviews the evidence submitted drawing all inferences against the moving party. *See Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

In the absence of genuine factual issues, whether to grant summary judgment turns on the proper construction of the HTSUS, which is a question of law. *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998).

**C. <u>Legal Standard for Classification</u>**

Determining whether imported merchandise has been properly classified is ultimately a question of law. *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999). "Resolution of that issue entails a two-step process: (1) ascertaining the proper meaning of specific terms in the tariff provision and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed." *Id.* The first step is a question of law, while the second step is one of fact. *Id.* However, when there is no dispute as to the nature of the merchandise, the two-step process "collapses entirely into a question of law." *Cummins Inc v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006).

"The tariff classification of merchandise under the HTSUS is governed by the principles set forth in the General Rules of Interpretation ('GRIs')," which are applied in order. *Deckers Outdoor Corp. v. United States*, 714 F. 3d 1363, 1366 (Fed. Cir. 2013). Pursuant to GRI 1, an article should be classified "according to the terms of the headings and any relative section or chapter notes…" Courts "apply GRI 1 as a substantive rule of interpretation, such that when an imported article is described in whole by a single classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative." *La Crosse Tech, Ltd. v. United States,* 723 F.3d 1353, 1358 (Fed. Cir. 2013) (quoting *CamelBak Products, LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011)).

Chapter 98 (Special Classification Provisions) covers subheading 9801.00.85 and contains U.S. Note 1, which provides:

> [t]he provisions of this chapter are not subject to the rule of relative specificity in general rule of interpretation 3(a).[7] Any article described in any provision in this chapter is classifiable in said provision if the conditions and requirements thereof and any regulations are met.

Under this special provision, if the imported articles meet the requirements articulated in subheading 9801.00.85 they are classifiable under that provision. "In other words, if merchandise is actually used for one of the enumerated purposes, it will be classified under Chapter 98 no matter what its classification would otherwise be . . . ." *Tradewind Farms, Inc. v. United States,* 31 CIT 664, 667 (2007).

**D. The Merchandise Declared On The Entry Forms <u>Is Not Classifiable Under Subheading 9801.00.85, HTSUS</u>**

None of the items declared by PMNA upon entry meet the requirements set forth in subheading 9801.00.85, HTSUS. PMNA is therefore not entitled to a refund of any duties in this case and the Court should grant the Government's cross-motion for summary judgment.

**1. <u>Promulgation of Subheading 9801.00.85, HTSUS</u>**

Subheading 9801.00.85, HTSUS, was promulgated in 1996 and originates from subheading 9804.00.10. *See* S. Rep. 104-393, Sec. 44 (*Articles Used To Provide Repair and Maintenance Services*) at 24-25. The report noted that, under the current law (subheading

---

[7] GRI 3(a) provides:

> When, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows:
> (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

9804.00.10), tools of trade occupation, or employment taken abroad by a person returning to the United States are entered duty free as a personal exemption. Chapter 98 was amended to add 9801.00.85 to permit duty-free entry of "tools of the trade" by corporations as well as individuals. The report explained that:

> Goods used by technicians and engineers to provide repair services abroad may be brought in duty-free under the personal-allowance exemption, but only if the same individual that took the goods abroad accompanies them on their return. By allowing for duty-free re-entry for such goods, the provision would simplify the customs procedures for U.S. companies that provide such services and are unable to avail themselves of the personal-allowance exemption.

By its terms, subheading 9801.00.85, HTSUS, is a duty-free provision that covers "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by or for the account of the person who exported such items." For items to be classifiable under this provision they must be (1) professional books, implements, instruments, or tools; of a (2) trade, occupation, or employment; that are (3) returned to the United States after having been exported for use temporarily abroad; and (4) imported by or for the account of the person who exported such items. All of the entered merchandise fails at least two of these elements, and most fail three.

**2. With the exception of wrench sockets, the inventory items do not qualify as "books, implements, instruments, or tools"**

The inventory items are automotive parts and accessories and, thus, do not qualify as books. *See* AJSMF Exhibits 12, 13, and 14. Turning to the other statutory terms, the term "implement" is defined as "a device used in the performance of a task," or an item that "serves as an instrument or tool." *Implement*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/implement (last visited May 24, 2021). An instrument is an item "used

by another as a means or aid" or an "implement *especially:* one designed for precision work." *Instrument*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/instrument (last visited May 24, 2021).  Finally, a tool is defined as "a handheld device that aids in accomplishing a task" or "something (such as an instrument or apparatus) used in performing an operation or necessary in the practice of a vocation or profession."  *Tool*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/tool (last visited May 24, 2021).  Based on these definitions, the terms "implements," "instruments," and "tools" may safely be described as synonyms.  The definitions of the terms all emphasize that they are items used to accomplish or complete some task.  Indeed, CBP has defined "tools of trade" generally to include those items necessary for the exercise of the trade or profession of the individual.  *See, e.g.,* Def. Ex. 7 (HQ H013537).

