UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HON. STEPHEN ALEXANDER VADEN, *JUDGE*

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| PORSCHE MOTORSPORTS NORTH | : | |
| AMERICA, INC. | : | Court No. 16-00182 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Plaintiff's Reply to Defendant's Memorandum in Opposition to
Plaintiff's Motion for Summary Judgement and Response to
Defendant's Cross Motion for Summary Judgment**

George R. Tuttle, III.
Law Offices of George R. Tuttle
A Professional Corporation
3950 Civic Center Drive Ste 310
San Rafael, CA 94903
(415) 986-8780
Attorneys for Plaintiff,
    Porsche Motorsports North America, Inc

Dated:  June 25, 2021

TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

I.      THIS COURT IS NOT OBLIGATED TO STRIKE THE NON-CONFIRMING
        UNSWORN THIRD SUPPLEMENTAL DECLARATION OF
        BRIAN BLOCKER ...........................................................................................1

II.     CBP'S JANUARY 24, 2015 NOTICES OF EXTENSION OF LIQUIDATION
        FOR ENTRIES KB5-5376882-5 AND KB5-5378599-3 WERE NEVER
        RECEIVED BY PMNA .....................................................................................4

III.    THE LEGISLATIVE HISTORY TO SUBHEADING 9801.00.85 SUPPORTS
        PMNA CONTENTION THAT THE ARTICLES IN QUESTION ARE
        "TOOLS OF TRADE" .......................................................................................9

IV.     DEFENDANT'S ATTEMPT TO EXCLUDE PMNA'S PART'S FROM
        TREATMENT UNDER SUBHEADING 9801.00.85 IS BASED ON OVERLY
        RESTRICTIVE AND UNSUPPORTED INTERPRETATION OF THE
        RELEVANT TARIFF TERMS ........................................................................11

A.      The Common Meaning of the Terms "Implements, Instruments, or Tools" Includes
        PMNA's Parts ..................................................................................................11

B.      Defendant's Contention that PMNA's Inventory Items Were Not Used in the Court of a
        Trade, Occupation, or Employment Is Not Supported by the Record. .......................12

C.      Defendant's Interpretation of the Term "Use" is Overly Restrictive (Actual) and Does
        Not Take into Account "Perspective Use"......................................................16

CONCLUSION...................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*A.N. Deringer, Inc. v. United States*, 20 C.I.T. 978 (1996) ............................................. 8

*Frontier Ins. Co. v. United States*, 155 F. Supp. 2d 779 (Ct. Int'l Tr. 2001) ......................... 7, 8, 9

*Porsche Motorsport N. Am., Inc. v. United States*, Slip Op. 18-105
   2018 Ct. Intl. Trade LEXIS 115, (Ct. Int'l Trade August 22, 2018) .............................. 5, 6, 16

*United States v. Gritz Bros. Partnership*, 155 F.R.D. 639, Lexis 7170 **1(E.D. Wis, 1994) ... 3, 4

**Statutes**

19 U.S.C. §1504(a) ....................................................................................... 4, 5

19 U.S.C. §1504(b) ....................................................................................... 4, 5

28 U.S.C. § 1746 ......................................................................................... 1, 2

28 U.S.C. § 1746(2) ........................................................................................ 3

**Rules**

USCIT Rule 56(c) ........................................................................................... 2

USCIT Rule 56(c)(4) ....................................................................................... 2

USCIT Rule 56(e) ........................................................................................... 3

USCIT Rule 30(b)(6) ....................................................................................... 8

**Regulations**

19 C.F.R. §159.12 ........................................................................................... 6

19 C.F.R. §159.12(b) ....................................................................................... 5

**Harmonized Tariff Schedules of the United States**

Heading 9801

   Subheading 9801.00.85 ........................................................................... *passim*

**Miscellaneous**

S. Rep. 104-393 ................................................................................................................. 10

HQ H013537 .................................................................................................................... 16

HQ 562318 ....................................................................................................................... 18

N013372 ...................................................................................................................... 17, 19

N013373 ...................................................................................................................... 17, 19

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HON. STEPHEN ALEXANDER VADEN, *JUDGE*

|  |  |  |
|---|---|---|
| PORSCHE MOTORSPORTS NORTH AMERICA, INC. | : : : : | |
| Plaintiff, | : | Court No. 16-00182 |
| v. | : : | |
| UNITED STATES, | : | |
| Defendant. | : : : | |

**Plaintiff's Reply to Defendant's Memorandum in Opposition to
Plaintiff's Motion for Summary Judgement and Response to
Defendant's Cross Motion for Summary Judgment**

This brief is submitted by Plaintiff, Porsche Motorsports North America, Inc. ("PMNA")

in response to Defendant, United States ("Government" and "Gov. Br.") Memorandum In

Opposition to Plaintiff's Motion for Summary Judgement and Cross Motion for Summary

Judgment, opposing PMNA's Rule 56 Motion for Summary Judgment (Defendant's Response

Br.).

