Slip Op. No. 21-176

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

PORSCHE MOTORSPORT NORTH AMERICA, INC.,

<em>Plaintiff,</em>

v.

UNITED STATES,

<em>Defendant.</em>

</td><td>

Before: Stephen Alexander Vaden, Judge

Court No. 16-00182

</td></tr>
</table>

## <u>OPINION</u>

[Granting Defendant's Cross Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment.]

Dated: December 30, 2021

<u>George R. Tuttle, III</u>, Law Offices of George R. Tuttle of San Rafael, CA, for Plaintiff.

<u>Beverly A. Farrell</u>, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director, Commercial Litigation Branch; <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office; and <u>Valerie A. Sorensen-Clark</u>, Office of Assistant Chief Counsel, U.S. Customs and Border Protection.

**Vaden, Judge:** As the curtain rises on Act III of Georges Bizet's masterpiece *Carmen*, Don José has joined with his lover and a band of smugglers as they seek to secrete goods across the frontier without paying the applicable duties. Nearly 150 years later, another European seeks to achieve that same goal — this time legally — by bringing a series of novel interpretations of American customs law before the Court. With recourse to a duty-free provision, the protagonist here, like the eponymous operatic character, has repeatedly tried to reshuffle the deck dealt to it to avoid an outcome foretold. As with *Carmen*'s final denouement, however, it cannot escape fate.

## BACKGROUND

Following the submission of an Amended Joint Statement of Uncontested Material Facts (AJSUMF), Plaintiff and Defendant submitted a second set of cross-motions for summary judgment regarding the repeated exportation and return of a trailer stocked with automotive parts. The three entries at issue pertain to approximately 10,000 articles brought by Plaintiff **Porsche** Motorsport North America, Inc. (PMNA) across the border to Canada and re-imported to the United States in 2014. Plaintiff contends the articles should be classified under subheading 9801.00.85.00 of the Harmonized Tariff Schedule of the United States (HTSUS), which provides for duty-free treatment of "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment, when returned to the United States after having been exported for use temporarily abroad, if imported by

or for the account of the person who exported such items."  Finding this provision inapplicable, U.S. Customs and Border Protection (CBP) instead classified the articles under multiple dutiable tariff provisions of the HTSUS.  Compl. ¶ 15, ECF No. 6.  At oral argument, PMNA dropped Count Two of its Amended Complaint regarding non-receipt of notices of extension for liquidation sent by CBP.  The present briefings dispose of the remainder of the case.  For the reasons set forth below, the Court finds that CBP's determinations regarding classification of PMNA's "inventory" items were correct, and the Court **GRANTS** Defendant's Cross Motion for Summary Judgment on that issue and **DENIES** Plaintiff's Motion.

## I.      Facts

PMNA claims its exportation and return of a trailer containing parts and tools allowed it to "promote the Porsche brand" through the provision of "emergency" support at racing events in Canada.  AJSUMF ¶ 6, Ex. 5 ¶ 5, ECF No. 81.  Plaintiff further attests that providing trackside access to parts and tools constituted a form of assistance for teams at 2014 Porsche GT3 Cup Challenge races that took place in Canada.  Access to these articles allowed the competitors to repair their Porsche automobiles in the event of accidents or unexpected breakdowns.  *See, e.g.*, Pl.'s Resp. at 10, ECF No. 85; Pl.'s Mot. Summ. J. (Pl.'s Br.) at Ex. 17 (Declaration of Robert Resetar), ¶¶ 11-14, ECF No. 83-2.  The 2014 races addressed in this Complaint were the (1) 2014 Porsche GT3 Cup Challenge Race at Canadian Tire Motorsport Park in Bowmanville, Ontario (Entry KB5-5376882-5 dated 05/30/2014); (2) 2014 Porsche

GT3 Cup at Calabogie Motorsports Park in Calabogie, Ontario (Entry KB5-5378599-3 dated 06/23/2014); and (3) 2014 Porsche GT3 Cup Challenge Canada, in Bowmanville, Ontario (Entry KB5 5381385-2 dated 09/01/2014).  While providing access to purchasable parts at these GT3 Cup races, the trailer was open for business solely with racing teams.  PMNA did not sell parts to the general public during the races.  Parts sold to the racing teams were not returned to PMNA.  AJSUMF ¶ 15, ECF No. 81.

PMNA's trailer functioned as a roving emporium.  Representatives from Porsche racing teams visited the trailer to obtain parts.  PMNA's employees kept track of parts purchased through a system of order sheets for each racing team. AJSUMF ¶¶ 26-27, ECF No. 81.  After the race, when the trailer had reentered the United States, the record of transactions from these sheets was transmitted to PMNA's accounting system.  PMNA's office in Carson, California, then sent invoices to race teams for the car parts they had purchased.  AJSUMF ¶ 29, ECF No. 81.

For each exportation to Canada and entry into the United States, PMNA filed "Certificates of Registration" (CBP Form 4455) with CBP.  On each submission, PMNA indicated its intention to provide support for a particular GT3 race.  *See, e.g.*, Pl.'s Br. at 32, ECF No. 83.  It further provided manifests listing quantities, descriptions, and values of each of the various automotive and non-automotive parts in the trailer.  The forms also listed the total respective values and quantities exported for each race, and they were later appended as declarations of the

automotive parts re-entered into the United States. *See* KB5-5376882-5 dated 05/22/2014, KB5-5378599-3 dated 06/23/2014, and KB5-5381385-2 dated 09/01/2014.