  With the exception of wrench sockets, none of the declared inventory items fall within the common meaning of "books, implements, instruments or tools."  Instead, the declared inventory items are generally automotive parts and accessories that had been offered for sale.  *See* AJSMF Exhibits 12, 13, 14.  For example, among these items are oil, brake fluid, radiator supports, head lamp trays, washers, hoses, grommets, nuts, bolts, O-rings, screws, clamps, mirror glass, mirror housings, transmission brackets, engine mounts, and socket wrenches.  *See* AJSMF Exhibits 12, 13, 14.  By simply residing in a trailer for purchase, these inventory items are not being used to accomplish or complete their intended task (which is to reside and operate in race car as a functioning part of a car).  PMNA's principal business is selling Porsche racing cars and parts for their repair and maintenance for automobile racing as well as promoting the Porsche brand.  Pl. Br. at 5.  Moreover, the inventory items are not the tools used for the task of selling or

promotion. Instead, they are supplies for purchase by a race team for the repair or maintenance of a their race car. AJSMF ¶¶ 17, 20

**3. While in Canada, the inventory items were not used in <u>the course of a trade, occupation, or employment</u>**

The inventory items fail to satisfy the second element of the statute (*i.e.*, that they must be of a "trade, occupation, or employment"). While in Canada, the inventory items were not used in the course of a trade, occupation, or employment.

Merriam-Webster defines trade as "a: an occupation requiring manual or mechanical skill: CRAFT; b: the business or work in which one engages regularly: OCCUPATION; c: the persons engaged in an occupation, business or industry. https://www.merriam-webster.com/dictionary/trade (last visited May 26, 2021). An occupation is defined as "1a: an activity in which one engages" or "b: the principal business of one's life." https://www.merriam-webster.com/dictionary/occupation (last visited May 26, 2021). Employment is defined as "2a: an activity in which one engages or is employed; b: an instance of such activity." https://www.merriam-webster.com/dictionary/employment (last visited May 26, 2021).

PMNA acknowledges that it filled a trailer with auto parts and accessories and exported it to Canada for three races. AJSMF at ¶¶ 12, 17, 19. It further admits that its principal business is to sell Porsche racing cars and parts for their repair and maintenance. Pl. Br. at 5. To enhance its business of selling Porsche race cars, parts, and tools, PMNA sponsors and supports automobile races by bringing its trailer to these races. AJSMF at ¶¶ 8, 12, 17, 19. By stocking a trailer and attending races, PMNA operates like a vendor at a car show or flea market where it offers merchandise for sale that its pre-made audience is likely to buy. As such, it is engaged in the activity or business of selling auto parts. The tools and instruments that PMNA uses in connection with its selling are not the wares (*i.e.*, inventory items), but, instead, the trailer,

inventory tracking sheets, and order slips. These items are not the inventory items for which PMNA was required to pay a duty.

PMNA states that "[a]uto racing and the repair of racing automobiles is a trade, occupation and or employment." Pl. Br. at 15. However, the inventory items exported and returned to the United States could not have been used for auto racing or auto repair in Canada and still be returned to the United States. If a part had been used for racing or repair, it would have been sold by PMNA to the racing team. PMNA admits that once sold these parts remained with the race car teams. AJSMF at 30. Thus, because the inventory items are those items returned to the United States, it is impossible that any of them had been used in Canada.

PMNA does not claim that racing or repair is its trade, occupation or employment. While in Canada, PMNA was not responsible for fixing or racing cars – its "trade" was selling car parts to race teams.[8] Def. Ex. 1 at 33:4-17; Pl. Br. at 5. As Mr. Blocker states, "[p]art of the cost to the driver for participating in the series comes from covering salaries and travel (flight, hotel, rental cars, and meals) for the team of support mechanics and race engineers at each event." Third Supplemental Declaration of Brian Blocker, Docket No. 80, Ex. 1. Thus, the race team is responsible for repairing its own vehicle. PMNA does not argue that the inventory items were brought to Canada so that PMNA could use them to repair race cars. Instead, the race teams had their own mechanics and engineers for that purpose. Thus, PMNA's "occupation, trade, or employment" at the races is more akin to salespeople like itinerant merchants or car show vendors who bring their wares with them to an event. Although "implements," "instruments,"

[8] PMNA did employ a gear box technician in Canada who may have used some of the inventory parts. Def. Ex. 1 at 31:04-31:09. However, PMNA was unable to identify which, if any, inventory items were used by the gearbox technician. *Id.* at 31:10-32:03. Nor has PMNA claimed that the gear box technician did any work at the three races at issue here. *See* AJSMF.

and "tools" of a salesperson might include receipt books, sales catalogs and computer tablets, they would not include the inventory of goods for sale. Even if PMNA's "occupation, trade, or employment" is brand promotion, the sale of repair parts collapses that role into one of travelling sales because all salespeople are promoting the item they sell.