For the reasons discussed in our moving brief and set forth below, we respectfully request

that the Court enter an Order granting Plaintiff's Motion for Summary Judgment and denying

Defendant's Cross-Motion for Summary Judgment.

**I.      This Court is not obligated to strike the non-confirming Unsworn
         Third Supplemental Declaration of Brian Blocker**

In an inadvertent error, Counsel for Plaintiff submitted an unsworn declaration in support

of its Motion for Summary Judgement that did not conform to the requirements of 28 U.S.C.

§ 1746 (the Third Supplemental Declaration of Brian Blocker).  The Third Supplemental Blocker

Declaration, did not include a declaration that his statements were "true and correct" and made

"under penalty of perjury of the laws of the United States."  Because of this, the Government, in its Response to Plaintiff Rule 56.3 Statement of Additional Uncontested Material Facts (ECF 84-1), urges this court to strike the Declaration from PMNA's Motion for Summary Judgement.

Rule 56 United States Court of International Trade provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. USCIT Rule 56(c) provides that a party asserting that a fact cannot be genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record.  USCIT Rule 56(c)(4) provides that an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.  The declaration in question, the Third Supplemental Declaration of Brian Blocker, was based on personal knowledge and demonstrates that Mr. Blocker is competent to testify on the matters stated (ECF 80, Exhibit 1).  Through counsel's oversite, however, the final version of the declaration that was submitted with Plaintiff's Rule 56.3 Statement of Additional Uncontested Material Facts Pertaining to the Classification Issue did not contain a statement that the declaration was made under penalty of perjury, contrary to the requirements of 28 U.S.C. § 1746.  Section 1746 of Title 28, U.S. Code provides that:

> Wherever, under any law of the United States … any matter is required or permitted to be supported … by the sworn declaration, … or affidavit, in writing of the person making the same … such matter may, … be supported, … by the unsworn declaration, … in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

This Court, however, is not obligated to strike the non-confirming declaration of Mr. Blocker. 3 Rule 56(e) provides that if a party fails to properly support an assertion of fact the court may chose from a number of different options, including:

> (e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

In its discretion, the court may give an opportunity to plaintiff to properly support or address the fact. Counsel for Plaintiff submits that the required statement was inadvertently dropped from the final draft of the Declaration, and this did not come to the attention of Plaintiff Counsel until receipt of Defendant's response to Plaintiff's Statement of Additional Uncontested Material Facts.

In *United States v. Gritz Bros. Partnership*, 155 F.R.D. 639, Lexis 7170 **1(E.D. Wis, 1994), the District court rejected defendants' Motion to Strike the Declaration of Diane L. Houk. In response to the defendants' motion to strike, the government filed a "Notice of Errata and Response to Motion to Strike Declaration of Diane L. Houk," and a corrected "Declaration of Diane L. Houk" that complied with the requirements of 28 U.S.C. § 1746(2). Lexis 7170 **13. Accordingly, the government requested the court to dismiss the defendants' March 15, 1994, motion to strike as moot in light of Ms. Houk's corrected declaration remedying the error in her March 4, 1994, declaration.  In reaching this decision, the District Court said:

> I turn first to the defendants two respective motions to strike which can be disposed of summarily. The defendants' "Motion to Strike the Declaration of

Diane L. Houk Dated March 4, 1994" will be dismissed as moot because the government has filed a corrected "Declaration of Diane L. Houk" that complies with the requirements of 28 U.S.C. § 1746. The defendants' "Motion to Strike the Amended Declaration of Diane L. Houk" will be denied because Ms. Houk's original declaration, which contained the error subsequently corrected by the government, was timely filed.

*United States v. Gritz Bros. Partnership*, 155 F.R.D. 639, 644, Lexis ** 14 (E.D. Wis, 1994).

At the discretion of the Court, Plaintiff is prepared to file a Motion to Correct Errata to

corrected declaration that complies with the requirements of 28 U.S.C. §1746.

## II.   CBP's January 24, 2015 Notices of Extension of Liquidation for Entries KB5-5376882-5 and KB5-5378599-3 Were Never Received by PMNA

PMNA's second claim of its Amended Complaint asserts that the notices of extension of

liquidation for Entries KB5-5376882-5 and KB5-5378599-3 were issued untimely and that the

entries liquidated by operation of law, as entered, pursuant to 19 U.S.C. §1504(a). PMNA

advanced two arguments on deeming two of its entries liquidated. PMNA first averred that CBP

failed to timely issue the notices of extension of liquidation within the required one-year period.