At each entry, PMNA's broker classified the tools and automotive repair parts under subheading 9801.00.85 of the HTSUS. Under this provision, they would be duty-free. In its filings to CBP, PMNA did not make any adjustments to the quantities it returned to the United States. Compl., Entry Papers in Court File, Exs. 1, 2, and 3, ECF No. 6. For 2014's first race, the Porsche GT3 Cup Challenge Race at the Canadian Tire Motorsport Park in Bowmanville, the trailer's inventory report at the time of export identified 1,562 unique items in its inventory, a total parts count of 9,921 with a total value of $1,442,775. AJSUMF ¶ 37, ECF No. 81. Seventy-one other items with an approximated value of $13,140 were classified as "[n]on-inventory items PMNA support truck" on the submitted Form 4455 and the export manifest of parts. AJSUMF ¶ 38, Ex. 19, ECF No. 81. Although these items were included in the trailer in the subsequent two exports and entries, they were not reported on the relevant forms by PMNA. AJSUMF ¶¶ 60, 70, ECF No. 81. For the second race that year, the Porsche GT3 Cup at Calabogie Motorsports Park, the inventory report at the time of export for trailer 4HH42354 identified 1,576 unique items in inventory, a quantity parts count of 10,322 with a total value of $1,483,795.32. AJSUMF ¶ 51, ECF No. 81. For the third and final race, the Porsche GT3 Cup Challenge Canada in Bowmanville, the inventory report at the time of export for trailer 4HH42354 identified 1,605 unique items in inventory and a

quantity parts count of 10,426 with a total value of $1,518,553.74.  AJSUMF ¶ 64, ECF No. 81.

The sale of parts at the three races resulted in differences between the total number of automotive repair parts exported to Canada in the trailer and the total returned to the United States on each trip.  Following the first and second races in 2014, PNMA also replenished the inventory while in Canada, resulting in further changes to the inventory of reimported parts.  At the first race, teams purchased 146 parts, netting PMNA $34,009.61.  While still in Canada, PMNA acquired additional inventory of 537 parts, valued at $11,507.09.  AJSUMF ¶ 41, ECF No. 81.  Less than half of the total number of replenished parts, 207 individual items, were exported from the United States.  The other 330 originated in Germany.  AJSUMF ¶ 41, ECF No. 81.  At re-entry, PMNA's customs broker failed to declare any changes in the export manifest, attesting that the total remained identical to the inventory initially exported to Canada.  AJSUMF ¶ 44, ECF No. 81.  The replenished parts received from Germany while the trailer was in Canada were declared and entered into the United States under a separate customs entry.  AJSUMF ¶ 45, ECF No. 81.  The additional replenished parts from the United States acquired while the trailer was in Canada were separately reported to CBP via a Prior Disclosure.  AJSUMF ¶ 46, ECF No. 81.

At the second race (Entry KB5-5378599-3), PMNA sold 106 parts with a total sales price of $31,850.37.  AJSUMF ¶ 52, ECF No. 81.  PMNA then replenished the

trailer's inventory in Canada with 148 parts with a value of $14,853.18.  AJSUMF ¶ 53, ECF No. 81.  Sixty-five of these parts were exported to Canada from Germany, and the other eighty-three were exported from the United States.  AJSUMF ¶ 54, ECF No. 81.  As in the first re-entry, the replenished parts from Germany were declared and entered under a separate customs entry, and the replenished parts from the United States were separately reported to CBP via a Prior Disclosure.  AJSUMF ¶ 58, ECF No. 81.

For the third race (Entry KB5-5381385-2), Porsche race car teams purchased 206 parts with a sales value of $69,069.93.  AJSUMF ¶ 65, ECF No. 81.  The trailer's stock was not replenished while the trailer was in Canada for the third race. AJSUMF ¶ 66, ECF No. 81.

After classifying the merchandise under various HTSUS provisions, CBP assessed duties, fees, and interest.  For the first entry, PMNA faced a total duty of $36,930.40, plus interest and fees of $2,592.65, for a total payment of $39,523.05.  For the second entry, PMNA faced a total duty of $40,488.92, plus interest and fees of $2,629.78, for a total payment of $43,118.70.  For the third and final entry in question, PMNA faced a total duty of $38,675.28, plus interest and fees of $1,288.09, for a total payment of $39,963.37.  Altogether, the claimed liquidated duties, fees, and interest amounted to $122,605.12.  PMNA filed two protests regarding the three entries.  CBP denied the protests; and PMNA paid CBP the assessed and the claimed liquidated duties, fees, and interest.  Am. Compl. ¶ 6; Am. Answer ¶ 4; Pl.'s Mot. Summ. J. Ex.

6 (Dep. of Def.'s Rule 30(b)(6) Witness, Mr. Christopher Kinner) at 41-42, ECF No. 23.

## II.   Procedural History

The parties have previously submitted cross-motions for summary judgment. Pl's Mot. Summ. J. at 2, ECF No. 23; Def.'s Mot. Summ. J. at 2, ECF No. 26.  The Court[1] has already considered whether the imported merchandise qualifies for duty free treatment by operation of classification under subheading 9801.00.85. *See Porsche Motorsport N. Am., Inc.*, Slip Op. 18-105, 2018 WL 4029172 (CIT Aug. 22, 2018).   However, after considering the parties' cross-motions, the Court did not determine whether the subject entries qualify for duty-free treatment under subheading 9801.00.85 of the HTSUS.  *Id.* at *5.  The Court requested further information from both parties about the nature of the parts in question and the applicability of the discussed provision.  *Id.* at *10.  The Court did, in part, address CBP's notices for extension of liquidation.  *Id.* at *5.  Following the submission of the AJSUMF, the Court has received new cross-motions for summary judgment.  Pl.'s Mot. Summ. J. at 2, ECF No. 83; Def.'s Mot. Summ. J. (Def.'s Br.) at 2, ECF No. 84.

---

[1] This case was originally assigned to The Honorable R. Kenton Musgrave on February 7, 2017, Order, ECF No. 15, who ruled on the original Motions for Summary Judgment.  Following Judge Musgrave's retirement, the case was reassigned to then-Chief Judge Timothy C. Stanceu on February 7, 2019. *See* Order, ECF No. 38.  On January 8, 2021, the case was reassigned once again from then-Chief Judge Stanceu to Judge Vaden.  Order, ECF No. 74.  Shortly thereafter, the Court held a teleconference with the parties that launched the present round of dispositive briefing.

## JURISDICTION AND STARDARDS OF REVIEW

The parties have not disputed PMNA's fulfillment of the prerequisites for initiating this action. *See* 28 U.S.C. § 2637(a). Because Plaintiff contests the denial of its protests by CBP against the tariff classification of its returning automotive repair parts, jurisdiction is proper pursuant to 28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part …. ").