**4. <u>The inventory items were not "exported for use temporarily" in Canada</u>**

Finally, the inventory items fail to satisfy the third element of the statute. The inventory items returned to the United States and declared at entry were not used by *anyone* while in Canada. Had they been used, they could not have been returned by PMNA because PMNA would no longer have them in its possession. Thus, the only items that were actually used were the items purchased by the race teams. Those purchased items remained with the race teams and were not reimported by PMNA. AJSMF ¶ 30; Def. Ex. 1 at 36:13-36:17; 56:13-56:20. PMNA agreed that those items covered by the entries at issue were unused while in Canada. Def. Ex.1 at 35:03-35:05, 36:18-36:21. In fact, when asked how the inventory items were used while abroad, PMNA's only response was that "being made available for sale" was a use. Def. Ex. 1 at 54:19-54:22.

Similarly, the inventory items were not originally exported from the United States for the purpose of being used temporarily in Canada. When PMNA exported the inventory items, it did not do so in response to a request for a specific repair or maintenance needs. Indeed, Porsche race teams at races are responsible for maintaining their own inventory of parts and tools. AJSMF at ¶ 24. Instead, PMNA exported the trailer of parts so they would be available if a race team needed to repair or maintain a vehicle during a race. AJSMF at ¶ 25. The articles needed by the race teams while in Canada are sold to the race team and not returned to the United States by PMNA. Plaintiff's Motion for Summary Judgment (PMSJ) Ex. 18 at ¶ 33. Thus, at the time

of exportation from the United States PMNA knew that the inventory items would either (1) remain unused while abroad and then returned to the United States, or (2) be permanently sold and not reimported. Accordingly, none of the inventory items were "exported for use temporarily abroad," a requirement for classification under subheading 9801.00.85, HTSUS.

Because (1) most[9] of the items are not "implements, instruments, or tools;" (2) none of the items were used in PMNA's "occupation, trade or employment;" and, (3) none of the reentered inventory items were used or were intended to be used temporarily abroad, the inventory items at issue in this action do not qualify for duty-free treatment under subheading 9801.00.85, HTSUS.

**E. PMNA's Arguments Are Unavailing**

PMNA argues that "the items returning in the specially equipped trailers are properly classified under subheading 9801.00.85, HTSUS, as implements, instruments, and tools of trade. . . ." Pl. Br. 13.

**1. PMNA's business is not racing automobiles or repairing them**

To make its case, PMNA first contends that auto racing and repair is a trade, occupation or employment. Pl. Br. at 15. There is no dispute that auto racing or auto repair would fall within the common meaning of a trade, occupation, or employment as defined above. The problem for PMNA is that *it* is not engaged in the trade, occupation or employment of racing autos or repairing them. Rather, at these races, it serves as a supplier of automotive parts to those who are actually engaged in such a trade, occupation, or employment. Pl. Br. at 5; AJSMF at ¶¶ 7, 17.

[9] The lone exception is the wrench sockets.

**2. PMNA's imported inventory does not constitute <u>implements, instruments or tools of subheading 9801.00.85</u>**

PMNA argues that the imported articles consist primarily of automotive repair parts and that such parts are implements, instruments or tools of trade. Pl. Br. at 17-18. We do not disagree that PMNA's recitation of definitions for implements, instruments, or tools of trade provides a fair sampling of the common meaning of these terms. Where we diverge is whether sending a trailer of automotive parts to a race with no idea whether any of these parts are needed renders those parts implements, instruments or tools of auto racing or auto repair. The answer is no.

Customs issues ruling letters that reflect its official position with respect to a particular transaction or issue. 19 C.F.R. § 177.9. Only the person to whom a ruling is directed may rely on it. 19 C.F.R. § 177.9(b). Others may rely on a ruling only if their merchandise is "identical to the description set forth in the ruling letter." 19 C.F.R. § 177.9(b); *see, e.g., United States v. Millenium Lumber Distrib. Co. Ltd.*, 887 F. Supp. 2d 1369, 1378 (Ct. Int'l Trade 2013). Moreover, "Customs rulings are not binding on the Court." *Skaraborg Invest USA, Inc. v. United States*, 9 F. Supp. 2d 706, 709 (Ct. Int'l Trade 1998); *S.C. Johnson & Son, Inc. v. United States*, 415 F. Supp. 3d 1373, 1385 (Ct. Int'l Trade 2019) (same).

PMNA's reliance on CBP Ruling H013537 does not help its cause. PMSJ Exhibit 12, Docket No. 82-2 at 59-62. There, the exporter/return importer is Texas Aero Engine Services Limited (TAESL), whose primary business is the overhaul of aircraft turbine engines and the return of the engines to a serviceable condition. CBP determined that the items brought by TAESL's mechanics when travelling internationally to accomplish their trade (*i.e.*, aircraft engine repair) including aircraft components qualified for entry under subheading 9801.00.85,

HTSUS. Unlike PMNA, TAESL and its employees were not making parts available for sale. Rather, they were exporting those parts for use in their trade: repairing aircraft engines.