Secondly, PMNA averred that notices of extension of liquidation failed to identify the reason for

the extension, as required by 19 U.S.C. §1504(b). The second issue was resolved by the trial

court.[1]

---

[1] In response to the second issue raised by PMNA, the court in *Porsche Motorsport N. Am., Inc. v. United States*, Slip Op. 18-105, explained:

The current state of the law, however, is that the failure to include a reason for [*11] an extension on such notice constitutes harmless error and does not invalidate the extension notice. *Intercargo Insurance Co. v. United States*, 83 F.3d 391, 394-96 (Fed. Cir. 1996). …[B]ut on the papers at bar, it is implicit from the statute and regulation referenced on the extension notice to PMNA for Entry One that the reason for the extension was that CBP did not have complete information to make a determination on PMNA's classification claims, which as mentioned in similar circumstances the appellate court deemed merely harmless error. On this issue, the defendant is entitled to summary judgment.

With regard to the timeliness of the notices of extension, Section 1504(a) provides:

(a) Liquidation

(1) Entries for consumption. Unless an entry of merchandise for consumption is extended under subsection (b) of this section … an entry of merchandise for consumption not liquidated within 1 year from—

(A) the date of entry of such merchandise …

shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by the importer of record….

19 U.S.C. §1504(a) (2015).  Section 1504(b) of title 19 (19 U.S.C. §1504(b)) provides:

(b) Extension. The Secretary of the Treasury may extend the period in which to liquidate an entry if—

(1) the information needed for the proper appraisement or classification of the imported or withdrawn merchandise… or for ensuring compliance with applicable law, is not available to the Customs Service; or

(2) the importer … requests such extension …

The Secretary shall give notice of an extension under this subsection to the importer of record ... Notice shall be in such form and manner (which may include electronic transmittal) as the Secretary shall by regulation prescribe.

19 U.S.C. §1504(b)(2015).  CBP's regulations regarding the issuance of extension of liquidation

are provided for in 19 C.F.R. §159.12(b).  Prior to certain regulatory changes regarding

electronic transmission of extension notices in 2016, section §159.12(b) provided:

b) Notice of extension. If the port director extends the time for liquidation, as provided in paragraph (a)(1) of this section, he promptly will notify the importer or the consignee and his agent and surety on CBP Form 4333-A, appropriately modified, that the time has been extended and the reasons for doing so.

---

*Porsche Motorsport N. Am., Inc. v. United States*, Slip Op. 18-105 2018 Ct. Intl. Trade LEXIS 115, *10-11 (Ct. Int'l Trade August 22, 2018)

19 C.F.R. §159.12 (2015).  In order for CBP's liquidation to be timely, it was necessary for

PMNA to receive CBP's §1504(b) extensions of liquidation on or before <u>May 22, 2015 for Entry</u>

<u>No. KB5-5376882-5</u> and on or before <u>June 23, 2015 for Entry No. KB5-5378599-3</u>.

> With regard to this issue Judge Musgrave explained:

> [a]s the date of "12-12-15" on the notice of extension for Entry One [KB5-
> 5376882-5 dated 05/22/2014] shown among the papers speaks for itself: if it is
> not clerical error then it is belated notice. In conjunction with PMNA's other
> arguments and papers on the subject, this presents more than a mere "bald
> assertion" or "uncorroborated affidavit" of the issue, it amounts to a disputed
> material fact necessitating trial. Cf. *Frontier Ins. Co. v. United States*, 25 CIT 717,
> 725-27, 155 F. Supp. 2d 779, 787-88, SLIP OP. 2001-79 (2001); *A.N. Deringer,
> Inc. v. United States*, 20 CIT 978, SLIP OP. 96-131 (1996) (trial of issue of
> whether notices of extensions of liquidation were sent and received). While the
> defendant in order to support its position also characterizes in detail aspects of
> PMNA's witnesses' deposition testimony on the issue of nonreceipt, <u>ultimately
> these matters involve findings of fact, which are not made on summary judgment.</u>
> [Emphasis added.]

*Porsche Motorsport N. Am. Inc.  v. United States*, CIT Slip Op 18-105 at 8-9.

> Plaintiff did not address the timeliness issue of the extension notices in its motion for

Summary Judgment.  Defendant argues, therefor that PMNA abandoned this count of its

amended complaint and that the count be deemed to be waived. (Defendant's Response Br. at

26). PMNA did not address this issue in it Motion for Summary Judgment because Judge

Musgrave, in Slip Op. 18-105 concluded that the question of whether the notices of extensions of

liquidation were prepared, mailed and received by PMNA in a timely fashion was an issue of

disputed fact, and could not therefore be decided on a motion for summary judgement.