The Court reviews CBP's denial of Plaintiff's protests *de novo*. *See Rheem Metalurgica S/A v. United States*, 951 F.Supp. 241, 246 (CIT 1996), *aff'd*, 160 F.3d 1357 (Fed. Cir. 1998). Although the decision of CBP is presumed correct and "[t]he burden of proving otherwise shall rest upon the party challenging such decision," the Court's "duty is to find the *correct* result." 28 U.S.C. § 2639(a)(1); *see also Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (Wisdom, J.).

Rule 56 of the United States Court of International Trade (USCIT) provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (interpreting the analogous provision of the Federal Rules of Civil Procedure). To reach this determination, the Court must decide "whether there are any factual disputes that are material to the resolution of the action." *Texas*

*Apparel Co. v. United States*, 698 F.Supp. 932, 934 (CIT 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In ascertaining whether a genuine, material issue of fact exists, a Court reviews evidence submitted, in this case primarily from the AJSUMF, drawing all inferences against the moving party.  *See Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant bears the burden of demonstrating that there exists no genuine issue of material fact that would warrant a trial.  *See, e.g.*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998).

## DISCUSSION

By this action, PMNA seeks a refund of the total amount cited above, $122,605.12.  PMNA now only disputes the customs duty classifications of its automobile parts and accessories that PMNA exported to Canada and returned to the United States in 2014.  Though PMNA initially had also disputed receipt of notices for extension of liquidation deadlines, at oral argument on November 10, 2021, PMNA's counsel Mr. George R. Tuttle, III, accompanied by Ms. Paula Kelly, PMNA's Deputy General Counsel, informed the Court that PMNA had decided to "drop" its

claims regarding non-receipt of notices for extension of liquidation deadlines.[2]  For

that reason, the Court **DISMISSES** Count Two of PMNA's Amended Complaint

despite its being further briefed by both parties in their latest Motions.

## I.      Classification under Subheading 9801.00.85.00

### A.      Legal Framework

In its Motion for Summary Judgment, Plaintiff maintains that the parts it

exported to Canada and returned to the United States on three separate occasions

should be properly classified under subheading 9801.00.85.00.  Loosely paraphrasing

this provision, the Court noted agreement among the parties in 2018 that:

> [T]he parties agree that for articles to be classifiable under subheading
> 9801.00.85.00 they must be (1) professional implements, instruments,
> or tools of a (2) trade, occupation, or employment (3) returned to the
> United States after having been exported for use temporarily abroad
> and (4) imported by or for the account of the person who exported such
> items.

*Porsche Motorsport N. Am., Inc.*, 2018 WL 4029172, at \*5.

The   Court   notes   there   remains   a   dearth   of   prior   caselaw

addressing subheading 9801.00.85.00, yet it finds reason to dispute the construction

previously promulgated by the parties.  The text of the provision reads in full:

> Professional books, implements, instruments, and tools of trade,
> occupation, or employment, when returned to the United States after
> having been exported for use temporarily abroad, if imported by or for
> the account of the person who exported such items.

---

[2] Mr. Tuttle stated, "I spoke with my client and we agreed to abandon that claim [regarding non-receipt of notices of extension of liquidation] in the case." Oral Arg. Tr. 8:17, ECF No. 94.

In its 2018 opinion, the Court inserted "or" rather than "and" between "instruments" and "tools." It also inserted "a" between "of" and "trade, occupation, or employment." *See Porsche Motorsport N. Am., Inc.*, 2018 WL 4029172, at \*5. This articulation of the elements of the provision suggests that "tools," "**books, implements, instruments**" may be "of [a] trade, occupation, or employment." Instead, the appropriate construction, given the bare "and" following the first two nouns in the series, would be to read "**tools of trade, occupation, or employment**" as the final component of the series. Under this construction, "books, implements, [and] instruments" are not tethered, grammatically, to "trade, occupation, or employment." This simplifies the analysis to three elements, rather than four: (1) "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment," (2) "when returned to the United States after having been exported for use temporarily abroad," (3) "imported by or for the account of the person who exported such items."

In addition, it is important to raise another grammatical feature of subheading 9801.00.85.00, previously implied by Defendant, that should be made explicit. Subheading 9801.00.85.00 requires that all elements, numbered above, be met. The use of a disjunction — in the phrase "trade, occupation, or employment" — does not alter the meaning of the commas placed after "employment" and "abroad." This punctuation makes all three elements a conjunctive series, indicating that each of the three elements must be fulfilled in order for merchandise to be classified under

the subheading.  This interpretation coheres with U.S. Note 1 of HTSUS Chapter

98, which states:

> The provisions of this chapter are not subject to the rule of
> relative specificity in general rule of interpretation 3(a). Any article
> described in any provision in this chapter is classifiable in said provision
> if the conditions and requirements thereof and any regulations are met.

The straightforward meaning of the phrases constituting subheading

9801.00.85.00 is to provide duty free treatment to articles that meet all three

elements articulated in the provision. If a re-importer can prove that its

merchandise meets only two of the three elements, it still fails to meet the

subheading's requirements; and the items will be dutiable.

The brief discussions of the legislative history of the subheading by both

parties provides little aid in deciphering which merchandise qualifies for duty free

treatment. Pl.'s Resp. at 9-10, ECF No. 85; Def. Resp. at 11-12, ECF No. 89. Instead,

it simply chronicles the evolution of the phrasing of the provision and how

corporations became eligible to apply the subheading to their merchandise in

appropriate circumstances.[3]

---

[3] In full, the relevant subsection of the Senate Report reads:

*Current law*
Under HTS heading 9804.00.10, tools of trade, occupation, or employment that have
been taken abroad by a person returning to the United States from a foreign country
are considered a personal exemption and enter the United States duty free.

*Explanation of provision*
This section amends Chapter 98, subchapter I of the HTS by adding a new heading to
permit the duty-free entry of "tools of the trade" by corporations as well as individuals.