**3. The automotive repair parts and tools were exported with the intention of being temporarily made available to race teams and returned**

PMNA claims that the inventory items meet the third element of the tariff provision ("use temporarily abroad") because its intention was to make the inventory of automotive parts temporarily available to the racing teams at races held in Canada. Pl. Br. at 19-22. But this is not the standard for subheading 9801.00.85, HTSUS. By its plain language, this subheading covers implements, instruments and tools exported for use temporarily abroad: it does not cover implements, instruments, and tools exported for availability temporarily abroad.

PMNA admits that its business (*i.e.*, trade, occupation or employment) is to sell Porsche racing cars and parts for the repair and maintenance of Porsche vehicles. Pl. Br. 5. Such sale of parts cannot be seen as being for temporary use. Once sold, the part will be incorporated by the racing team's mechanic into the vehicle for as long as the part properly functions. AJSMF ¶¶ 24, 30. PMNA claims that it enters into race sponsorship agreements with race promoters such as the International Motor Sports Association LLC in order to promote the brand. Pl. Br. 20. Yet, a review of a sample agreement reveals that PMNA is not assured that other companies will not be on site to provide parts to the Porsche race teams, AJSMF Exhibit 8 at 4 (¶ 4), or that Licensed Space will even be available during an event. AJSMF Exhibit 8 at 5 (¶ 1). If the track site services were so critical to brand promotion, PMNA would be expected to obtain more certain assurances regarding favorable conditions for marketing or brand promotions.

Similarly, PMNA's expectation or intention to re-import a large portion of the items in the trailer is also irrelevant to the plain meaning of this provision. The issue is whether the implements, instruments, and tools were used temporarily abroad for the trade, occupation, or

employment identified by PMNA of race car driving or race car repair. By PMNA's own admission, the bulk of the items in the trailer are never used. Pl. Br. at 21. Further, PMNA's contention that filling out a Certification of Registration is *prima facie* evidence to temporarily export the auto parts and make them temporarily available reflects the same fatally flawed interpretation of subheading 9801.00.85, HTSUS, which contains no provision for temporary "availability." It is use, not availability, that is critical to this subheading. Moreover, compliance with procedural requirements does not establish that a particular classification is appropriate. Instead, courts determine classification by "ascertain[ing] the meaning of the terms within the relevant tariff provision, which is a question of law" and then "determin[ing] whether the subject merchandise fits within those terms, which is a question of fact." *Ford Motor Co. v. United States*, 926 F.3d 741, 748 (Fed. Cir. 2019); *see also* GRI 1. Here, the reimported inventory items do not meet the terms of the "tools of trade" tariff provision. Thus, even though these items may have been included on Certificates of Registration, they are still not classifiable in the claimed provision.

Next, PMNA strains to suggest that certain Customs Rulings support its position. As noted above, reliance on another importer's Customs Ruling letter is only appropriate when the situations are identical. 19 C.F.R. § 177.9(b)(2). PMNA points to HQ 562318, in which CBP determined that "laser tracker systems" that were exported from the United States to Canada, and then reimported after having been used by a Canadian company to fabricate, assemble, and inspect specialty tooling, were classifiable under subheading 9801.00.85, HTSUS. Pl. Br. at 22; PMSJ Exhibit 14. In that ruling, the company that used the laser tracker system in Canada was not the same company as the exporter (who was also the consignee upon reimportation). *Id.* In deciding that the laser tracking system was classifiable under the special provision, CBP noted

that "there is no requirement that the merchandise be used abroad by the person who exported it." *Id.*

While there may be no requirement that the merchandise be used abroad by the parties who exported it (here, PMNA) there is a requirement that the merchandise be exported "for use temporarily abroad." Subheading 9801.00.85, HTSUS. The merchandise at issue here was never used or intended to be used temporarily by the race teams and then returned to the United States. AJSMF ¶ 30; Def. Additional Statement of Material Facts (DASMF) ¶ 1. Rather, the only items that were declared upon reentry were items that were unused because PMNA did not sell them while in Canada. AJSMF Exs. 12, 13, 14. In HQ 562318, the laser tracking system was exported with the specific purpose that the item be used while in Canada and then returned to the exporter once the Canadian company completed its task. *Id.* Here, the inventory items were not exported with the expectation or intention that they would be used by the race teams and then returned to PMNA. AJSMF ¶ 30; DASMF ¶ 1. Instead, the items were offered for sale. Any items that PMNA did sell permanently remained with the purchaser and were not reimported. AJSMF ¶ 30.

The analysis contained in HQ 562318 might have been applicable to the permanent tools on PMNA's trailer, not the inventory items. The permanent tools were exported by PMNA from the United States and the race teams were permitted to borrow these tools when needed. Def. Ex. 1 at 29:08-29:12). Once a race team finished borrowing a permanent tool, it would return it to PMNA, who then reimported it to the United States. Def. Ex. 4 at ¶ 6. Accordingly, these permanent tools may have been classifiable under subheading 9801.00.85, HTSUS, based on the guidance provided in HQ 562318. However, classification of the permanent tools is not at issue in this case because PMNA did not register these items or declare them upon entry. Def. Ex. 1 at

41:1523; Def. Ex. 2 at ¶ 1.  Because these items were not declared upon entry, CBP did not assess duties on these permanent tools.  Nonetheless, the existence of the permanent tools serves to highlight the difference between items that are "exported for use temporarily abroad," and those that are not (*i.e.* the inventory items).