> The Government, however, in its Memorandum In Opposition to Plaintiff's Motion for

Summary Judgement and Cross Motion for Summary Judgment ("DMOPMSJ") (ECF 84 at 27-

29) and in its Additional Statement of Uncontested Material Facts (DASUMF) (ECF 84-2)

submitted the declarations of Import Specialist Mark Badger Defendant and CBP Employee

Dewey Hicks regarding CBP procedures related to the issuance of Notices of Extension of

Liquidation, as well as provided exhibit 5 EXTENTION SUSPENSION HISTORY REPORT,

which show that a Customs Extension Notice was processed on 1/24/15 for PMNA for entry

KB5-5376882-5. Page 2 of Defendant's Exhibit 5 A is EXTENTION SUSPENSION HISTORY

REPORT for entry KB5-5378599-3. Notice was also processed on 1/24/15 for PMNA.

 Defendant's Exhibit 5C, titled EXTENTION SUSPENSION HISTORY FILE LOCATE

lists both entries KB5-5376882-5 and KB5-5378599-3 and identifies that Customs Extension

Notices were processed for KB5-5376882-5 and KB5-5378599-3 on 1/24/15 for PMNA and its

surety and on 12/12/15 for PMNA and its surety.

 In *Frontier Ins. Co. v. United States*, the court explained:

> Customs officers like other Government officials are entitled to a rebuttable
> presumption of "regularity," i.e., their duties are performed in the manner required
> by law. *International Cargo & Sur. Ins. Co. v. United States*, 15 C.I.T. 541, 544,
> 779 F. Supp. 174 (1991). Here, the Government relies upon [***26] both the
> presumption of regularity, specifically that notice was given in accordance with
> statutory and regulatory requirements, and the presumption of delivery.  In other
> words, "a letter properly directed that is placed in the mail or delivered to a postal
> carrier is presumed to have reached its destination and to have been received by
> the person to whom it was addressed. . . . Thus, the onus upon the Government is
> to establish proper mailing of requisite notices; it then falls to the plaintiff to
> establish nonreceipt [sic]." *A.N. Deringer, Inc. v. United States*, 20 C.I.T. 978,
> 993 (1996)(internal citations omitted); see also Hanover, supra.
>
> Here, while the Government does not have direct proof that the notices of an
> extension were actually mailed, it has submitted the  [*727]  declaration of Arthur
> Versich, to establish that while Customs does not retain a hard copy of the
> notices, they are regularly mailed within a day of printing each week and Customs
> retains a printout indicating when and to what address notices of extension are
> mailed. Customs' printout for the entries at issue, unrebutted by any evidence
> submitted by plaintiff, demonstrate that between 1991 and 1994, notices were
> mailed to IB&M at 60 East 42nd Street, suite 1914. Thus, the Government is
> entitled to the presumptions of regularity and delivery if Customs mailed the
> notices to the correct address.

*Frontier Ins. Co. v. United States*, 155 F. Supp. 2d 779 (Ct. Int'l Tr. 2001).

The declarations and evidence submitted by the Government establishes that CBP timely generated and delivered the notices with the correct address to the USPS. It is therefore entitled to the presumptions of regularity and delivery of the January 24, 2015 notices of extension. Under *Frontier* and *A.N. Deringer, Inc. v. United States*, 20 C.I.T. 978 (1996) it now falls upon PMNA to establish non-receipt of the Notices of Extension of liquidation for entries KB5-5376882-5 and KB5-5378599-3 were timely extended. .

PMNA asserts that the two January 24, 2015 notices of extension were never received by PMNA at its address on South Shannon Street in Santa Ana. PMNA did receive the untimely December 2015 notice of extension for entry KB5-5376882-5.

Exhibit 1 to Defendant's Memorandum In Opposition to Plaintiff's Motion for Summary Judgement and Cross Motion for Summary Judgment is the USCIT Rule 30(b)(6) Deposition transcript of PMNA's designated witness Robert Resetar, dated August 2, 2017. At the time, Mr. Resetar was the Customs and Trade Compliance Manager for Porsche Cars North America (Resetar Dep. 12:7-16) and PMNA (Resetar Dep. 13:16-19). In his declaration, Mr. Resetar explained PMNA's procedures for receiving and processing mail:

> At PMNA, the mail is received by the administration department. … It's first received by the executive administrative assistant. And she sorts out 24 anything that would go to Jens Walther. And the remaining mail would go to Brian Blocker, who's in the administration department. PMNA

(Resetar Dep. 87:18-88:1).

The executive administrative assistant was always the first point of contact with the mail PMNA (Resetar Dep. 88:1-7). If she was on vacation, the mail would be sorted by Brian Blocker. (Resetar Dep. 88:7-9).

Mr. Resetar was not aware whether the executive administrative assistant ever lost a piece of mail or gave it to the wrong person (Resetar Dep. 88:25-89:5).  Any mail that did not go to Jens Walther went to Brian Blocker.  (Resetar Dep., 89:6-13).  Jen Walters is the president of PMNA. (Resetar Dep. 85:19-21).