## B.      Analysis

### i.      Summary

In denying the parties' previous cross-motions for summary judgment, the Court noted that their briefings "reveal fundamental disagreement over not only the proper delineation of the ambit of subheading 9801.00.85.00, but also over the 'nature' of the article(s) claimed for classification in that tariff provision, *i.e.*, the ultimate question of fact." *Porsche Motorsport N. Am., Inc.*, 2018 WL 4029172, at *5. Having assembled an AJSUMF, the parties have provided sufficient additional undisputed facts for the Court to render judgment in favor of the Government on the issue of classification.

After consulting authoritative definitions of key terms, the Court finds the trailer full of automobile parts that PMNA exported to Canada and re-entered into the United States fails to meet at least one, if not two, of the three elements within subheading 9801.00.85.00. As a special, duty-free provision, it should be strictly construed. *See Atlas Copco, Inc. v. United States*, 651 F. Supp. 1446, 1448 (CIT 1986).

---

*Reason for change*
Under the Customs Service's interpretation of current law, goods used by technicians and engineers to provide repair services abroad may be brought in duty-free under the personal-allowance exemption, but only if the same individual that took the goods abroad accompanies them on their return. By allowing for duty-free re-entry for such goods, the provision would simplify the customs procedures for U.S. companies that provide such services and are unable to avail themselves of the personal-allowance exemption.

S. Rep. 104-393, Sec. 44 (*Articles Used to Provide Repair and Maintenance Services*) at 24-25. This recapitulation of the simple statutory alteration undertaken by Congress does not resolve the issue raised by PMNA's conduct: Whether a trailer full of parts intended for sale should or should not be considered dutiable under the provision.

The "inventory" items were not "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment." There is considerable evidence against the proposition that the "inventory" items were "returned to the United States after having been exported for use temporarily abroad." However, the Court, at this time, refrains from entering into the legal morass in this case surrounding the second element. CBP's repeated reinterpretation of that subsection of the provision and its relationship to key facts has introduced uncertainty that this opinion need not resolve. As noted above, failure to meet any one of the three elements is fatal to Plaintiff's claim. For that reason, a sequential analysis of the elements need not advance once a single element — here, the first — is found not to be met. It is undisputed that PMNA's inventory was "imported by or for the account of the person who exported such items," thereby satisfying the third element. Pl. Br. at 15, ECF No. 83.

Before performing the analysis, it is appropriate to note that, regarding the value of a small proportion of the items on PMNA's trailer, namely its "non-inventory" and "Workshop Tool Inventory" items, CBP applied no duty. In the first entry, PMNA cited seventy-one items under this heading on the submitted Form 4455 and the export manifest of parts. These items had an approximated value of $13,140. They included everything from "trashcans" to a limited number of hand tools. AJSUMF ¶ 38, Ex. 19, ECF No. 81. As noted in the "Background" section of this opinion, these

items were not declared in the second and third entries.  In Defendant's Additional

Statement of Material Facts, it notes with regard to these items:

> … PMNA also exported various hand tools from the United States to
> Canada. Def. Ex. 2 at ¶¶ 1.A, 1.B. … The[se] hand tools … were not
> made available for sale, but race teams were permitted to borrow them.
> Def. Ex. 1 at 29:08-29:12 … Any race team that borrowed one of the[se]
> hand tools … was required to return it to PMNA. Def. Ex. 4 (Pl. Resp. to
> First Set of Interrogatories) at ¶ 6 … After a race, PMNA would reimport
> the[se] hand tools … to the United States but did not individually
> declare any of them on its entry forms. Def. Ex. 2 at ¶ 1.B; Def. Ex. 1 at
> 48:04-48:07 … PMNA did not declare the[se] hand tools … because it
> considered them to be part of its truck. Def. Ex. 2 at ¶ 1.B; Def. Ex. 1 at
> 48:08-48:10 ... Because PMNA did not individually report the[se] … on
> its entry forms, CBP did not classify the items or assess duties on them.

Def. Additional Statement of Material Facts (DASMF) ¶¶ 7-12, ECF No. 84.

In its written Response to these facts, Plaintiff attempted to deny the validity

of CBP's elaboration of the record, which indicates that the non-inventory items were

not duied.  Relying on its inconsistent delineation of exported and reimported goods

on later entries, Plaintiff asserted that "the non-inventory items would not be

included … on CBP Form 7501."  Resp. to Def.'s Rule 56.3 Statement of Additional

Uncontested Material Facts ¶ 7, ECF No. 87.  Plaintiff then reiterated the following

statement that appears in the AJSUMF:  "The total quantity and value reported on

the CBP form 4455, Certificate of Registration is a quantity of 9,992 and

$1,455,915.89, which is the combined quantity and value of the parts inventory, *plus

the 'Non-inventory items.'"  Id.* (emphasis added).

The parties definitively resolved this issue at oral argument.   Both

acknowledged, on the record, that PMNA did not dispute that CBP treated all

"Workshop Tool Inventory" and "non-inventory" items as nondutiable in its calculations. Oral Arg. Tr. 6:16, ECF No. 94; *see also* Oral Arg. Tr. 6:22. The process of assembling the AJSUMF thereby disposed of the dispute over what had and had *not* been assessed duties. The parties' statements on the record narrowed the dispute solely to "inventory items." Confusion over whether non-inventory items had been dutied, in part, prevented the Court's determination about the propriety of CBP's classification in its 2018 opinion. *Porsche Motorsport N. Am., Inc.*, 2018 WL 4029172, at *11, n.5.

In a larger sense, resolution of this relatively minor dispute provides an important factual backdrop. Through their actions in the series of instant entries, both PMNA and CBP treated certain articles on the trailer, which fell under subheading 9801.00.85.00, as duty free. In the wake of PMNA's subsequent non-declarations of the seventy-one non-inventory items in its second and third entries, CBP did not attempt to apply a duty based on their value. These facts provide context and a point of contrast for the much larger quantity of "inventory" items that PMNA provided for purchase at the Canadian races for which it also seeks duty free treatment.