In its discussion of HQ 562318, PMNA argues that it satisfied the requirements identified in the ruling, in particular the requirement that merchandise be exported for temporary use abroad, because "[t]here is no requirement that merchandise be used abroad by the person who exported it."  Pl. Br. at 22.  But, contrary to PMNA's temporary availability theory, HQ 562318 required temporary use abroad and return to the United States.  PMNA does not explain how items can be exported for temporary use if, like the articles at issue here, they are exported either to be sold or to remain completely unused.

Next, PMNA cites New York Rulings N013373 and N013372, both of which involve the classification of airline repair kits consisting of tools, spare parts for an aircraft, spare parts for an aircraft engine, and items "such as lubricants and gloves to support the repair."  Pl. Br. 22-24: PMSJ Exhibits 15 and 16.  The kits in these rulings were assembled in the United States for a specific airplane repair, and then exported to a foreign location where the repair was performed.  CBP determined that those items that were reimported to the United States after the repair was completed were classifiable under subheading 9801.00.85, HTSUS.  *See* PMSJ Exhibits 15 and 16.

Although PMNA appears to find comfort in the *2018 Decision*'s observation that the New York rulings are not unreasonable interpretations of subheading 9801.00.85, HTSUS, Pl. Br. at 25, the facts underlying these two New York rulings are notably different from the facts at issue here.  PMNA's trailer of inventory items was not a kit that was assembled to address a

specific repair need.  Instead, PMNA's trailer was stocked with spare parts and accessories as an anticipatory and prospective selling opportunity.  AJSMF at ¶¶ 21, 24, 40, 52, 65.  PMNA was under no obligation to make these parts available to the race teams.  Def. Ex. 3 at ¶ 2.  PMNA's trailer was akin to a mobile store, not a repair kit.  The kits at issue in the cited rulings were not available for sale.  Rather, they were used to complete a specific task (repairing the airplane), and then returned to the United States.  PMNA's merchandise was not exported for the purpose of completing a task; it was exported to be offered for sale.  The fact that PMNA's customers may have used purchased inventory items to perform specific tasks is immaterial, as those items were not reimported and are not at issue.

PMNA's reliance on the three cited rulings is misguided because none of these rulings are based facts analogous to the situation here.  As discussed above, unless a ruling is to the importer or another importer's are virtually identical, reliance is inappropriate.  19 C.F.R. § 177.9(b)(2).  Moreover, while our position is not inconsistent with the rulings upon which PMNA relies, even if it were, the Court's review in this case is *de novo*.  *See Millennium Lumber Distr. Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009).

In construing the New York rulings, the *2018 Decision* left open the question of whether "temporary use" could encompass "temporary availability."  Pl. Br. at 25.  PMNA finds hope in the discussion of whether its "kit" is analogous to the airline maintenance toolkits.  Such hope is false.  In both New York rulings, a critical fact is present: "[w]hen a specific repair is required at an international location, the kit to support the repair is" either exported or assembled and then exported.  PMSJ Exs. 16 and 15.  The kits described in the rulings are not sent overseas to American Airlines' terminals to provide temporary availability to repair tools and parts.  Instead, they are sent in response to a specific repair being needed overseas.  In contrast, rather than send

a specified repair kit to the races, PMNA exports an entire trailer loaded with all manner of automotive parts, the bulk of which the record evidence shows were not necessary for auto racing or auto repair given that they were never used.  AJSMF ¶¶ 20, 21, 24 and AJSMF Exs. 12, 13, 14.  Therefore, it does not qualify as a kit.

Further, PMNA's position that it is "using" the trailers and auto parts therein by the very act of exporting them and making them temporarily available to the race teams should be rejected.  Pl. Br. at 26.  The "use" referred to in the claimed provision is the actual use of the article in the course of a trade or occupation (*i.e.* a mechanic using a wrench to tighten bolts); it does not extend to simply being available for purchase.  Under PMNA's theory, any person or entity who exports inventory, fails to sell that inventory, and then reimports the unsold inventory could obtain duty free treatment for the unsold items under the "tools of trade" provision.  But special, duty-free provisions are to be strictly construed.  *See Atlas Copco, Inc. v. United States*, 651 F. Supp. 1446, 1448 (Ct. Int'l Tr. 1986).  As noted, subheading 9801.00.85, HTSUS confers duty-free status only on "books, implements, instruments, and tools of trade, occupation, or employment … having been exported for use temporarily abroad."  Exported inventory that is put up for permanent sale in unused condition is neither a tool of trade nor "for temporary use abroad."