Mr. Resetar never informed the executive assistant that CBP materials needed to be forwarded to him but did instruct Mr. Blocker that all CBP materials needed to be forwarded to him. (Resetar Dep. 89:18-22).  Mr. Blocker would scan the CBP mail and send it to Mr. Resetar by e-mail. And then if requested, the original document would be sent FedEx to Mr. Resetar. (Resetar Dep. 90:12-25).  Mr. Resetar was not familiar with any occurrence were Mr. Blocker failed to scan a piece of CBP mail and send it to him. (Resetar Dep. 91:13-15).  Mr. Resetar was not aware that any documents when missing when PMNA moved its offices in 2016 from South Shannon Street in Santa Ana to South Main St. in Carson.  (Resetar Dep. 86:9-87:6).

Mr. Resetar stated that he maintained hard copy files of all CBP correspondence and documents that are forwarded to him by PMNA, so if he had received an extension notice, it would have been in his file with the other extension notices. (Resetar Dep. 92:17-93:11).

Based on this evidence PMNA did not receive the notices of extension from Defendant and has rebutted the presumption regularly under *Frontier*, *supra*.

III.    **The Legislative History to Subheading 9801.00.85 Supports PMNA Contention That the Articles in Question Are "Tools of Trade"**

The legislative history to HTSUS subheading 9801.00.85 cited on page 16 of Defendant's Memorandum In Opposition to Plaintiff's Motion for Summary Judgement and in Support of Defendant's Cross Motion for Summary Judgment ("DMOPMSJ") (ECF 84), supports Plaintiff's contention that the inventory articles (vehicle parts and components) identified on the attachment

to the CF-4455 Certificate of Registration are "Tools of Trade." The articles intended to be covered by S. Rep. 104-393 are "goods used by technicians and engineers to provide repair services abroad." There is no factual dispute between the parties that the articles identified on CF-4455 were exported with the intention that they be made available for use in the repair of race cars by technicians and engineers. (AJSMF ¶ 20).  The tools and parts stocked in the trailer are intended exclusively for the repair of Porsche race cars that are damaged during a race event, or to replace a part on a race car that malfunctioned or failed, and the race team does not have the necessary part or tool n their own rice-side pit inventory to effectuate the repair of the vehicle.

Exhibit 7, Resetar, SAUMF ¶¶ 12, 13, 14:

> 12. Like drivers, the team or crew of people that prepare, maintain and repair the vehicle have many years of experience and training to acquire the skills and knowledge necessary to maintain a race car in its proper condition, ready to race, and maintain that vehicle in racing condition during the race. B. Blocker Third Supplemental Declaration. Plaintiffs Rule 56.3 Exhibit 1, ¶9.

> 13. The people that work to prepare, maintain, and repair the race vehicle are often overlooked, but it is their experience, training, skill, and knowledge that keep the vehicles on the track competing. They are often employed by the team owner of the vehicle(s) to do so. B.Blocker Third Supplemental Declaration. Plaintiffs Rule 56.3 Exhibit 1, ¶10 Third Declaration of Brian Blocker

> 14. The people that work to prepare, maintain, and repair a race vehicle may not always receive a paycheck for what they do, but they are dedicated individuals who would consider the work and service they provide to the team and the car to be their full or part time vocation, occupation, or career. B. Blocker Third Supplemental Declaration, Plaintiffs Rule 56.3 Exhibit 1, ¶11

Plaintiffs Rule 56.3 Statement of Additional Uncontested Material Facts (SAUMF) (ECF 80).

**IV.     Defendant's Attempt to Exclude PMNA's Part's from Treatment Under Subheading 9801.00.85 is Based on Overly Restrictive and Unsupported Interpretation of the Relevant Tariff Terms**

    **A.     The Common Meaning of the Terms "Implements, Instruments, or Tools" Includes PMNA's Parts**

Defendant contents that the statutory terms "Implements, Instruments, or Tools" do not include the items contained in PMNA trailers that were identified on the export manifest, which was attached to and referenced on CBP Form 4455, Certificate of Registration. DMOPMSJ at 13-14. ("With the exception of wrench sockets, none of the declared inventory items fall within the common meaning of "books, implements, instruments or tools," DMOPMSJ at 14). The items identified on the inventory list attached to CBP Form 4455, Certificate of Registration, and contained within the trailers are vehicle components intended for the repair of the race cars during the race.  AJSMF ¶ 20.  The question presented is whether these vehicle components fall within the common meaning of the statutory terms 'Implements, Instruments, or Tools."  On page 13 -14, Defendant states:

> Turning to the other statutory terms, the term "*implement*" is defined as "a device used in the performance of a task," or an item that "serves as an instrument or tool." Implement, Merriam-Webster.com, https://www.merriamwebster.com/dictionary/implement (last visited May 24, 2021). An instrument is an item "used by another as a means or aid" or an "implement *especially*: one designed for precision work." *Instrument*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/instrument (last visited May 24, 2021). Finally, a *tool* is defined as "a handheld device that aids in accomplishing a task" or "something (such as an instrument or apparatus) used in performing an operation or necessary in the practice of a vocation or profession." Tool, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/tool (last visited May 24, 2021).