### ii.   PMNA's "Inventory" Under the First Element of Subheading 9801.00.85.00

The inventory included in PMNA's three entries, which it has variously described as "automotive replacement and repair tools," "parts," and "accessories,"

did not include books.  *See* AJSUMF Exs. 12, 13, and 14, ECF No. 81.  By putting

forward capacious definitions for other terms in the opening clauses of subheading

9801.00.85.00, PMNA claims its inventory fulfills the first element of the provision.

These claims are unavailing.

Although the parties have largely ignored the first word in the subheading,

"professional," its placement in the statute's text is consequential.  PMNA's counsel

suggested at oral argument that the word applied only to "books" but provided no

textual basis for this interpretation.  **Oral Arg. Tr. 14:25, ECF No. 94.**  In fact, the

phrasing of the first element of the subheading cuts against any such limiting of the

term's application:   Subsequent nouns — for example, "**implements**" **and**

"**instruments**" — lack preceding, modifying adjectives of their own.  The adjective that

precedes the entire series therefore most likely applies to all of the nouns listed,

including "tools."  *Lockhart v. United States*, 577 U.S. 347, 364 (2016) (Kagan &

Breyer, JJ., dissenting) (The "interpretive practice of applying [a] modifier to the

whole list boasts a fancy name—the 'series-qualifier canon,' see Black's Law

Dictionary 1574 (10th ed. 2014)—but … it reflects the completely ordinary way that

people speak and listen, write and read."); *see also Thomas v. Bryant*, 938 F.3d 134,

146 (5th Cir. 2019) ("A modifier ordinarily applies to an entire series of parallel

terms.").  "When there is a straightforward, parallel construction that involves all

nouns or verbs in a series, a prepositive or postpositive modifier normally applies to

the entire series." ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal Texts* 147 (2012).

Authoritative definitions of "professional" elucidate an underlying distinction made by the provision in question.  Under the heading "4. [o]f, belonging to, or proper to a profession," **the definition reads:** "a. [r]elating to, connected with, or befitting a (particular) profession or calling; preliminary or necessary to the practice of a profession."   *Professional, Oxford English Dictionary* (2nd ed. 1989); *see also* **Professional**, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/professional (last visited December 30, 2021)) ("1: b: engaged in one of the learned professions[;] c: (1): characterized by or conforming to the technical or ethical standards of a profession"); *Professional, Collins English Dictionary* (10th ed. 2010) ("[p]rofessional means relating to a person's work, **especially work that requires special training**").  The *Oxford English Dictionary* defines "profession," under the subheading "II. [s]enses relating to professional occupation," as "7. a. [a]n occupation in which a professed knowledge of some subject, field, or science is applied; a vocation or career, especially one that involves prolonged training and a formal qualification ...."  *Profession, Oxford English Dictionary* (2nd ed. 1989); *see also* **Profession**, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/profession (last visited December 30, 2021) ("4: a: a calling requiring specialized knowledge and often long and intensive academic preparation"; "4: b: a principal calling, vocation, or employment"); *Profession, Collins English*

*Dictionary* (10th ed. 2010) ("A profession is a type of job that requires advanced education or training.").

Applicable definitions of the first two nouns in subheading 9801.00.85.00 similarly clarify the provision's meaning.  The *Oxford English Dictionary* defines "implements" as "2. a. [i]n plural[,] [t]he apparatus, set of utensils, instruments, etc., employed in any trade, or in executing any piece of work." *Implements, Oxford English Dictionary* (2nd ed. 1989); *see also* **Implement**, Merriam-Webster.com, https://www.merriamwebster.com/dictionary/implement (last visited December 30, 2021) ("a device used in the performance of a task"; "serves as an instrument or tool."); *Implement, Collins English Dictionary* (10th ed. 2010) ("An implement is a tool or other piece of equipment.").  "Instrument" has a similar definition: "1. b. [a] tool, implement, or utensil used to execute a piece of work; (now) *esp*. one used in delicate, precise, or skilled work, or for artistic, medical, or scientific purposes," noting "6. [w]ith singular or plural agreement.  Tools, weapons, or other devices collectively; equipment, gear." *Instruments, Oxford English Dictionary* (2nd ed. 1989); *see also* **Instrument**, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/instrument (last visited December 30, 2021) ("used by another as a means or aid"; "instrument especially:  one designed for precision work."); *Instrument, Collins English Dictionary* (10th ed. 2010) ("a tool or device that is used to do a particular task, especially a scientific task"; "a device that is used for making measurements of something such as speed, height, or sound, for example, on

a ship or plane or in a car"; "[s]omething … for achieving a particular aim [that] is used by people to achieve that aim."). Although the similarity in the meaning of these latter two words is evident in their appearance in each other's definitions, "instruments" and "implements" bear slightly different connotations. One clear commonality, however, is that the objects entailed by their definitions are fashioned for a specific purpose for which they are used.

PMNA's declared inventory items do not fall within these common, authoritative definitions. The parties submitted as undisputed fact that "Porsche Cars NA is in the business of importing and selling high-performance sports cars, SUVs, sedans, and parts and accessories for these vehicles to Porsche dealers throughout the United States and Canada, and to promote the Porsche brand." AJSUMF ¶ 6, ECF No. 81. They further concur that "PMNA is in the business of importing and selling high-performance race cars, parts, and tools for use therewith, and to promote the Porsche brand." AJSUMF ¶ 6, ECF No. 81. Selling cars and their parts is not a "professional" pursuit within the meaning of subheading 9801.00.85.00. It does not require "professed knowledge of some subject" or "prolonged training and a formal qualification." Because the items were brought to the racetracks merely for the purpose of sales, they are indistinguishable, under subheading 9801.00.85.00, from other goods related to racing that may be desired by drivers and mechanics but have nothing to do with professional services.