Finally, the language used and the history behind the derivation of this tariff provision counsels that actual use, not mere availability, of the implements, instruments and tools in connection with a trade, occupation, or employment is the proper interpretation for this heading. If Congress had intended this subheading to apply to situations where implements, instruments and tools are made available, then different language would have been used such as "after having been exported for possible use temporarily abroad" or "after having been exported for

availability for use temporarily abroad." Such an articulation would be inconsistent with the prior law, upon which this provision is based, which noted that the provision covered "*goods used by technicians and engineers to provide* repair services abroad may be brought in duty-free." S. Rep. 104-393 at 25. This is active use not potential use.

For these reasons, the Court should find that the declared inventory items are classifiable according to their respective HTSUS provisions and not as "tools of trade" in subheading 9801.00.85, HTSUS.

## II. CUSTOMS PROPERLY EXTENDED THE TIME TO LIQUIDATE ENTRY NUMBERS ENTRIES KB5-5376882-5 AND KB5-5378599-3

In Count 2 of its Amended Complaint, PMNA alleges that Entry Nos. KB5-5376882-5 and KB5-5378599-3 were deemed liquidated by operation of law as entered because Customs failed to timely extend the liquidation period for these two entries.[10] Am. Compl. at 4-5, Docket No. 21.

However, PMNA fails to address any portion of this claim in its motion for summary judgment.[11] Because PMNA has abandoned this count of its amended complaint, we respectfully request that the Court deem the count waived. *See, e.g.*, *United States v. Great American Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (stating that "[i]t is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived") (citations omitted.)); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-

---

[10] The third entry covered by this case (Entry No. KB5-5381385-2) was entered on September 1, 2014 and liquidated within one year of entry on May 15, 2015. (Docket No. 1). Accordingly, no extension was required for that entry. *See* 19 U.S.C. § 1504(a).

[11] PMNA references a portion of the *2018 Decision*, which states that the notices issue is one involving findings of fact. Pl. Br. at 4. However, this determination hinges on the receipt by PMNA of a notice dated December 12, 2015. Pl. Br. at 4. The Court concluded that this notice was either a clerical error or a belated notice. Pl. Br. at 4.

20 (Fed. Cir. 2006) (explaining, *inter alia*, that "[the] law is well established that arguments not raised in the opening brief are waived" (citation omitted.)); *Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (holding that argument raised for the first time in reply brief was waived).

Notwithstanding PMNA's apparent abandonment of this claim, in the event the Court determines that PMNA's claim remains viable, we include our position and supporting evidence that Entry Nos. KB5-5376882-5 and KB5-5378599-3 did not liquidate by operation of law.

**A. Notices of Extension Were Timely Mailed And Delivered To PMNA**

Pursuant to 19 U.S.C. § 1504(a), an entry of merchandise that is not liquidated within one year of entry will liquidate by operation of law. However, CBP "may extend the period in which to liquidate an entry if the information needed for the proper appraisement or classification of the imported or withdrawn merchandise… is not available to the Customs Service." 19 U.S.C. § 1504(b)(1). In order to extend the liquidation time period, CBP "shall give notice of an extension … to the importer of record." 19 U.S.C. 1504(b). "Notice shall be in such form and manner (which may include electronic transmittal) as [CBP] shall by regulation prescribe." *Id.*

Entry No. KB5-5376882-5 was entered on May 22, 2014 and Entry No. KB5-5378599-3 was entered on June 23, 2014. Docket No. 1. CBP liquidated these entries on March 18, 2016. Accordingly, in order for CBP's liquidation to be timely, it was necessary for CBP to issue extensions on or before May 22, 2015 for Entry No. KB5-5376882-5 and on or before June 23, 2015 for Entry No. KB5-5378599-3.

To the extent the Court considers this count of the amended complaint, which it should not given PMNA's waiver, the Court should reject the claim because the agency's processing of the notices and its computer recordkeeping are entitled to a presumption of regularity. The

presumption of regularity is a presumption that "public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations." *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993) (citation omitted). '"The presumption of regularity supports the official acts of public officers[,] and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."' *Riggs Nat. Corp. & Subsidiaries v. C.I.R.*, 295 F.3d 16, 20-21 (Fed. Cir. 2002) (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14-15 (1926).

In this case, CBP's electronic records show the processing of these notices. Import Specialist Mark Badger was assigned to the two entries at issue in this case. Def. Ex. 6 (Declaration of Mark Badger) at ¶ 9. In his declaration, Mr. Badger states that while CBP does not maintain paper copies of extension notices, it does store information concerning the issuance of such notices in its Automated Commercial System (ACS)[12] in a computer file known as the "Extension Suspension History." *Id.* at ¶¶ 3, 6. Mr. Badger explains that import specialists initiate the process that extends the time to liquidate. *Id.* at ¶ 4. If an import specialist decides to extend the liquidation of an entry, he or she makes a notation on an Alert Report which is then given to an entry technician. *Id.* at ¶ 5. The entry technician then enters the liquidation extension into ACS, which triggers an automatic process by which extension notices are printed by The Data Center in Utah.[13] *Id.*

According to Dewey Hicks, Print Specialist and Team Lead for print services with CBP since January 2012, CBP had a contract with The Data Center to perform printing and mailing services. Def. Ex. 5 (May 20, 2021 Declaration of Dewey Hicks) at ¶ 3. One of these services is

[12] CBP transitioned from the ACS system to the Automated Commercial Environment (ACE).