In its brief the Government states that the definitions of the terms all emphasize that they are items used to accomplish or complete a task. Defendant's Response Br. at 14. The Government's definition of the term "implement" includes … "a device used in the performance of a task." PMNA's vehicle parts and components are, however, "implements" because they are

used in the "performance of a task," that task being the repair of race cars.  AJSMF ¶ 20.

Likewise, the vehicle parts and components that are in issue constitute "tools" because they are

"something 4 used in performing an operation or necessary in the practice of a vocation or

profession." The repair of racing vehicles is vocation or profession (Plaintiffs Rule 56.3

SAUMF, ¶¶. 12, 13, 14), and performing such work is an activity or "operation." In fact, the

Government acknowledges that:

> "the terms "implements, as synonyms. The definitions of the terms all emphasize that they are items used to accomplish or complete some task. Indeed, CBP has defined "tools of trade" generally to include those <u>items necessary for the exercise of the trade or profession of the individual</u>. See, e.g., Def. Ex. 7 (HQ HO13537). [Emphasis added.]

Defendant's Response Br. , at 14. The inventory items in question are, however, "items used

to accomplish or complete some task," and "include those items necessary for the exercise of

the trade or profession of the individual." Again, the inventory items are vehicle components

used to "accomplish or complete some task" i.e., repair a race car, and are "necessary for the

exercise of the trade or profession of the individual," the race car technician.

**B.**     **Defendant's Contention that PMNA's Inventory Items Were
         Not Used in the Court of a Trade, Occupation, or Employment
         Is Not Supported by the Record.**

The Government maintains that PMNA the inventory items were not "used" in the

court of a trade, occupation, or employee.  Defendant's Response Br. at 15, 16, and 18.  This is

not supported by the record. PMNA's purpose of being at the races, and for supplying the trailers

and inventory of parts is to provide temporary technical and physical support (tools and parts) for

the race card drivers and their repair teams.

To further its business of selling the Porsche race cars and to promote the Porsche brand, PMNA sponsors various automotive race events, including the GTE 3 CUP Challenge Race that take place in the United States and Canada.  AJSMF ¶ 8.  If PMNA does not support the teams at the track, no one would want to drive the Porsche in the race.  AJSMF ¶ 11.

PMNA agrees to provide various support activities in furtherance of races that include Porsche branded race cars, including technical support, advertising, promotion and track-site services. AJSMF ¶14. Race Promoters restrict Porsche's activities at track events to those services which support the race event, including race team participants. Such restrictions include a prohibition on sales to the general public as well as non-Porsche race teams. AJSMF ¶ 15. In furtherance of its onsite track support activities, PMNA sends customer service personnel (technicians) to provide technical advice as well as parts staff. AJSMF ¶ 16. For each Porsche GTE Cup Challenge race event, PMNA provides a support tractor/trailer (hereinafter "trailer") stocked with tools for the repair of the race cars during the event (such as Hydraulic Press and vise, wrench socket lug nuts, center lock wrench sockets and wrench socket central bolts) and spare parts for the repair of race cars as needed. AJSMF ¶ 17.

The average selling price at retail for a Porsche 911 GT3 is $ 225,000. A single race may have between 14 and 25 Porsche 911 GT3 vehicles participating, and there are 6 race events annually in a series. AJSMF ¶ 10. If PMNA did not support the teams at the tracks, no one would want to drive a Porsche in the races. AJSMF ¶ 11.

While PMNA is not physically driving or repairing the vehicles, it is intimately engaged in the trade, occupation, or employment of auto racing, the repairing race vehicles, and providing services to those individuals that are driving or repairing the vehicles. At pages 15 through 17 of its Memorandum of Law in Support of its Motion for Summary Judgement, PMNA reviews the

common meaning of the terms trade, occupation, or employment. Defendant provides similar definitions at page 15 of its Brief. Automobile racing and the repair of automobiles is a trade, occupation, or employment. By providing the tools, knowledge and parts necessary to maintain and repair the race cars, PMNA is engaged in the trade, occupation, or employment of auto racing, the repairing race vehicles.

The Government also mischaracterizes PMNA's purpose and intention for being at the races. In its Response Brief at 15 Defendant expresses it opinion that:

> By stocking a trailer and attending races, PMNA operates like a vendor at a car show or flea market where it offers merchandise for sale that its pre-made audience is likely to buy. As such, it is engaged in the activity or business of selling auto parts.