PMNA brought its inventory items, in this case parts, to Canada and sold them under the auspices of a business operation.  PMNA knew these items would have a market among the enthusiasts who had purchased its cars.  Plaintiff claims that "it is not the intention of PMNA to send the support trailers … to Canada to 'make money' or to 'sell parts' like a mobile Kiosk or food truck."  Pl.'s Br. at 6, ECF No. 83.  However, an international venture's unprofitability does not render the re-entry of unsold merchandise duty-free.  Moreover, PMNA derived commercial benefits from the trackside sales beyond their immediate value, ensuring that the purchase of high-priced cars would remain "attractive."  Pl.'s Br. at 6, ECF No. 83; AJSUMF ¶¶ 11, 20, ECF No. 81.  Throughout years of litigation, Plaintiff has repeatedly failed to show that it did anything other than "sell parts," despite its protracted disavowal of Defendant's analogies applied to the trailer.

Even a cursory review of the supplies, parts, and accessories that made up PMNA's inventory suggests they were neither "implements" nor "instruments."  The overwhelming majority of unique products were consumables to be purchased in the event of wear and tear suffered by cars on the racetrack.  *See* AJSUMF Exs. 12, 13, 14, ECF No. 81.  For example, oil, brake fluid, washers, hoses, radiator supports, head lamp trays, grommets, nuts, bolts, O-rings, screws, clamps, mirror glass, mirror housings, transmission brackets, and engine mounts had no specific purpose for PMNA if they are not sold to and used by others.  *See* AJSUMF Exs. 12, 13, 14, ECF No. 81.  Before purchase, these products had no use; there was no task to which

PMNA was putting them.  They were placed in the trailer for PMNA to garner sales resulting from the occasional need of race teams — not PMNA — to maintain their cars.  Parts that did find a specific use were permanently — not temporarily — used. *Cf.* HTSUS, 9801.00.85.00 (" … when returned to the United States after having been exported for use temporarily abroad … ").  They remained in Canada with the racing teams.  AJSUMF ¶ 30, Ex. 6 ¶¶ 8, 13, 18, ECF No. 81.  The dutiable "inventory" returned to the United States had never been put to a specific use, as evidenced by the fact that it was not sold.

PMNA's inventory items are also not "tools of trade, occupation, or employment."  From the outset, it is appropriate to address the possibility that "tools of trade," "tools of occupation," or "tools of employment" might together or separately be terms of art, which have a specialized meaning that is well accepted in a particular subfield, in this case administrative or international trade law.  Absent previous judicial decisions invoking this phrase in the context of subheading 9801.00.85.00, the Court notes Defendant's statement that "CBP has defined 'tools of trade' generally to include those items necessary for the exercise of the trade or profession of the individual."  Def.'s Br. at 14, ECF No. 84; *see also* Def. Ex. 7 (HQ H013537).  Beyond this brief summary, there appears to be little in the record to support the conclusion that "tools of trade" (or other iterations of that phrase implied by the statutory text) is a term of art with an established meaning.  Plaintiff's provision of *The Free Dictionary*'s definition of "tools of trade" — "the things that are needed in

order to do a job" — is both imprecise and does little to clarify the term's meaning in this context. *Tools of Trade*, *The Free Dictionary* (2021).  Pl.'s Br. at 18, ECF No. 83.

Uses of the phrase "tools of trade" in learned treatises and other bodies of law suggest that, as a term of art in other contexts, it specifically excludes goods that are meant for sale.   For example, the American Bar Association's discussion of "temporary importation under bond" (TIB) notes:

> TIB allows merchandise to be entered into the United States for certain specific purposes temporarily free of duty by posting a bond ... *Merchandise imported under a TIB may not be imported for sale or for sale on approval*. Specific purposes for which merchandise may be imported under a TIB include repair, alteration, or processing (including manufacture), testing or use for experimental purposes, use by nonresidents as *tools of trade*, as well as other more limited purposes.

BARTON LEGUM ET AL., INTERNATIONAL PRACTITIONER'S DESKBOOK SERIES:  U.S. CUSTOMS: A PRACTITIONER'S GUIDE TO PRINCIPLES, PROCESS, AND PROCEDURES, Ch. 6 *Duty Savings Opportunities: Introduction to Trade Agreements, Unilateral Preference Programs, & Other Duty Savings Mechanisms* (ABA Section of International Law, 2nd ed. 2011) (emphasis added).   In its footnotes, this discussion by the ABA's International Law Section cites HTSUS subheadings 9813.00.05 through 9813.00.75. *Id.*  This analysis suggests that "tools of trade" are not typically considered to include items for sale, either when they are inbound to or outbound from the United States. Suggesting that "tools of trade" can be saleable merchandise in one context, to the benefit of American-based importers, and not saleable merchandise in another

context, when the term is applied to goods brought by foreign exporters to the United

States, would be anomalous.

A treatise on bankruptcy provides further support from a body of federal law

to distinguish "tools of [the] trade" from items that may be sold as merchandise.  The

Bankruptcy Code provides an exemption for "[t]he debtor's aggregate interest, not to

exceed $2,525 in value, in any implements, professional books, or tools, of the trade

of the debtor or the trade of a dependent of the debtor."  11 U.S.C. § 522(d)(6).  Recent

surveys of this provision's application indicate a majority interpretation has emerged

that clarifies the meaning of "tools of [the] trade":

> Several    courts    have    considered    whether    automobiles
> constitute tools of the trade … and have reached different conclusions.
> The  majority  view  is  that  automobiles  may  constitute tools of the
> trade under certain circumstances. Courts adopting the majority view
> have generally held that an automobile can be considered a tool of the
> trade if the vehicle *'is necessary to, and is used by, the debtor to carry on
> his or her trade.'* This conclusion is consistent with the Code's goal of
> providing the debtor with his or her fresh start by allowing the debtor
> to continue to make a living pursuing his or her prepetition occupation.

BLOOMBERG LAW BANKRUPTCY TREATISE, Part II: Creditors, the Debtor and the

Estate, Chapter 62: Bankruptcy Code § 522 – Exemptions (Charles J. Tabb ed., 2018).