[13] With the change to ACE, such notices are now provided electronically.

the printing and mailing of extension/suspension notices.  *Id.*  There were approximately 3,000 to 12,000 such notices printed and mailed weekly during 2014 and 2015.  *Id.*  During 2014 and 2015, The Data Center followed standard operating procedure for printing and mailing extension/suspension notices.  *Id.* at ¶ 4.

First, a data file in the form of American Standard Code for Information Interchange (ASCII) text that contains the records of the entries for which extension/suspension notices are to be printed and mailed are sent to The Data Center.  *Id.* at ¶ 4(a).  Next, a computer program reviews the data file to ensure that the correct amount of records are in fact received.  This process is referred to as "balancing."  *Id.* at ¶ 4(b).  Then another computer program checks the names and addresses of each record against information in postal database to ensure that the addresses are complete.  The purpose of this step is to prevent the printing of records with incomplete addresses or foreign addresses that do not contain a country code.  *Id.* at ¶ 4(c).

After the address check, the records with addresses that were found to be consistent with the postal database are formatted by a computer program that takes the ASCII text data and converts it into a readable PDF form.  *Id.* at ¶ 4(d).  The information is then sent to the printing system that prints each individual notice on an 8x11 paper.  *Id.* at ¶ 4(d).  A sample of such an extension notice is attached to Def. Ex. 5 as Exhibit B.

At the end of the print run, the total number of records printed is provided in the end sheet.  Def. Ex. 5 at ¶ 4(e).  This number of total printed records should match the number of records first received less those records that contained incomplete addresses or foreign addresses that do not contain a country code.  *Id.*  The individual printed notices are then sent to the inserter, a machine that folds the notice and inserts it into an envelope.  *Id.* at ¶ 4(f).  The inserter

also gives a count of the total envelopes used to ensure that no stray notices are lost along the way.  *Id.*

The extension/suspension notices that have U.S. addresses are mailed under the "G71" government permit, which is printed at the upper right hand corner of the envelope so that no postal metering is required.  *Id.* at ¶ 4(g).  The envelopes containing the extension/suspension notices are sorted according to zip code and put into trays.  The trays are banded and tagged.  *Id.* at ¶ 4(h).  The banding prevents the trays from being open and the tagging identifies what is in the tray and includes a count.  *Id.*  The trays are then placed on pallets and taken by The Data Center personnel to the post office for mailing.  *Id.* at ¶ 4(i).  At the post office, a Certificate of Conformance, GPO Form 712, is filled out by an employee of The Data Center who delivered the extension/suspension notices for mailing and stamped by the post office as proof of mailing, including the number of pieces mailed.  *Id.*  Due to the large number of notices generated and the difficulty of filing paper copies of each notice, CBP does not retain paper copies of extension notices that have been mailed.  *Id.* at ¶ 4(j).  Instead, records of the processing of the electronic notices are kept in CBP's computer-based Extension Suspension History file.  *Id.*

As part of his position as a Team Lead and Print Specialist for print services, in 2015, if there had been any problems at The Data Center in processing, printing, and delivering to the USPS the Customs Notices, Mr. Hicks would have been notified.  *Id.* at ¶ 5.  Also, if the USPS is unable to deliver notices, it returns those notices to the source.  *Id.*  For Customs Notices in 2015 that source would have been The Data Center.  *Id.*  Mr. Hicks would also have been notified of returned Customs Notices, but has no recollection of The Data Center informing him that there had been any problems with the processing, printing or delivery of Customs Notices in 2015.  *Id.*

As reflected in Exhibit A to Def. Ex. 5, printouts of the "Extension Suspension History Query" screens for Entry Nos. KB5-5376882-5 and KB5-5378599-3 identify a processing date of January 24, 2015 and a mailing address for Porsche Motorsport North America, 3203 S Shannon St, Santa Ana, CA, 92704. These notices were timely because they were sent before the one year deadline for liquidation. 19 U.S.C. § 1504(b)(1). Based on these extension notices, CBP had until May 22, 2016 for Entry No. KB5-5376882-5 and June 23, 2016 for Entry No. KB5-5378599-3 to liquidate. By liquidating the entries on March 18, 2016, the entries did not liquidate by operation of law.