PMNA does not deny that the race teams that withdraw parts from the trailer ultimately pay PMNA for them, however, it is gross mis-characterization of the facts to say that "PMNA operates like a vendor at a car show or flea market where it offers merchandise for sale that its pre-made audience is likely to buy." PMNA entire purpose at the race, and as defendant has agreed in the Joint Statement of Agreed Facts, PMNA's purpose for exporting the trailer to the race is not to sell parts but to make the parts and tools for the repair of the race vehicles available to the Porsche racing teams, should the parts and tools be needed to repair or maintain the car during a race. AJSMF ¶ 23. The tools and parts stocked in the trailer are intended exclusively for the repair of Porsche race cars that are damaged during a race event, or to replace a part that malfunctioned or failed, and the race team does not have the necessary part to effectuate the repair of the vehicle. AJSMF ¶ 20. Thus, the purpose of the trailer with the inventory of parts is not to offer merchandise for sale that "its pre-made audience is likely to buy." PMNA is actually

restricted or prohibited by the Race Promoters on sales to the general public as well as non-Porsche race teams. AJSMF ¶ 15.

The Government also characterizes PMNA's parts team and technicians' as "akin to people like itinerant merchants or car show vendors who bring their wares with them to an event." Again, nothing is further from the truth. In furtherance of its onsite track support activities, PMNA sends customer service personnel (technicians) to provide technical advice as well as parts staff. AJSMF ¶ 16. Based upon its racing experience, PMNA prepares a parts inventory of over 1,500 individual stock-keeping units (SKU), with a quantity exceeding 10,000 items, and tools for the repair of the race vehicles, all of which are housed in PMNA's trailer. AJSMF ¶ 21. PMNA does not make the parts or tools in the trailer available to the general public or any non-Porsche race teams. AJSMF ¶¶ 15, 23.

Finally, the Government implies that in order for the articles in question to qualify for Subheading 9801.00.85, the same party that exports and then imports them mut be the party that engages in the trade, occupation, or employment. Def. Response Br., at. 5 ("PMNA ... is not engaged in the trade, occupation or employment of racing autos or repairing them.")

There is no such requirement in subheading 9801.00.85, however, that requires the articles subject to the claim be "used" by the same person or party that engaged in the export and their subsequent reimport. Defendant acknowledged as much in CBP Headquarters Ruling HQ 562318 (PMSJ Exhibit 14) where in it agreed that the merchandise qualified for 9801.00.85 ("There is no requirement that the merchandise be used abroad by the person who exported it.") CBP Headquarters Ruling HQ 562318 (August 27, 2002), PMSJ Exhibit 14.

### C.    Defendant's Interpretation of the Term "Use" is Overly Restrictive (Actual) and Does Not Take into Account "Perspective Use"

The Government contents that the imported inventory parts in issue were not "exported for temporary use abroad," and therefore do not qualify for treatment under 9802.00.85. Defendant's Response Br. at 17 ("the inventory items fail to satisfy the third element of the statute. The inventory items returned to the United States and declared at entry were not used by anyone while in Canada."). In reviewing the requirements of 9802.00.85, the Court recognized that "[t]he question of moment, thus, appears to be whether 'temporary use' encompasses 'temporary availability,' of automobile parts in furtherance of the Porsche brand, to professional race teams in case of 'emergency.'" Id. at *7. The Court then conducted a definitional analysis of the term "use" in the subheading. Id. at *7-*9. However, the Court in 18-105 reached no conclusions as to whether the subject entries qualify for classification in subheading 9801.00.85 Id. at *9. See also, Defendant Response Br. at 6.

First, Defendant's position that each and every article exported and returned be actually and physically put to use is neither supported by logic or its own administrative interpretations. Defendants position assumes that the claimant, at the time of original export will know exactly what items (whether they be tools, equipment, or parts) will be necessary[2] or required for the repair. What if a particular book or hoist is exported, but then it is not needed? Should the articles, when returned to the U.S. not be eligible for treatment under 9801.00.85?

---

[2] See HQ H013537, dated July 2, 2007. Plaintiffs MSJ, Exhibit 12. Supports position that inventory parts that are "necessary for a repair" are eligible for treatment under 9801.00.85. The issue is not whether the parts are "sold" or not, but that they include repair parts that if necessary for the repair will not be returned, and parts that were thought to be necessary but not use, are returned under 9801.00.85

Second, there are U.S. Customs Rulings that support the position of PMNA that the actual use of the article is not required in order to qualify for classification under subheading 9801.00.85.  In Rulings N013372 and N013373, aircraft repair kits were exported and returned. The aircraft repair kits included spare parts for the aircraft and engines; the consumable aircraft repair parts and items such as lubricants and gloves to support the repair; nuts and bolts, etc.