Here again, courts have noted the particular attributes of "tools of trade."   In

bankruptcy, these items are used to support the performance of a livelihood.  They

are not typically understood as merchandise to be sold freely by a debtor, even if the

debtor's livelihood is the sale of those goods.  The Bankruptcy Code's careful attention

to avoiding unnecessary exemptions that prevent the satisfaction of debts has led this

term to be more clearly defined in relation "to carry[ing]" on an occupation.   *See id.*

Similarly, in state law governing civil litigation, "tools of trade" are often

excluded from sale or liquidation to satisfy judgements or debts owed to creditors.

For example, New York's Civil Practice Law & Rules describe the term as follows:

> 7. tools of trade, necessary working tools and implements, including
> those of a mechanic, farm machinery, team, professional instruments,
> furniture and library, not exceeding three thousand dollars in value,
> together with the necessary food for the team for one hundred twenty
> days, provided, however, that the articles specified in this paragraph are
> necessary to the carrying on of the judgment debtor's profession or
> calling;

New York Consolidated Laws, N.Y. CPLR § 5205, Personal property exempt from

application to the satisfaction of money judgments.  Where most saleable goods that

are not put to a specific employment-related use by their owner may be liquidated to

satisfy judgements, items needed to sustain their possessor's occupation may not.

The underlying principle at play relates to the special status of goods that are

necessary for an individual to be a productive service-provider.  Goods that do not

meet this threshold of immediate or essential utility may be liquidated to satisfy

judgments because doing so would not prevent their possessor from earning a living.

Credible definitions of the constituent words of "tools of trade, occupation, or

employment" bolster the propositions proffered by these scholarly and juridical

sources.  Individually and collectively, relevant dictionary entries indicate PMNA's

inventory does not fall under the phrase's ambit.  The *Oxford English Dictionary* provides a useful definition of "tool":

> 1. a. 'Any instrument of manual operation' (Johnson); a mechanical implement for working upon something, as by cutting, striking, rubbing, or other process, in any manual art or industry; usually, one held in and operated directly by the hand (or fixed in position, as in a lathe), but also including certain simple machines, as the lathe; sometimes extended to simple instruments of other kinds[.]

*Tool, Oxford English Dictionary* (2nd ed. 1989); *see also* **Tool**, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/tool (last visited December 30, 2021) ("a handheld device that aids in accomplishing a task"; "something (such as an instrument or apparatus) used in performing an operation or necessary in the practice of a vocation or profession"); *Tool, Collins English Dictionary* (10th ed. 2010) ("any instrument or simple piece of equipment that you hold in your hands and use to do a particular kind of work"; "[y]ou can refer to anything that you use for a particular purpose as a particular type of tool.").

"Trade" bears a similarly helpful definition in the *Oxford English Dictionary*, falling below the first heading, "II. [a]n occupation or profession, and related senses":

> 6. a. In early use: any regular occupation, profession, or business, esp. when undertaken as a means of making one's living or earning money. In later use usually: an occupation involving manual [labor] or the buying and selling of goods, e.g. that of a craftsperson or shopkeeper, as distinct from a learned profession; *spec.* a skilled manual occupation, esp. one requiring an apprenticeship or other training, as that of a builder, plumber, electrician, etc.

*Trade, Oxford English Dictionary* (2nd ed. 1989).  Although this definition mentions "the buying and selling of goods … as distinct from a learned profession," the

interpretive canon *noscitur a sociis* elucidates that this general, as opposed to specific, meaning of "trade" is inapplicable.  The canon holds that "words grouped in a list should be given related meanings." *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977).  Because "professional" appears as the first word in subheading 9801.00.85.00, and "profession" is used in the heading just above the cited definition, the "*spec*[*ific*]" definition which concludes the overall entry for "trade" has the most relevance.  "Trade" is therefore most clearly defined in subheading 9801.00.85.00 as a "skilled manual occupation, esp. one requiring an apprenticeship or other training." Related definitions confirm the validity of this interpretation. *See Trade*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/trade (last visited December 30, 2021) ("an occupation requiring manual or mechanical skill" ); *Trade*, *Collins English Dictionary* (10th ed. 2010) ("[s]omeone's trade is the kind of work that they do, especially when they have been trained to do it over a period of time.").

*Noscitur* is also instructive for definitions of the final two nouns in subheading 9801.00.85.00's second nested series.  A credible definition of "occupation" indicates it is: "4. b. A particular action or course of action in which a person is engaged, esp. habitually; a particular job or profession; a particular pursuit or activity." *Occupation*, *Oxford English Dictionary* (2nd ed. 1989). *See Occupation*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/occupation (last visited December 30, 2021) ("an activity in which one engages"; "the principal business of one's life:  vocation"); *see also Occupation*, *Collins English Dictionary* (10th ed. 2010)

("[y]our occupation is your job or profession").   "Employment," under the *Oxford*

*English Dictionary*'s heading "5. That which a person is employed to do," has a related

definition: "5. d. A person's regular occupation; a trade, a profession." *Employment,*

*Oxford English Dictionary* (2nd ed. 1989).    *See also* **Employment**, Merriam-

Webster.com, https://www.merriam-webster.com/dictionary/employment (last visited

December 30, 2021) ("activity in which one engages or is employed"); *Employment,*

*Collins English Dictionary* (10th ed. 2010) "[e]mployment is the fact of having a paid

job").

PMNA's admitted "trade," "occupation," and "employment" do not allow for its

inventory to be considered "tools" related to those pursuits.   In its opening rendition

of uncontested facts, PMNA tellingly notes:

> The team or crew of people that prepare, maintain and repair the
> vehicle[s] [for automobile racing] have many years of experience and
> training to acquire the skills and knowledge necessary to maintain a
> race car in its proper condition, ready to race, and maintain that vehicle
> in racing condition during the race.   The people that work to prepare,
> maintain, and repair the race vehicle apply their experience, training,
> skill, and knowledge to keep the vehicles on the track competing. *They*
> *are often employed by the team owner of the vehicle(s) to do so* and
> consider the work and service they provide to the team and the car to be
> their full or part time vocation, occupation, or career.