During discovery, PMNA produced an extension notice with a processing date of December 12, 2015, which was mailed to Porsche Motorsport North America, 3203 S Shannon St, Santa Ana, CA, 92704. Def. Ex. 5 at ¶ 5, Ex. B. In the *2018 Decision*, the Court noted that the existence of a December 12, 2015 notice to PMNA meant that this notice was either a clerical error or a belated notice. However, this notice was neither a clerical error nor a belated notice. As shown in Exhibit C to Def. Ex. 5, a second extension notice with a processing date of December 12, 2015 was sent to PMNA by Customs for Entry No. KB5-5376882-5. This document reflects all of the extension notices that were sent out by Customs for Entry Nos. KB5-5376882-5 and KB5-5378599-3. The same process and address for the December 12, 2015 notice that PMNA agrees it received was used for the earlier notices. Because Mr. Hicks was not informed of any printing or mailing problems by The Data Center as to any of the notices sent to PMNA, there is no reason to believe that the January notices were not printed and mailed.

"Customs officers like other Government officials are entitled to a rebuttable presumption of 'regularity,' *i.e.*, their duties are performed in the manner required by law." *Frontier Insurance Co. v. United States*, 155 F. Supp. 2d 779, 788 (Ct. Int'l Tr. 2001); *see also*

*Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) (applying presumption of regularity to the mailing of notices); *Alaska Airlines*, 8 F.3d at 795 (citation omitted) (presumption of regularity is presumption that "public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations."). There is also a presumption that if a notice is properly given to a post office for delivery, the postal service actually made the delivery and the notice was received by the person to whom it was addressed. *A.N. Deringer, Inc. v. United States*, 20 CIT 978, 993 (1996) (citing *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884)); *Int'l Cargo & Surety Ins. Co. v. United States*, 779 F. Supp. 174, 177 (Ct. lnt'l Trade 1991). These presumptions stand unless there is "irrefragable proof to the contrary." *Alaska Airlines*, 8 F.3d at 795 (citation omitted); *see also Butler*, 244 F.3d at 1340 (noting that presumption of regularity stands unless there is clear evidence to the contrary). Once the Government establishes proper mailing of a notice, "it then falls to the plaintiff to establish nonreceipt [sic]." *Frontier*, 155 F. Supp. 2d at 788 (quoting *A.N. Deringer,* 20 CIT at 993).

The ACS records reflecting that extension notices were processed and the Hicks Declaration are sufficient to create a presumption that extension notices from CBP were printed and mailed to PMNA on or about January 24, 2015. This Court has previously determined that ACS records reflecting an extension processing date that are accompanied by the testimony of CBP employees are sufficient for establishing the presumptions of regularity and delivery. *See Frontier*, 155 F. Supp. 2d at 788 (CBP printouts providing information about when the notices were processed and to what address they were mailed are sufficient to entitle the Government to a presumption of regularity and delivery to the address listed in the printout). Accordingly, the burden has shifted to PMNA to rebut the presumptions of regularity and delivery with clear evidence.

**B. The Extension Notices Provided PMNA With A Reason For Customs' Extension Of Liquidation**

As discussed above, the Court has had an opportunity consider the parties' respective positions in prior summary judgment briefing. PMNA claimed that the December 12, 2015 Notice it received did not contain a reason for the extension of liquidation as required by 19 U.S.C. § 1504. The notice contained the entry number and stated that "[t]he period to liquidate this entry has been extended for a period not to exceed one year, pursuant to 19 USC § 1504(b) and 19 CFR § 159.12(a)(1)." Although the *2018 Decision* ultimately denied the cross-motions for summary judgment, it found that CBP's notice of extension by including references to the statute and regulation had provided the reason for the extension: CBP did not have complete information on which to make a determination on PMNA's classification claims. *2018 Decision*, 2018 WL 4029172, *4.

The law of the case doctrine encompasses issues expressly decided or "decided by necessary implication." *United States v. White*, 846 F.2d 678, 684 (11th Cir. 1988); *see also Ford Motor Co. v. United States*, 992 F. Supp. 2d 1346, 1355 (Ct. Int'l Trade 2014). "The doctrine of law of the case generally bars retrial of issues that were previously resolved." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697 (Fed. Cir. 2001). Whether to apply this doctrine is within the discretion of the Court. *Hudson v. Principi*, 260 F.3d 1357, 1363 (Fed. Cir. 2001).

Here, the Court expressly resolved the issue of whether Customs provided a reason for its extension of liquidation. Accordingly, the Court should follow the doctrine of law of the case preclude further briefing on this issue.

## CONCLUSION

For the foregoing reasons, the Court should deny PMNA's motion for summary judgment, grant our cross-motion for summary judgment; and dismiss the action in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

By: /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

/s/ Beverly A. Farrell
BEVERLY A. FARRELL
Senior Trial Attorney
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel.: (212) 264-9230
Attorneys for Defendant

*Of Counsel*:
Valerie A. Sorensen-Clark
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: May 26, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN ALEXANDER VADEN, *JUDGE*

PORSCHE MOTORSPORTS NORTH AMERICA, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Court No. 16-00182

**CERTIFICATE OF COMPLIANCE**

I, BEVERLY A. FARRELL, a Senior Trial Attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures and contains 10,478 words.

/s/ Beverly A. Farrell
Beverly A. Farrell