In CBP New York Ruling N013373 (June 29, 2007), PMSJ Exhibit 15, a U.S. company, American Airlines, assembled kits in the U.S. for export to a foreign country to expedite the repair of an aircraft or aircraft engine before re-importing the balance of the items back to the U.S. The kits consist of tools; equipment, such as an aircraft engine hoist or sling; spare repair parts for an aircraft; spare repair parts for aircraft engines; and items such as lubricants and gloves to support the repair; and consumable aircraft repair parts, such as nuts and bolts. PMSJ Exhibit 15. In CBP NY Ruling N013373, CBP explained that when a repair was required at an international location, the kit to support the repair was exported; the repair work was performed; the aircraft repair parts needed for the repair are utilized; and the remaining aircraft repair parts in the kit that are not needed for the repairs were imported back into the U.S. The contents of the kit varied based on the required type of repair. CBP ruled that the kit containing the unused items was properly classifiable under subheading 9801.00.85, HTSUS, when imported back into the United States. CBP NY Ruling N013373, PMSJ Exhibit 15.

Similarly, PNMA's trailer contain various repair parts and tools, that, based on years of experience, were determined necessary for the repair of the race cars. AJSUMF, f 21. At the time of exportation of the subject parts from the United States to Canada, PMNA intended to reimport all parts that were not used by a Porsche race team in Canada back into the United State. AJSMF. 33.

This situation is similar to that presented in CBP New York Ruling NO13373 (PMSJ Exhibit 15), and the American Airlines' repair kit. American Airlines exported the full repair kits and then imported the kits back into the U.S., except for the parts utilized abroad. Everything that it exported, except for the items needed abroad, was imported back into the U.S. As in CBP New York Ruling NO13373, PNMA exported the trailer with full parts and tools for the track-side repair of the racing vehicles; and then expects, and intends, to import them all back into the U.S., except for those items actually withdrawn by the Porsche racing teams that were necessary for the repair of their vehicles. Those items remain in Canada with the teams.

The American Airlines Ruling NO13373 and the Porsche case are nearly identical, except that American Airlines uses the needed parts abroad itself, whereas PMNA uses the parts as temporary inventory abroad, and the Porsche teams use the needed parts to repair their vehicles. As CBP Headquarters confirmed in CBP Headquarters Ruling HQ 562318 (August 27, 2002) (PMSJ Exhibit 14), "there is no requirement that the merchandise be used abroad by the person who exported it."  PMNA contends that these Customs Rulings are directly on point and confirm that the automotive repair parts are properly classifiable under c, HTSUS.

Next, in CBP New York Ruling NO13372 (July 3, 2007), American Airlines sought confirmation a second time that when its maintenance toolkit (consisting of tools, equipment, spare parts for an aircraft, spare parts for an aircraft engine, and spare parts for support equipment and/or consumable spare parts) is exported, after the repair work is performed abroad and the kit is imported back into the U.S. without those parts used abroad, the returning kit is classifiable under subheading 9801.00.85, HTSUS. PMSJ Exhibit 16. Again, in New York Ruling NO13372 (July 3, 2007), CBPs' National Commodity Specialist Division affirmed its earlier ruling NO13373 (June 29, 2007), and concluded that even though some of the spare parts

and consumable parts were removed from the kit and used to repair the airplane or its engine, the remaining items were classifiable under subheading 9801.00.85, HTSUS, when were imported back into the U.S.

CBP New York Ruling N013372 (July 3, 2007), along with CBP New York Ruling NO13373 (June 29, 2007) are directly applicable to PMNA's case. And should be considered dispositive of the issue of the eligibility of PMNA's returning trailer and repair parts and tools under subheading 9801.00.85, HTSUS.  Just as in the two American Airlines Rulings, PMNA intended to export the Porsche repair parts for use temporarily abroad before importing them back into the United States. (Declaration of Robert Resetar, at 2 (March 1, 2017), PMSJ Exhibit 17; Declaration of Jens Walter, at 4 (April 10, 2017), PMSJ Exhibit 18.)

Defendant attempts to distance itself from its decisions in rulings N013372 and N013373, by arguing that PMNA's trailer of inventory items was not a kit assembled to address a specific repair need. First, the inventory items in PMNA's trailer were selected based on its knowledge and history of what might be needed. AJSMF ¶ 21.

## CONCLUSION

For the reasons provided in PMNA memorandum supporting its motion for summary judgment and for the above reasons, we respectfully request that the Court enter an Order: ( 1) granting plaintiffs motion for summary judgment; (2) ordering Defendant to reliquidate the entries in question under HTSUS 9801.00.85, and granting plaintiff such other and further relief as may be just and appropriate.

Respectfully submitted,


By: George R. Tuttle III
George R. Tuttle, III.
Law Offices of George R. Tuttle
A Professional Corporation
3950 Civic Center Drive Ste 310
San Rafael, CA 94903
(415) 986-8780
Attorneys for Plaintiff,
    Porsche Motorsports North America, Inc

Dated:  June 25, 2021

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiff's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgement and Response to Defendant's Cross Motion for Summary Judgment, as computed by Law Office of George R. Tuttle word processing system Microsoft Word 365 ProPlus is 6,121 words, less than the 7,000 word limit.

_/s/ George R. Tuttle, III._
George R. Tuttle, III
_Counsel for Plaintiff_