Pl. Br. at 13-14. (emphasis added) (citations omitted).   In this passage, Plaintiff

asserts that the individuals it describes as involved in a trade are not employees of

PMNA.   These individuals — who evidently do not sell parts — are hired by the race

teams who purchase supplies from PMNA.   Echoing these declarations, Plaintiff

acknowledged at oral argument that its avowed "trade," "occupation," and

"employment" pertain to selling cars. *See, e.g.*, Oral Arg. Tr. 18:9, ECF No. 94 (describing sales as "the only job they [PMNA's track employees] know"). At the 2014 Canadian races, PMNA was not repairing race cars. It made no effort to do so through contracts.[4] As Mr. Blocker noted: "Part of the cost to the driver for participating in the series comes from covering salaries and travel (flight, hotel, rental cars, and meals) for the team of support mechanics and race engineers at each event." Third Suppl. Dec. Brian Blocker, ECF No. 80, Ex. 1.

"Tools" that assist PMNA in selling goods are the only "tools" of PMNA's "trade," "occupation," and "employment." These include its undutied trailer, onboard computers, invoice paperwork, and the limited number of hand tools that it loaned to race teams. These items assist PMNA in its sales. Where "non-inventory" items were nondutiable, "inventory" items, as merchandise, were rightly subject to duties.

To the extent that PMNA may rely on customs ruling letters to support its position, CBP Ruling H013537 undermines its claimed classification of its inventory. The party to whom a ruling letter is directed is the only party who may rely on it. 19 C.F.R. § 177.9(b). Parties litigating other transactions may only rely on the ruling if their merchandise is "identical to the description set forth in the ruling letter." 19 C.F.R. § 177.9(b); *see, e.g.*, *United States v. Millenium Lumber Distrib. Co. Ltd.*, 887 F.Supp.2d 1369, 1378 (CIT 2013). Customs rulings are not "binding on the Court."

---

[4] Citing Plaintiff's own documents, Defendant's additional statement of facts points out: "PMNA was under no contractual obligation with the race teams or any other party to make the inventory items available for sale in Canada." Def. Ex.3 (Pl. Resp. to Req. for Prod. of Docs. ¶ 2), ECF No. 84.

*Skaraborg Invest USA, Inc. v. United States*, 9 F.Supp.2d 706, 709 (CIT 1998); *see also S.C. Johnson & Son, Inc. v. United States*, 415 F. Supp. 3d 1373, 1385 (CIT 2019).

In CBP Ruling H013537, the party in interest, Texas Aero Engine Services Limited (TAESL), undertook a fundamentally different activity than PMNA. Unlike PMNA, TAESL's mechanics travelled abroad to overhaul aircraft turbine engines, not to sell the parts to do so. The ruling's opening recitation of facts notes "[TAESL mechanics] bring [the] goods needed to accomplish their work." CBP Ruling HQ H013537 (July 2, 2007). TAESL mechanics did not arrive with a trailer full of parts that they offered to clients for sale, declining to fix the aircraft engines. TAESL's trade and its use of the confined number of parts its mechanics brought overseas are not analogous to PMNA's conduct as a re-importer of its inventory.

In sum, appropriate definitions indicate the first element of subheading 9801.00.85.00 yields a clear meaning that precludes applicability to PMNA's "inventory." The items in question were not "[p]rofessional books, implements, instruments, and tools of trade, occupation, or employment." PMNA did not bring these items across the Canadian border for a professional purpose; instead, it aimed to generate sales among clients who raced cars that year. Nor did these goods relate to "learned" or "highly skilled" activities undertaken by PMNA, like actually repairing cars. In fact, Plaintiff had no specific application in mind for any of the goods it exported and re-imported beyond their purchase by third parties who might use them to remedy breakdowns of cars entered into races in Canada in 2014. The

items at issue are not "tools" for reuse; they are instead merchandise for one-time sale.

## II.   General Principles Regarding the Application of Subheading 9801.00.85.00

The Court finds that HTSUS subheading 9801.00.85.00 has been significantly misunderstood and misapplied by both Plaintiff and Defendant. This duty-free subsection, which facilitates the cross-border provision of services by both individuals and corporations, should not be misconstrued to allow for importers and exporters to engage solely in sales of merchandise abroad. To determine subheading 9801.00.85.00's applicability in the future, CBP should undertake the three-part analysis flowing naturally from the provision's three elements.

Under the first element, CBP should first assess whether professed "books, implements, instruments, and tools of trade, occupation, or employment" are for "professional," *i.e.* non-sales, purposes. The intended use for these items should correspond to the provision of a form a skilled labor by trained members of a trade. PMNA's consumable products should serve as a salient point of contrast for goods claimed as duty free under this provision. Selling, by the definitions provided above, does not fall within the ambit of tradesmen's skilled labor.

Regarding the second element, CBP should determine whether the items were actually used temporarily by the claimant while abroad, not merely made available for purchase by others who might employ them in a professional capacity. Here

again, PMNA's activities involving its trailer full of goods is instructive.  Analysis of the first element has briefly touched on the reality that reimportation of reusable "implements, instruments, and tools" was not the company's objective.  Instead, it sought solely to re-import unsold, and therefore unused, goods.  Consumable products remained in Canada when they were purchased; they faced no chance of being returned after "temporary use."

Under the subheading's third element, if the goods are also transported "by or for the account of the person who exported such items," they are nondutiable.  This is the most straightforward of the three elements.  It requires only a comparison of the names and items listed on the paperwork for exportation and reentry.

All three elements must be fulfilled.  PMNA has failed to meet the requirements of the first element.  It therefore cannot claim the duty-free status that the subheading confers for its inventory items.

## CONCLUSION

In consideration of the foregoing, the Court finds in favor of Government on the matter of classification of PMNA's inventory items.  The auto parts, accessories, and supplies therein entailed do not meet the requirements of subheading 9801.00.85.00.

**ORDERED** that Government's Motion for Summary Judgment is **GRANTED** on Count One of the Amended Complaint;

**ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED**; and

**ORDERED** that Count Two of Plaintiff's Amended Complaint is **DISMISSED**

as abandoned.

/s/      Stephen Alexander Vaden
Stephen Alexander Vaden, Judge

Dated:   December 30, 2021
         New York, New York